weeks (Sunday through Saturday), once in each week, the first such notice to be published not more than 45 days prior to the sale, the last such notice to be published not less than 7 days prior to the sale, by:

(a) (1) an advertisement in a newspaper circulated to the general public in the county in which the Real Estate is located, in the section of the newspaper where legal notices are commonly placed and (2) a separate advertisement in the section of such newspaper, which may be the same newspaper, in which real estate other than real estate being sold as part of legal proceedings is commonly advertised to the general public; provided, that where both advertisements could be published in the same newspaper and that newspaper does not have separate legal notices and real estate advertisement sections, a single advertisement shall be sufficient; and

(b) No other publications shall be required.

(3) The party who gives notice of public sale shall also give notice to all parties in the action who have appeared and have not heretofore been found by the Court to be in default for failure to plead. Such notice shall be given in the manner provided in the applicable rules of Court for service of papers other than process and complaint, not more than 28 days nor less than 7 days prior to the day of sale. After notice is given as required in this Section, a copy thereof shall be filed in the office of the Clerk of this Court together with a certificate of counsel or other proof that notice has been served in compliance with this Section.

(4) The sale may be adjourned at the discretion of the party conducting it, provided, however, that if the adjourned sale is to occur less than 60 days after the last scheduled sale, notice of any adjourned sale need be given only once, not less than 5 days prior to the day of the adjourned sale.

(5) Notice of the sale may be given prior to the expiration of any reinstatement period or redemption period.

(6) No other notice by publication or posting shall be necessary.

(7) The person named in the notice of sale to be contacted for information about the real estate shall not be required to provide additional information other than that set forth in the notice of sale.

P. Upon the sale of Real Estate, the person conducting the sale shall give a Receipt upon Sale to the purchaser.

Q. In the event the Plaintiff is the successful bidder at the sale, such party may offset against the purchase price to be paid for such Real Estate the amounts due such party under this Judgment, plus all costs, advances and fees.

R. Upon or after confirmation of the sale, the person who conducted the sale or the Court shall execute a deed to the holder of the Certificate of Sale sufficient to convey title, which deed shall identify the Court and the caption of the cause in which judgment was entered authorizing issuance of the deed. Signature and the recital in the deed of the title or authority of the person signing the deed as grantor, of authority pursuant to this Judgment and of the giving of the notices required by statute shall be sufficient proof of the facts recited and of such authority to execute the deed, but such deed shall not be construed to contain any covenant on the part of the person executing it.

S. Delivery of the deed executed on the sale of the Real Estate, even if the purchaser or holder of the Certificate of Sale is a party to the foreclosure, shall be sufficient to pass the title thereto. Such conveyance shall be an entire bar of (l) all claims of parties to the foreclosure and (2) all claims of any non-record claimant who is given notice of the foreclosure as provided by

statute.

T. The proceeds resulting from the sale ordered herein shall be applied in the following order:

(1) The reasonable expenses of sale;

(2) The reasonable expenses of securing possession before sale, holding, maintaining, and preparing the real estate for sale, including payment of taxes and other governmental charges, premiums on hazard and liability insurance, management fees, and, to the extent provided for in the mortgage or other recorded agreement and not prohibited by law, payments made pursuant to 735 ILCS 5/15-1505 (1992 State Bar Edition), and other legal expenses incurred by the mortgagee;

(3) Satisfaction of the judgment in favor of the Plaintiff against the Defendant Hal D. Hicks, in the amount of $2,495,563.63 under paragraph III of this Judgment, plus post-judgment costs and interest accruing at the statutory rate; and

(4) Remittance of any surplus to the mortgagor or as otherwise directed by the Court.

U. Only the owner of redemption may redeem from this foreclosure, and such owner of redemption may redeem on or during the redemption period specified herein.

V. The amount required to redeem shall consist of the total balance due as set forth in paragraph I. of this Judgment plus interest thereon at the statutory rate hereafter and all additional costs and other expenses allowed by the Court.

W. The person conducting the sale shall file a report of sale with the Clerk of this Court specifying the amount of proceeds of sale realized and the disposition thereof.

X. The Defendant-mortgagor, Hal D. Hicks, waived his right to homestead or other

exemptions in the Real Estate in the body of the Mortgage, which was duly signed and acknowledged, and said Defendant-mortgagor is therefore barred from claiming any right to homestead or other exemptions in said Real Estate.

Y. That, if after payment of the items in paragraph T. (1), (2) and (3) above there shall be a remainder, said U.S. Marshall shall hold this surplus subject to the further order of this Court; that, if there are insufficient funds to pay in full the amounts in paragraph T. (1), (2) and (3) above, said U.S. Marshall shall specify the amount of this deficiency in the report of sale and Plaintiff shall be entitled to pursue this deficiency against the other assets of Defendants, Midwest Transit, Inc. and Hal D. Hicks.

III. Count III of the First Amended Complaint regarding the Security Agreement executed and delivered to the Plaintiff by the Defendant, Midwest Transit, Inc., dated April 22, 2000, attached to the First Amended Complaint as Exhibit "H" ("Security Agreement"), has been dismissed without prejudice by a previous order of this Court. (Doc. 41).

IV. On Count IV of the First Amended Complaint, Summary Judgment is entered in favor of Plaintiff, Fifth Third Bank, Indiana, against the Defendant, Hal D. Hicks in the amount of $2,495,563.63, under the Guaranty executed and delivered to the Plaintiff by such Defendant, dated April 22, 2000, attached to the First Amended Complaint as Exhibit "J" ("Guaranty").

**DATE: October 31, 2002.**

NORBERT G. JAWORSKI, CLERK

[signature]

Deputy Clerk

APPROVED: [signature]

J. PHIL GILBERT
United States District Judge

CASE: 4:01-cv-04215
DOCUMENT: 48
DATE: 10/31/02
CLERK: djs

Orders/Notices will be sent to:

Marjorie Meeks, 812-421-4936 fax
David Overstreet, 618-244-5844 fax
Timothy Neubauer, 618-244-5844 fax
Terrell Sharp, 618-242-1170 fax
John Pawloski, 618-628-9823 fax
Lyndon Sommer, 314-241-7604 fax

**United States Department of Labor**
**Wage and Hour Division**
509 W. Capitol Ave., Suite 205
Springfield, Illinois 62704-1929
Telephone: 217-492-4061
Fax: 217-492-4910
Email: henryr@chi.dol-esa.gov

COPY

December 19, 2002

Mr. Don Hoagland, Trustee
U.S. Bankruptcy Court, Southern District
Of Illinois
P.O. Box 661
Robinson, IL 62454

Dear Mr. Hoagland:

This letter will serve to summarize our teleconference of today's date in which we discussed the resolution of our McNamara-O'Hara Service Contract Act investigation of Midwest Transit. We agreed to conditionally accept your offer to pay a total of $2.0 million to resolve the underpayment of wages. This offer was contingent upon the full payment being made by no later than February 15, 2003 and the distribution of said back wages by this office. As you explained, this amount can only be paid through the sale of the company to another party which is currently under negotiation.

We would like to emphasize that if the pending sale falls through and thus the payment of back wages cannot be made by February 15, 2003, this office will pursue administrative action for the payment of the original estimated computed back wage amount of $4.0 million.

Sincerely,

Henry Rodriguez
District Director

Jim Yochim
Assistant District Director

*National Office Home Page Information: http://www.dol.gov*

*Working for America's Workforce*



EXHIBIT
C

December 27, 2002

*VIA FACSIMILE 618-242-1170*
***and FEDERAL EXPRESS***

Mr. Don Hoagland,
Receiver of Midwest Transit, Inc.
c/o Mr. Terry Sharp
Law Office of Terry Sharp, PC
1115 Harrison
P.O. Box 906
Mr. Vernon, Illinois 62864

**RE: Term Sheet Regarding Purchase of Midwest Transit, Inc.'s Assets**

Dear Mr. Hoagland:

The purpose of this letter ("Letter of Intent") is to outline the terms upon which two (2) companies owned by certain employees of Midwest Transit, Inc. (Midwest Transportation Services, Inc., a Delaware corporation and Midwest Transport, Inc., a Delaware corporation, hereinafter collectively referred to as the "Buyer") will purchase the Assets described herein from Midwest Transit, Inc., an Illinois corporation in receivership (the "Seller"). The names and structure of the entities comprising "Buyer" may change prior to Closing (as hereinafter defined). Buyer and Seller will be referred to collectively as the "Parties" and the sale of Assets described herein will be referred to as the "Acquisition". All of the terms of the Acquisition will be set forth in a Definitive Asset Purchase Agreement ("Definitive Agreement") prepared by Buyer's counsel and acceptable to Seller and Seller's counsel. The Definitive Agreement will be the binding agreement between Buyer and Seller with respect to the Acquisition and will include the following terms:

1. *Basic Transaction*. The Seller will sell all of its assets which are useful or necessary to operate a trucking company specifically including the "Included Assets" described below and specifically excluding the "Excluded Assets"



EXHIBIT D

described below (all of the Seller's assets so determined are hereinafter collectively referred to as the "Assets").

## *LIST OF INCLUDED ASSETS*

2. *All equipment and all other assets of every type, nature and description (except for the Excluded Assets described below) owned by Midwest Transit, Inc. ("Midwest") useful or necessary to operate a trucking company including:*

   (a) *Tractors (Midwest titled)*
   (b) *Trucks (Midwest titled)*
   (c) *Vans (Midwest titled)*
   (d) *Autos (Midwest titled)*
   (e) *Trailers (including the leased trailers with Rightway Trucking, Inc. and KBK, LLC)*
   (f) *Parts (all parts and inventory at all Midwest locations)*
   (g) *Equipment and Tools (owned, etc. for use in working on equipment)*
   (h) *Tires and rims*
   (i) *Trailer parts*

1. *Effingham facility (if the facility does not pass phase 2 EPA investigation, then the facility will be leased to Buyer for 6 months rent free). Failure to pass EPA phase 2 investigation, will result in a reduction of the purchase price by $250,000.*

2. *All postal routes.*

3. *Freight contracts.*

4. *Insurance/license(s), etc, to be transferred at Closing as is.*

5. *Office equipment/supplies/computer/furniture/etc. at all Midwest locations.*

6. *Transfer of leases, deposits, etc., equipment and terminals. This excludes any lease in Hal D. Hicks' name only or any affiliate's (other than Midwest) name.*

7. *Use of Sumner facility for a period of six (6) months rent free effective as of Closing. Buyer shall also receive an option to lease the Sumner facility for an additional three (3) months at a lease amount of $3,000 per month.*

8. *All computer software currently being utilized by Midwest Transit, Inc.*

## *LIST OF EXCLUDED ASSETS*

*Cash*

*Bank Accounts and Deposits*

*Receivables*

*All real estate except: (i) Effingham, Illinois, and (ii) all real estate leases described in Exhibit A.*

*All Leases in Hal Hick's name described in Section 7 of Exhibit A.*

Except as expressly provided herein, the Assets will be conveyed by Seller to Buyer free and clear of all liens and Buyer will not assume any of the liabilities of the Seller, including, without limitation, Seller's bank loans, Seller's accounts payable, accrued expenses, employee benefit obligations, collective bargaining agreements (including any pending agreements), lease obligations, indebtedness, Department of Labor related liabilities, environmental liabilities, and employee pension liabilities and obligations. The closing of the Acquisition (the "Closing") will occur on February 21, 2003 at a place mutually agreed by the parties, or if the United States Postal Services has not approved the novations as described in Section 5(i) of this Letter of Intent, at such other date as Seller and Buyer may mutually agree upon.

9. *Total Purchase Price.* The total purchase price paid in connection with the Acquisition will be Ten Million Eight Hundred Thousand Dollars ($10,800,000) and will be paid as follows:

(a) Two Million Seven Hundred Fifty Thousand Dollars ($2,750,000) in cash at Closing which will be paid by wire transfer to Sellers; and

(b) Assumption of the following debts in amounts which approximates amounts listed:

(i) assumption of Fifth Third Note and Judgment with respect thereto, $2,500,000;

(ii) assumption of accrued payroll and accrued vacation costs, $1,500,000;

(iii) assumption of Rightway Trucking, Inc. Lease, $700,000;

(iv) assumption of Buddy and Ed Trailer Lease, $650,000 to replace 100 trailers currently used by Midwest Transit, Inc. and owned by Hal Hicks; and

(v) assumption of KBK, LLC Lease, $550,000;

(c) An unsecured interest free promissory note in the amount of $2,150,000 which provides for $1,000,000 to be paid on March 1, 2004, and $1,150,000 to be paid on March 1, 2005. The $2,150,000 unsecured interest free promissory note described above shall be subject to a right of offset whereby Buyer may offset any breach of the Definitive Agreement or the Noncompete Agreements against debt evidenced by the note. If Seller believes it to be in the best interest of Seller, Seller's shareholders or otherwise, Seller may assign a portion or all of the payments under said Note to Seller's shareholders, or either of them, as payment for the Noncompete Agreements. Said amount of the Note herein shall be reduced by any amounts, not to exceed $30,000 per month, paid by Buyer to Seller's Receiver pursuant to an order of the Court regarding receivership expenses.

Buyer shall have thirty (30) days to return all tractors owned by Hal Hicks and ninety (90) days to return all trailers owned by Hal Hicks. Seller shall agree to reimburse Buyer for all reasonable costs of returning the tractors and trailers described in the previous sentence.

1. *Noncompetition, Nonsolicitation and Confidentiality Agreements*. At the Closing, Seller, C. Michael Witters, Diane Witters, his wife, and Hal Hicks will each execute a five (5) year Noncompetition, Nonsolicitation and Confidentiality Agreement (collectively the "Noncompete Agreement(s)") in favor of Buyer prohibiting any of them, directly or indirectly, from competing with, soliciting or accepting any of the current eighty-nine (89) U.S. Postal Service Mail Contracts described on Exhibit A attached hereto ("USPS Contracts"). In lieu of such an agreement executed by C. Michael Witters, Diane Witters, his wife, and/or Hal Hicks, the Buyer will accept an order from the Court (as hereinafter defined), in form and substance acceptable to Buyer, which contains similar provisions with respect to any or all of such persons.

2. *Seller's Employees*. At the Closing, Buyer will hire, in its sole and complete discretion, such of Seller's employees as Buyer deems appropriate under the circumstances. Buyer shall not be required to hire any number or percentage of Seller's employees and Buyer may "pick and choose" such of Seller's employees as Buyer determines in Buyer's sole and complete discretion. Buyer will not be responsible for any employee related liabilities which accrue on or before Closing.

3. *Conditions Precedent to Closing*. The Closing of the Acquisition shall be conditioned upon and subject to each of the following conditions precedent which shall be acceptable to Buyer in Buyer's sole and complete discretion. The earlier of the waiver by Buyer of each of the conditions or the satisfaction of each of the following conditions, or the Closing shall be referred to herein as the "Condition Expiration Date".

(i) Seller, at its sole cost and expense, will cause all and not less than all of the USPS Contracts currently owned and operated by Seller (89 contracts) to be transferred to Buyer through valid and binding novations with the U.S. Postal Service. In addition, Buyer shall determine in its sole discretion that (a) there are no material defaults under any of the USPS Contracts; (b) the parties to the USPS Contracts have complied in all respects with all of the terms and performed in all respects with all the terms of the USPS Contracts; (c) neither Seller nor any other person has received any formal or informal notice of unsatisfactory performance under the USPS Contracts; (d) the United States Postal Service has provided satisfactory assurances, in form acceptable to Buyer in Buyer's sole discretion, of Buyer's ability to renew existing USPS contracts and bid new USPS Contracts successfully; and (e) that upon completion of novation of the USPS Contracts, Buyer will own clear title to the USPS Contracts free and clear of all liens, claims and encumbrances of any kind whatsoever, and all such USPS Contracts will be valid, binding and enforceable in accordance with their terms between Buyer as contractor and the U.S. Postal Service, and no such USPS Contract shall be subject to being set aside for any reason other than Buyer's failure to perform the contract in accordance with its terms.

(ii) The written approval of the Circuit Court of the Second Judicial Circuit of Lawrence County, Illinois (the "Court") and the U.S. Postal Service,

of this Letter of Intent, the Definitive Agreement and all transactions contemplated herein and therein. In addition, C. Michael Witters and Diane Witters, his wife, will consent in writing to this Letter of Intent, the Definitive Agreement, and all transactions contemplated herein and therein. As a condition to Closing, Buyer shall have satisfied itself that the other shareholders of Seller do not intend to contest or set aside any of the transactions contemplated herein. We understand that Mr. Hal Hicks has appealed to Illinois appellate courts certain rulings of the Court with respect to, *inter alia*, your receivership, and has instituted legal action outside of Illinois relating to certain of Seller's assets. We further understand your position that these appeals and any such suits are without merit. However, Buyer reserves the right prior to the Closing to evaluate independently any such appeals, suits or threats of action and their potential effects on the transactions contemplated by this Letter of Intent including whether such appeals and/or suits are final and non-appealable. Any order of the Court relating to this Letter of Intent and the sale of assets contemplated hereunder must be acceptable to Buyer.

(iii) The Parties reaching a Definitive Agreement in form and substance satisfactory to each of them and their respective legal counsel with such representations, warranties, indemnities and other provisions as may be recommended by them.

(iv) The performance of Phase I, and if deemed appropriate by Buyer, Phase II environmental assessments, all at the expense of Seller, with respect to all facilities of Seller. The results of all such assessments must be acceptable to Buyer in Buyer's sole and complete discretion.

(v) Any approvals of the Department of Transportation, Interstate Commerce Commission, and all other governmental, quasi-governmental and regulatory authorities which are useful or necessary for Seller to conduct a trucking business in connection with the transactions contemplated herein.

I. *Other Terms*. The Definitive Agreement shall release, indemnify and hold harmless Buyer, Ken Hohlbaugh, Ed Smith, M.R. "Buddy" Relihan, John S. Elmore, and all other equity owners of Buyer, from any and all lawsuits, issues, damages, losses, and claims arising out of or in connection with the receivership

and/or employment with Seller at all times prior to Closing.

In the event of any dispute regarding the Definitive Agreement or any matter contemplated therein, such dispute shall be settled by binding arbitration.

7. *Costs*. The Buyer and the Seller will be responsible for and bear all of their own costs and expenses incurred at any time in connection with pursuing or consummating the Acquisition, provided that the Seller shall pay (i) the first $25,000 of Buyer's attorney's, counsel's, accountant's and other advisor's fees and expenses incurred in connection with the Acquisition, and (ii) if the Acquisition is appealed, then the next $25,000 of Buyer's attorney's, counsel's, accountant's and other advisor's fees and expenses incurred in connection with the Acquisition. Seller shall pay such fees even if the Acquisition fails to close for any reason. Buyer will be responsible for any of Buyer's attorney's, counsel's, accountant's and other advisor's fees and expenses in excess of $50,000. Except as described herein, there will not be any broker's or finder's fees in connection with the consummation and Closing of the Acquisition.

8. *Binding And Nonbinding Provisions, and Governing Law.* This Letter of Intent sets forth an outline of certain terms of the Definitive Agreement but, except as provided below, does not constitute a legally binding agreement of Buyer and Seller. The Buyer and Seller will be legally bound to conclude the Acquisition only upon the execution of the Definitive Agreement by all of the parties to it and the approval of the Definitive Agreement by all necessary corporate actions and authorizations. Only Sections 7 through 12 of this Letter of Intent constitute legally binding agreements of Buyer and Seller, and except as expressly set forth herein, no past or future action, course of conduct, or failure to act relating to the possible Acquisition, or relating to the negotiation of the terms of the Acquisition or any Definitive Agreement, will give rise to or serve as a basis for any obligation or other liability on the part of the Parties. This Letter of Intent shall be governed by and construed in accordance with the laws of the State of Illinois without giving effect to its principles of choice of law.

9. *Liquidated Damages*. The Definitive Agreement shall provide that the Closing of the transaction contemplated herein shall be subject to the Court approving a different offer with respect to the sale of Seller's assets at any time prior to ten (10) days prior to the Closing. If the Court approves any such other offer, then Buyer shall immediately receive, in cash, the sum of One Hundred Thousand

Dollars ($100,000) in liquidated damages which is intended to compensate Buyer for Buyer's costs, expenses, and opportunities foregone in connection with the Acquisition. The parties agree that liquidated damages are appropriate because actual damages are difficult to ascertain. The parties further agree that the amount of liquidated damages described in this paragraph are not a penalty and are the parties' best effort to estimate the actual damages which would be incurred by Buyer.

10. *Counterparts*. This Letter of Intent may be executed in one or more counterparts, each of which will be deemed to be an original copy and all of which, when taken together, will be deemed to constitute one and the same agreement. This Letter of Intent may be executed by use of counterpart signature pages.

11. *Assignment*. No Party may assign this Letter of Intent or any of its rights or interest herein to any other person without the written consent of the other Party, except that Buyer may assign its rights hereunder to any affiliate of Buyer (including any entity(ies) under common ownership with Buyer) without Seller's consent.

12. *Entire Agreement.* This Letter of Intent constitutes the entire agreement between the Parties, and supersedes all prior oral or written agreements, understandings, representations and warranties, and courses of conduct and dealings between the parties on the subject matter hereof. Except as otherwise provided herein, this Letter of Intent may be amended or modified only by a writing executed by both Parties.

If you are in agreement with the foregoing, please sign and return one copy by the close of business ten (10) days after the execution of this Letter of Intent by Buyer, which thereupon will constitute our agreement with respect to its subject matter.

**[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]**

**COUNTERPART SIGNATURE PAGE TO LETTER OF INTENT DATED ______________, 2002**

"Seller"

Midwest Transit, Inc., an Illinois corporation

By: ____________________
Don Hoagland, Receiver

Date: 12-27-02

{4644\000\148958.DOC.13}

Mr. Don Hoagland
December 26, 2002
Page 10

**COUNTERPART SIGNATURE PAGE TO LETTER OF INTENT DATED ________________, 2002**

"Buyer"

Midwest Transport, Inc., a Delaware corporation

By: ________________

Printed Name: Ken Hohlbaugh

Title: General mgr

Date: 12/26/02

Midwest Transportation Services, Inc., a Delaware corporation

By: ________________

Printed Name: Ken Hohlbaugh

Title: General mgr

Date: 12/26/02

**EXHIBIT A**

**LIST OF USPS CONTRACTS**

**[LIST]**

Route
015SE
~~030LJ~~
030PJ
030VJ
~~8013~~
8529
10112
~~10216~~
137CE
14024
~~14041~~
14070
14075
~~140CE~~
140LO
144CJ
~~144EJ~~
14737
14813
~~15021~~
15030
15037
~~15116~~
15117
17039
~~171LO~~
189MR
189MS
207AE
207BE
207CK
207FE
207HE
207JE
207KE
207L1
207ME
207QE
24011
32213
323CE
350DE
350EE
38125
42334
42335
440MR
440NS
465L2
47611

47630
47631
~~47634~~
47890
48010
~~590LO~~
50318
50323
~~50324~~
530MO
54112
~~60213~~
60518
60537
~~60629~~
607L3
607L6
~~607MO~~
62834
62835
~~628AO~~
62935
62936
~~63290~~
663YO
680NO
730CE
740AR
740IR
740LR
740MS
740PR
740RR
740SR
740TR
740WR
760L8
98011
980L3
980AK
980Y2

IN THE CIRCUIT COURT OF THE SECOND JUDICIAL CIRCUIT
LAWRENCE COUNTY, ILLINOIS

C. MICHAEL WITTERS AND DIANE WITTERS, INDIVIDUALLY AND DERIVATIVELY ON BEHALF OF MIDWEST TRANSIT, INC.,

Plaintiffs,

vs.

HAL D. HICKS and MIDWEST TRANSIT, INC.,

Defendants.

FIFTH THIRD BANK, INDIANA,

Intervener.

Case No. 00-L-2

FILED
JAN 14 2003
[signature]
CIRCUIT CLERK, LAWRENCE CO., ILL

## ORDER APPROVING MOTION FOR AUTHORITY TO ENTER INTO SALES CONTRACT

This cause having been heard upon the Motion for Authority to Enter Into Sales Contract filed herein by Don Hoagland, Receiver of Midwest Transit, Inc. The Court having considered the motion, arguments of counsel, and being fully advised in the premises, finds that the motion should be granted.

IT IS HEREBY ORDERED that the Motion for Authority to Enter Into Sales contract is approved, and Don Hoagland, Receiver of Midwest Transit, Inc., is authorized to sign the Letter of Intent and to enter into a definitive agreement as contemplated in the Letter of Intent.

Dated: 1/14/03

ENTER: [signature]
Associate Circuit Judge

This order is final and appealable

# DEFINITIVE ASSET PURCHASE AGREEMENT

**by and among**

**MIDWEST TRANSPORT, INC.,**
**a Delaware corporation**

**and**

**MIDWEST TRANSPORTATION SERVICES, INC.,**
**a Delaware corporation**

**and**

**MIDWEST TRANSIT, INC.,**
**an Illinois corporation in receivership**

**DATED FEBRUARY 7, 2003**



{4644\000\151030 DOC.5}

# DEFINITIVE ASSET PURCHASE AGREEMENT

**THIS DEFINITIVE ASSET PURCHASE AGREEMENT** (the "Agreement") is made this 7th day of February, 2003, by and among Midwest Transport, Inc., a Delaware corporation ("Midwest Transport"), Midwest Transportation Services, Inc. a Delaware corporation ("Midwest Transportation Services") (Midwest Transport and Midwest Transportation Services shall be collectively referred to herein as the "Buyer"), and Midwest Transit, Inc., an Illinois corporation in receivership ("Seller").

## RECITALS

**WHEREAS,** Buyer desires to purchase from Seller the Assets, on the following terms and conditions; and

**WHEREAS,** Seller desires to sell to Buyer the Assets, on the following terms and conditions; and

**WHEREAS,** the Court, on January 14, 2003, issued an Order which approved the Letter of Intent which contemplates the parties entering into this Agreement.

**NOW, THEREFORE,** in consideration of the foregoing recitals and the mutual covenants, representations, warranties, conditions, and agreement hereinafter expressed, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

"Assets" means the Assets listed on Exhibit A and all equipment and all other assets of every type, nature and description (except for the Excluded Assets described on Exhibit B) owned by Seller which are useful or necessary to operate a trucking company, including, but not limited to:

1. All equipment and all other assets of every type, nature and description (except for the Excluded Assets) owned by Seller useful or necessary to operate a trucking company including:

    (a) Tractors (Seller titled)
    (b) Trucks (Seller titled)
    (c) Vans (Seller titled)
    (d) Autos (Seller titled)
    (e) Trailers (including Seller's interest, if any, in the leased trailers with Ed and Buddy, L.L.C., Rightway Trucking, Inc. and KBK, LLC)
    (f) Parts (all parts and inventory at all Seller's locations)
    (g) Equipment and Tools (owned, etc. for use in working on equipment)
    (h) Tires and rims

(i) Trailer parts

2. Effingham facility, provided that such site passes a Phase II EPA environmental assessment. In the event that said facility fails to pass a Phase II environmental assessment, Buyer shall have the option of accepting the site "As Is" or refusing to accept the conveyance of the property. If the Buyer refuses to accept the property due to the property's failure to pass a Phase II assessment, Buyer shall be entitled to a $250,000.00 reduction in the purchase price, or the Seller shall immediately return the sum of $250,000.00 to the Buyer if the cash purchase price has already been paid. If the Seller refuses to remit said sum to Buyer, Buyer may withhold such sum from any other monies due Seller or Seller's shareholders. If the Buyer refuses to accept the property due to the property's failure to pass a Phase II assessment, then Buyer shall have the right to use the said facility rent free for a period of six (6) months from the Closing Date.

3. USPS Contracts to be novated as contemplated in the first sentence of Section 3.1(a) of this Agreement.

4. Freight contracts.

5. Insurance/license(s), etc, to be transferred at Closing as is without proration.

6. Office equipment/supplies/computer/furniture/etc. at all Seller's locations.

7. Transfer of leases, deposits, etc., equipment and terminals. This excludes any lease in Hal D. Hicks' name only, Midwest Transit Racing's name, or any affiliate of Hal D. Hicks (other than Seller) name.

8. Use of Sumner facility for a period of six (6) months for a rental of $1,000 per month effective as of Closing subject to sublease of Webworld. Buyer shall also receive an option to lease the Sumner facility for an additional three (3) months at a lease amount of $3,000 per month. All such payments are to be made to Seller's Receiver for the benefit of Hal D. Hicks.

9. All computer software currently being utilized by Seller.

10. All Intellectual Property of Seller.

11. All records, including business, computer, engineering, and other records, and all associated documents, discs, tapes, and other storage or recordkeeping media of Seller prepared or held in connection with the Business, including but not limited to all sales data, customer lists, accounts, bids, contracts, supplier records, and other data and information of the Business, excluding corporate minute books of Seller. Notwithstanding the foregoing sentence, however, Seller shall, at all times, and upon reasonable notice, have the right to inspect, review and copy, all documents, records, and other writings of every type, nature and description

comprising any part of the "Assets" including but not limited to the records and other writings described in this subsection 11.

"Assumed Leases" means only those leases described in Exhibit C.

"Assumed Liabilities" means only those liabilities specifically described on Exhibit D.

"Assumption Agreement" means the Assignment and Assumption Agreements relating to the Assumed Leases executed by Buyer and Seller at Closing.

"Assumption Certificate" means a certain written Assumption Certificate which is dated as of the Closing Date and which is signed by Buyer and Seller and which evidences that aggregate value of the Assumed Leases at the Closing Date. The amounts described in the Assumption Certificate, if the Closing Date is February 21, 2003, will be the amounts set forth in Section 2.4 of this Agreement. If the Closing Date is after February 21, 2003, then the amounts described in the Assumption Certificate will be valued at the then existing unamortized principal balance of any loan (or hypothetical loan at the prevailing rates) utilized to purchase the property subject to the lease plus the gross amount of any optional or mandatory purchase price for the equipment at the termination of any such lease.

"Bill of Sale" means the form of Bill of Sale executed by Seller in favor of Buyer at Closing.

"Business" means the business and operations of Seller generally conducted under the trade name MIDWEST TRANSIT and all derivations thereof.

"Cash Purchase Price" means Two Million Seven Hundred Fifty Thousand Dollars ($2,750,000.00), provided that the Cash Purchase Price will be adjusted so that the sum of the Cash Purchase Price so adjusted, plus the actual amount of the assumption of accrued payroll and accrued vacation costs at Closing which is described in Section 2.3(b), plus $2,500,000.00 which represents the amount of the assumption of the Fifth Third Note and judgment (irrespective of the actual amount paid to satisfy said note and judgment), plus the aggregate value of the Assumed Leases as set forth in the Assumption Certificate, equals $8,798,950.00.

"Closing" means the consummation of the transactions contemplated by this Agreement.

"Closing Date" means February 21, 2003, or such other date as Seller and Buyer may mutually agree upon. If the Closing Date does not occur on February 21, 2003, then the parties shall use their best efforts to close on a date which corresponds with the next twenty-eight (28) day payment cycle employed by the United States Postal Office in the USPS Contracts.

"Company" means the Buyer.

"Company Affiliate" means a Person that directly, or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with either of the Corporations comprising the Buyer. In this definition, "Control" means the possession, direct or

indirect, of the power to direct or cause the direction of the management and policies of a Person, wither through ownership of securities, by contract, or otherwise.

"Confidential Information" means information which is of a confidential, trade secret or proprietary character and shall include, but shall not be limited to, information, in whatever form kept or recorded, pertaining to: inventions, discoveries, know-how, ideas, computer programs, designs, algorithms, processes and structures; product information; research and development information; client information; financial information; business processes and methodology; and any other technical and business information of Buyer which is of a confidential, trade secret and/or proprietary character.

"Consideration" has the meaning set forth in Section 2.2 hereof.

"Court" means the Circuit Court of the Second Judicial Circuit of Lawrence County, Illinois.

"DOL Liabilities" means any Liability of the Seller to the U.S. Department of Labor.

"Escrow Agreement(s)" means a certain Escrow Agreement executed by Seller and Buyer at Closing into which the amounts which would be paid under either or both of the Noncompete Agreements will be paid in the event either or both of the Noncompete Agreements are not executed by Michael and Diane Witters or Hal D. Hicks.

"Effective Time" means the effective time of the Closing, which shall be as of the close of business on the Closing Date.

"Excluded Assets" means the Assets listed on Exhibit B.

"Fifth Third Note" means the promissory note made by Seller for the benefit of Fifth Third Bank in the approximate amount of $2,500,000.00 together with all security therefor and a certain judgment related thereto.

"Government" means the United States of America, any other nation or sovereign state, the European Union, any federal, bilateral or multilateral governmental authority, any state, possession, territory, county, district, city or other governmental unit or subdivision, and any branch, agency, or judicial body of any of the foregoing.

"Indemnified Parties" means Kenneth Hohlbaugh, Ed Smith, M.R. "Buddy" Relihan, John S. Elmore, and all other equity owners of Buyer at Closing.

"Intellectual Property" means all of the following (in whatever form or medium) which are owned by or licensed to Seller: patents, trademarks, service marks, trade names, corporate names, copyrights, and copyrighted works; registrations thereof and applications therefor; trade secrets, software (whether in source code or object code), firmware, mask works, programs, inventions, discoveries, proprietary processes, and items of proprietary know-how, information, data or intellectual property; proprietary prospect lists, customer lists, projections, analyses, and

market studies; and licenses, sublicenses, assignments, and agreements in respect of any of the foregoing.

"Letter of Intent" means a certain Letter of Intent dated January 14, 2003 by and between Buyer and Seller which was approved by Order of the Court on January 14, 2003.

"Liabilities" means liabilities and/or obligations of every type, nature and description whatsoever, whether or not required to be reflected on the financial statements of a business and whether or not liquidated or unliquidated, contingent or otherwise.

"Lien" means any lien, security interest, mortgage, option, lease, tenancy, occupancy, covenant, condition, easement, agreement, pledge, hypothecation, charge, claim, restriction, or other encumbrance of every type, nature and description whatsoever.

"Noncompete Agreements" means two (2) certain Noncompete, Nonsolicitation and Nondisclosure Agreements dated as of the Closing Date, one of which may be executed by Mr. Michael Witters and Mrs. Diane Witters and the other of which may be executed by Mr. Hal D. Hicks.

"Order" means an order, judgment, writ, injunction, award or decree of any Government or any court (including the Court), grand jury, administrative or regulatory body, Government agency, arbitration or mediation panel or similar body.

"Party" means either Buyer, or Seller, and "Parties" means all of them.

"Permitted Bank Liens" means Liens securing certain bank loans made by Union Planter's Bank in Robinson, Illinois, and First Bank in St. Louis, Missouri, which are secured in part by certain of the Assets and which relate to the Rightway Trucking, Inc. Lease, the Buddy and Ed, L.L.C. Lease, and the KBK, LLC Lease.

"Person" means any natural person, any corporation, partnership, limited liability company, limited liability partnership, joint venture, association, company, or other legal entity, and any Government.

"Proprietary Information" means all trade names, trademarks, service marks, patents and trade secrets and any and all other information not publicly available which relates to specific matters concerning the Business, such as, without limiting the generality of the foregoing, engineering, design, manufacturing, maintenance and repair information; computer software and programs; component sourcing and supply information; identities of suppliers, customers and contractors; product distribution information; pricing and compensation policies; sales or financing procedures or methods; operational methods; strategic plans; internal financial information; research and development plans and activities; and acquisition and expansion plans.

"Restrictive Period" means the period beginning with the Closing Date and ending five (5) years later.

"USPS Contracts" shall refer to the ninety-five (95) U.S. Postal Service Mail Contracts described on Exhibit E attached hereto.

## ARTICLE II
## PURCHASE AND SALE OF ASSETS

**2.1 Assets to be Purchased.** Subject to the terms and conditions hereof, on the Closing Date and as of the Effective Time, Seller shall sell to Buyer, and Buyer shall purchase from Seller the Assets.

**2.2 Consideration.**

The consideration paid by Buyer to Seller for the Assets and other rights contained herein (the "Consideration") shall be the Cash Purchase Price and the assumption of the Assumed Liabilities and Assumed Leases by Buyer. The Consideration provided for in Section 2.2, shall be allocated among the Assets as agreed by the parties.

**2.3 Assumed Liabilities.**

(a) assumption of Fifth Third Note in the amount of $2,500,000 (irrespective of actual amount paid);

(b) assumption of accrued payroll and accrued vacation costs determined in an amount equal to the actual amount of such liabilities at the Closing Date, not to exceed $1,500,000;

**2.4 Assumed Leases (determined at the values described in the Assumption Certificate).**

(a) assumption of Rightway Trucking, Inc. Lease, $700,000;

(b) assumption of MWT Leasing LLC Trailer Lease, $775,000 to replace 100 trailers currently used by Midwest Transit, Inc. and owned by Hal Hicks; and

(c) assumption of KBK, LLC Lease, $573,950;

EXCEPT AS OTHERWISE PROVIDED HEREIN, BUYER DOES NOT ASSUME OR AGREE TO BECOME LIABLE FOR OR SUCCESSOR TO ANY LIABILITIES OR OBLIGATIONS WHATSOEVER, LIQUIDATED OR UNLIQUIDATED, KNOWN OR UNKNOWN, CONTINGENT OR OTHERWISE, WHETHER OF SELLER, ANY PREDECESSOR THEREOF, OR ANY OTHER PERSON, OR OF THE BUSINESS. NO OTHER STATEMENT IN OR PROVISION OF THIS AGREEMENT AND NO OTHER STATEMENT, WRITTEN OR ORAL, ACTION, OR FAILURE TO ACT INCLUDES OR CONSTITUTES ANY SUCH ASSUMPTION OR AGREEMENT, AND ANY STATEMENT TO THE CONTRARY BY ANY PERSON IS UNAUTHORIZED AND HEREBY

DISCLAIMED.

## ARTICLE III
## CONDITIONS

### 3.1 Conditions Precedent to Buyer's Obligations

The Closing shall be subject to and conditioned upon the satisfaction or Buyer's waiver of each of the following on or before the Closing Date:

(a) Seller, at its sole cost and expense, will cause all and not less than all of the USPS Contracts currently owned and operated by Seller (95 contracts) to be transferred to Buyer through valid and binding novations with the U.S. Postal Service. In addition, Buyer shall determine in its sole discretion that (a) there are no material defaults under any of the USPS Contracts; (b) the parties to the USPS Contracts have complied in all respects with all of the terms and performed in all respects with all the terms of the USPS Contracts; (c) neither Seller nor any other person has received any formal or informal notice of unsatisfactory performance under the USPS Contracts; (d) the United States Postal Service has provided satisfactory assurances, in form acceptable to Buyer in Buyer's sole discretion, of Buyer's ability to renew existing USPS contracts and bid new USPS Contracts successfully; and (e) that upon completion of novation of the USPS Contracts, all such USPS Contracts will be valid, binding and enforceable in accordance with their terms between Buyer as contractor and the U.S. Postal Service, and no such USPS Contract shall be subject to being set aside for any reason other than Buyer's failure to perform the contract in accordance with its terms.

(b) Buyer shall have satisfied itself that the other shareholders of Seller do not intend to contest or set aside any of the transactions contemplated herein. Buyer understands that Mr. Hal D. Hicks has appealed to (and may hereafter appeal to) Illinois appellate courts certain rulings of the Court with respect to, *inter alia*, your receivership, and has instituted legal action outside of Illinois relating to certain of Seller's assets. Buyer further understands Seller's position that these appeals and any such suits are without merit. However, Buyer reserves the right prior to the Closing to evaluate independently any such appeals, suits or threats of action and their potential effects on the transactions contemplated by this Agreement including whether such appeals and/or suits are final and non-appealable. Any order of the Court relating to the Letter of Intent, this Agreement and the sale of assets contemplated hereunder must be acceptable to Buyer.

(c) The performance of Phase I environmental assessments, all at the expense of Seller, with respect to all facilities of Seller (including leased facilities). The results of all such assessments must be acceptable to Buyer in Buyer's

sole and complete discretion.

(d) Any approvals of the Department of Transportation, Interstate Commerce Commission, and all other governmental, quasi-governmental and regulatory authorities which are useful or necessary for Buyer to conduct a trucking business in connection with the transactions contemplated herein.

(e) Buyer obtaining Assumption Agreements.

(f) Buyer receiving all agreements, documents and instruments contemplated herein in a form and substance acceptable to Buyer.

**3.2 Payments Under Noncompete Agreements.** If Michael and Diane Witters, on the one hand, or Hal. D. Hicks, on the other hand, do not execute their respective Noncompete Agreements at Closing, then the amount which would be paid to them under Section 1(b) of their respective Noncompete Agreements (which equals $1,075,000.00 plus interest) will be paid to the Company pursuant to an Escrow Agreement.

**3.3 Liquidated Damages.** The Closing of the transaction contemplated herein shall be subject to the Court not approving a different offer with respect to the sale of Seller's assets at any time prior to February 11, 2003. If the Court approves any such other offer; then Seller shall immediately pay to Buyer, in cash, the sum of One Hundred Thousand Dollars ($100,000) in liquidated damages which is intended to compensate Buyer for Buyer's costs, expenses, and opportunities foregone in connection with the Acquisition. The parties agree that liquidated damages are appropriate because actual damages are difficult to ascertain. The parties further agree that the amount of liquidated damages described in this paragraph are not a penalty and are the parties' best effort to estimate the actual damages which would be incurred by Buyer.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby makes the following representations and warranties, each of which is true and correct on the date hereof and, except for changes expressly permitted by this Agreement, shall be true and correct on the Closing Date and each of which shall survive the Closing Date.

**4.1 Corporate Existence and Power of Seller.**

(a) Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Illinois.

(b) Seller has the corporate power and authority to own and use its Assets and to transact the Business, hold all franchises, licenses and permits necessary and required therefor, is duly licensed or qualified to do business as a foreign corporation and is in good standing in each jurisdiction where such license or qualification is required. Seller has the corporate power to enter into this Agreement, to perform its obligations hereunder, and to

consummate the transactions contemplated hereby.

**4.2 Approval and Enforceability of Agreement.**

(a) The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized, approved and ratified by all necessary action on the part of Seller and the Court. Seller has full authority to enter into and deliver this Agreement, to perform its obligations hereunder, and to consummate the transactions contemplated hereby.

(b) Assuming the due execution and delivery hereof by Buyer, this Agreement is the legal, valid and binding obligation of Seller, enforceable against Seller according to its terms.

**4.3 Title to the Assets.** Except for the Permitted Bank Liens, Seller has good and marketable title to all of the Assets, free and clear of all Liens. Upon the Closing Buyer will, except for the Permitted Bank Liens, have title to the Assets, free and clear of all Liens, except for Liens arising by, through or under Buyer

**4.4 Condition of Assets.** The Assets are being sold from Seller to Buyer, in "AS-IS", "WHERE-IS" condition and Seller is making no representation or warranty to Buyer with respect to the condition of the Assets.

**4.5 Undisclosed Liabilities.** Seller has no Liabilities whatsoever, known or unknown, unasserted, or asserted, liquidated or unliquidated, accrued, absolute, contingent or otherwise, which, to Seller's knowledge, Buyer is unaware of.

**4.6 Real and Personal Property Leased to Seller.** As set forth on Exhibit F is a description of each Lease under which Seller is the leasee of any real or personal property in connection with the business and which comprises a part of the Assets. Upon the Closing, Buyer will have all right, title and interest of the leasee under the terms of such Leases, as free and clear of all Liens. There is no default or basis for acceleration or termination under any such Lease, nor has any event occurred, nor does any condition exist, which, with the passage of time, or the giving of notice, or both, would constitute a default or basis for termination or acceleration under any such Lease.

**4.7 Receiver's Authority and Power.** Donald Hoagland, as Receiver of the Seller, acting alone, has the right, power and authority, on behalf of Seller, to enter into this Agreement, to perform in accordance with the terms and conditions of this Agreement, and to consummate the transactions contemplated herein.

**4.8 Trade Creditors and DOL Liability.** As soon as practical after Closing the Seller shall extinguish all Liabilities of trade creditors and the DOL Liability.

**4.9 Use of Name.** Seller shall not use the name "Midwest Transit" or any derivative

thereof in connection with any trade, business or activity after the Closing Date.

**4.10 Brokers, Finders.** No finder, broker, agent, or other intermediary, acting on behalf of Seller, is entitled to a commission, fee, or other compensation or obligation in connection with the negotiation or consummation of this Agreement or any of the transactions contemplated hereby.

**4.11 Truthfulness.** No representation or warranty of Seller herein and no statement, information or certificate furnished or to be furnished by Seller or its counsel, accountants or other agents pursuant hereto or in connection with the transactions contemplated hereby contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary in order to make the statements contained herein or therein not misleading. There is no fact or development, actual or prospective, other than general economic conditions, which adversely affects or in the future might reasonably be expected adversely to affect the Business or the Assets in any material respect which has not been set forth or described in this Agreement.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby makes the following representations and warranties, each of which is true and correct on the date hereof and shall be true and correct on the Closing Date and each of which shall survive the Closing Date.

**5.1 Corporate Existence and Power of Buyer.**

(a) Midwest Transport is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware. Midwest Transport has the corporate power and authority to own and use its properties and to transact the business in which it is engaged. Midwest Transport has the corporate power to enter into this Agreement, to perform its obligations hereunder, and to consummate the transactions contemplated hereby.

(b) Midwest Transportation Services is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware. Midwest Transportation Services has the corporate power and authority to own and use its properties and to transact the business in which it is engaged. Midwest Transportation Services has the corporate power to enter into this Agreement, to perform its obligations hereunder, and to consummate the transactions contemplated hereby.

**5.2 Approval and Enforceability of Agreement.**

(a) The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized, approved and ratified by all necessary action on the part of Midwest Transport.

Certified copies of all required resolutions, authorizations, consents, approvals and/or ratifications shall be delivered at Closing and no such resolution, authorization, consent or approval has been altered, amended, rescinded, repealed or revoked. Pursuant to such resolutions, authorizations, consents, approvals and/or ratifications, Midwest Transport has full authority to enter into and deliver this Agreement, to perform its obligations hereunder, and to consummate the transactions contemplated hereby. Assuming the due execution and delivery hereof by Seller, this Agreement is the legal, valid and binding obligation of Midwest Transport enforceable against Midwest Transport according to its terms.

(b) The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized, approved and ratified by all necessary action on the part of Midwest Transportation Services. Certified copies of all required resolutions, authorizations, consents, approvals and/or ratifications shall be delivered at Closing and no such resolution, authorization, consent or approval has been altered, amended, rescinded, repealed or revoked. Pursuant to such resolutions, authorizations, consents, approvals and/or ratifications, Midwest Transportation Services has full authority to enter into and deliver this Agreement, to perform its obligations hereunder, and to consummate the transactions contemplated hereby. Assuming the due execution and delivery hereof by Seller, this Agreement is the legal, valid and binding obligation of Midwest Transportation Services enforceable against Midwest Transportation Services according to its terms.

**5.3 Brokers, Finders.** No finder, broker, agent, or other intermediary, acting on behalf of Buyer, is entitled to a commission, fee, or other compensation or obligation in connection with the negotiation or consummation of this Agreement or any of the transactions contemplated hereby.

**5.4 Truthfulness.** No representation or warranty of Buyer herein and no statement, information or certificate furnished or to be furnished by or on behalf of Buyer or its counsel, accountants or other agents pursuant hereto or in connection with the transactions contemplated hereby contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary in order to make the statements contained herein or therein not misleading.

## ARTICLE VI
## CLOSING

**6.1 Closing.** The Closing shall take place at any place as may be mutually agreed to by the Parties.