# MIDWEST TRANSIT, INC.
# RECEIVERSHIP EXPENSES
# PAID AFTER APRIL 18, 2003

| | | | |
|---|---|---|---|
| | DON HOAGLAND'S SALARY FROM 04/18/2003 TO 08/22/2003 | $ | 108,000 |
| | TERRY SHARP PAID AFTER 04/18/2003 | $ | 139,813 |
| | BOGGS, BOGGS, & BATES, LLC (legal-court ordered) | $ | 22,681 |
| | REBMAN, LINHARES & BEACHEM (legal-court ordered) | $ | 21,750 |
| | THIEL LAW FIRM / HAL HICKS (legal-court ordered) | $ | 21,216 |
| | ROOT REAL ESTATE ( 4 MONTHS P&I) | $ | 60,419 |
| | INTEREST ON UPB $150,000 NOTE | $ | 2,352 |
| | ALLEN BRYSON (NASCAR EQUIPMENT RECOVERED) | $ | 5,882 |
| | JAY PRINDABLE - STORAGE RECORDS | $ | 5,400 |
| 2 | WICKWIRE GAVIN LEGAL | $ | 13,328 |
| | REAL ESTATE TAXES ON FLORIDA | $ | 33,213 |
| | NORMA PRICE (rent on new office) | $ | (7,800) |
| | COST OF GETTING HAL HICKS EQUIPMENT OUT OF SERVICE (238 trailers at 750 miles at .65 per mile) | $ | 116,025 |
| | USPS OVERPAYMENTS DEDUCTED OUT AFTER 04/18/2003 | $ | 179,500 |
| | 1996 FREIGHTLINER THAT HAL HICKS KEPT | $ | 11,000 |
| | STORAGE AND CLEANING RACING TRAILER | $ | 2,494 |
| | LOADING RACING TRAILER | $ | 500 |
| | RELOCATING RACING TRAILER | $ | 4,362 |
| 3 | CARMODY MACDONALD | $ | 27,615 |
| | TOTALS | $ | 767,750 |

1 ALL NUMBERS ARE NOT FINAL UNTIL REVIEWED BY INDEPENDENT AUDITORS, INCLUDING ANY FUTURE FINDINGS.

2 IT IS THE DUTY OF SELLER TO GET CONTRACTS NOVATED IN ACCORDANCE THE DEFINITIVE ASSET PURCHASE AGREEMENT. ALL FUTURE BILLS REGARDING NOVATION, WILL BE PAID BY SELLER.

3 IT IS THE RESPONSIBILITY OF SELLER TO DEFEND BUYER AGAINST ALL EXISTING AND FUTURE LAWSUITS REGARDING THE SALE, PURSUANT TO SELLER'S INDEMNIFICATION OBLIGATIONS.

# MIDWEST TRANSPORT, INC.
## REVISED PROPOSED PURCHASE
## 18-Apr-03

| | | | |
|---|---|---|---|
| PURCHASE PRICE | | $ | 8,798,950 |
| SOURCE OF FUNDING | TOTAL OWED | $ | 8,798,950 |
| DOL | | $ | 2,000,000 |
| FIFTH THIRD NOTE | | $ | 2,400,000 |
| CASH FROM SHAREHOLDERS | | $ | 1,011,825 |
| ASSUME ACCRUED PAYROLL AND ACCR VAC | | $ | 1,376,874 |
| ASSUME RIGHTWAY LEASE | | $ | 687,229 |
| ASSUME MWT TRAILER LEASE | | $ | 775,000 |
| ASSUME KBK LEASE | | $ | 548,022 |
| | TOTAL | $ | 8,798,950 |
| MONEY TO MIDWEST TRANSIT, INC. | | $ | 1,011,825 |
| INCOME TAX LIABILITY | | $ | (612,605) |
| | NET PROCEEDS AFTER TAX | $ | 399,220 |

LAW OFFICE OF TERRY SHARP, P.C.
ATTORNEYS AT LAW

ERRY SHARP*
ERIC DEAN TROUTT

1115 HARRISON STREET ○ P.O. BOX 906 ○ MT. VERNON, IL 62864
TELEPHONE (618) 242-0246 ○ FAX (618) 242-1170
WRITER'S E-MAIL: LAW@LOTSHARP.COM

*CERTIFIED PUBLIC ACCOUNTANT
CERTIFIED FRAUD EXAMINER

October 2, 2003

Mr. Russell A. Sykes
National Mail Transportation Purchasing
475 L'Enfant Plaza SW, Room 4900
Washington, DC 20260-6210

**Re: Authority of the Receiver of Midwest Transit, Inc.**

Dear Mr. Sykes:

Quite some time ago, Don Hoagland, as interim receiver of Midwest Transit, was given authority to sell the assets of Midwest Transit. Stated or implied in this authority was the requirement that contracts be novated with the Post Office. The Order appointing Don as interim receiver was appealed to the Fifth District Appellate Court. A copy of the Fifth District Appellate Court's Rule 23 Order has been previously been provided to your counsel, but suffice it to say that clearly and without any reservation the Fifth District Appellate Court found that Hal D. Hicks had not been a nice person in his management of the affairs of the company and for the Circuit Court of Lawrence County to have not appointed a receiver would have been an abuse of discretion.

Thereafter, Don Hoagland was appointed liquidating receiver of Midwest Transit and has been serving as liquidating receiver since March 25, 2002. Actual and implied authority exists under the laws of the State of Illinois for a liquidating receiver to sell the assets of the company.

On December 27, 2002, Don Hoagland, as liquidating receiver, petitioned the Court for authority to enter into a letter of intent and further into a definitive agreement as contemplated by that letter of intent to sell the assets of the company to an employee group. An Order thereon approving the proposed sale was signed by Judge Hill on January 14, 2003. This is a final and appealable Order. On February 18, 2003, the Court ruled upon the Motion to Reconsider the January 14th Order filed by Hal D. Hicks. This Motion was denied without prejudice. Also, on February 18, 2003, the trial court heard argument on Hal D. Hicks' Motion to Stay Enforcement of the January 14th Order until completion of that appeal and found that the Court was without authority to rule on that Motion as no appeal had then been filed. Thereafter, on the 5th day of March, Hal D. Hicks did appeal the January 14th Order granting the receiver's motion for authority to enter into a contract for sale and the February 14th Order denying Hal D. Hicks' Motion to Reconsider the Court's January 14, 2003, Order.

On or about January 31, 2003, Hal D. Hicks filed with the Circuit Court of Lawrence County a Motion to Stay Enforcement of the January 14th Order which the Court denied. Now Hal D. Hicks has filed a Motion to Stay Enforcement of the Trial Court's January 14th Order with the Appellate Court. That, too, was denied.

The law in Illinois is clear. The losing party to litigation may file an appeal of that order, but if the order is not stayed, it is of full force and effect and any party that changes position based upon that order does so with the protection of Illinois Supreme Court Rule 305(b).

Illinois Supreme Court Rule 305(f) provides for condition of the bond. More specifically, however, Rule 305(j) is applicable to the affairs of Midwest Transit and is set out in total below.

> (j) Failure to Obtain Stay; Effect on Interests in Property.
> If a stay is not perfected within the time for filing the notice of appeal, or within any extension of time granted under subparagraph ©) of this rule, the reversal or modification of the judgment does not affect the right, title, or interest of any person who is not a party to the action in or to any real or personal property that is acquired after the judgment becomes final and before the judgment is stayed; nor shall the reversal or modification affect any right of any person who is not a party to the action under or by virtue of any certificate of sale issued pursuant to a sale based on the judgment and before the judgment is stayed. This paragraph applies even if the appellant is a minor or a person under legal disability or under duress at the time the judgment becomes final.

The Illinois Supreme Court has interpreted the effect of these rules in a case known as Steinbrecher v. Steinbrecher, 197 Ill.2d 514, 759 N.E.2d 509, 259 Ill.Dec. 729 (2001), a copy of which is enclosed for your convenience along with the majority of the Orders cited above.

This sale of all the assets necessary to perform the postal contracts from Midwest Transit to Midwest Transport, Inc., closed on September 7, 2003. A bill of sale was given to the new purchaser that day. It is my opinion as an Illinois lawyer that the sale is final and that it properly closed under Illinois law.

Yours truly,

LAW OFFICE OF TERRY SHARP, P.C.

By [signature]
Terry Sharp

TS/sc

# NOVATION AGREEMENT

(a) THE PARTIES TO THIS AGREEMENT:

Midwest Transit, Inc. (Transferor), an Illinois corporation with its principal office in Mt. Carmel, Illinois; Midwest Transport, Inc. (Transferee) a Delaware corporation doing business as Midwest Transport of Illinois, with its principal office in Robinson, Illinois; and the United States Postal Service enter into this agreement as of the 4th day of December 2003.

(b) THE FACTS OF WHICH THE PARTIES AGREE AND WHICH FORM A BASIS FOR THIS AGREEMENT:

(1) The United States Postal Service has entered into contractual agreements with the Transferor which contracts are accurately identified on Exhibit "A", attached hereto and incorporated herein, including modifications to these contractual documents made between the parties before the effective date of this agreement. Included in the term "contractual agreements" are those contractual agreements under which performance has been accepted and payments have been made if the United States Postal Service or the Transferor have any remaining rights, duties, or obligations under those contractual agreements. Hereafter, the term "contract" shall include all the contractual agreements as referenced in this paragraph.

(2) As of February 7, 2003, the Transferor, an Illinois corporation in receivership, has agreed to transfer its Postal Service contracts, together with all necessary equipment to perform such contracts, to the Transferee. A copy of the Definitive Asset Purchase Agreement is attached hereto as Exhibit "B". This was done pursuant to a Court Order dated January 14, 2003 granting the authority to enter into such a contract. A copy of said Court Order is attached as Exhibit "C".

(3) The Transferee has acquired the entire portion of the Transferor's assets necessary to perform the contracts. A copy of the Bill of Sale is attached as Exhibit "D".

(4) The Transferee agrees to assume all obligations and liabilities of the Transferor under the said contracts, including all liabilities arising out of the performance of said contracts.

(5) The Transferee is in a position to fully perform all obligations that may exist under the contracts.

(6) It is consistent with the United States Postal Service's interest to recognize the Transferee as the successor party to the contracts.

(7) All the necessary documentation and evidence have been filed with the United States Postal Service.

(8) A certificate issued by the Secretary of the State of Illinois, to the effect that the Transferee is authorized to do business as Midwest Transport of Illinois is attached hereto as Exhibit "E".

(c) IN CONSIDERATION OF THESE FACTS, THE PARTIES HEREBY AGREE THAT:

(1) The Transferor confirms the transfer to the Transferee, and waives any claims and rights it now has or may have in the future against the Postal Service in connection with the contracts.

(2) The Transferee agrees to be bound by and perform each contract in accordance with conditions contained in the contracts. The Transferee also assumes all obligations and liabilities of and all claims against the Transferor under the contracts as if the Transferee were the original party to the contracts.

(3) The Transferee ratifies all previous actions taken by the Transferor with respect to the contracts, with the same force and effect as if the action had been taken by the Transferee.

(4) The Postal Service recognizes the Transferee as the Transferor's successor in interest in and to the contracts. The Transferee by this agreement becomes entitled to all rights, titles, and interests of the Transferor in and to the contracts as if the Transferee were the original party to the contracts. Following the effective date of this agreement, the term "contractor" as used in the contract shall refer to the Transferee.

(5) Except as expressly provided in this agreement, nothing in it shall be construed as a waiver of any rights of the Postal Service against the Transferor.

(6) All payments and reimbursements previously made by the Postal Service to the Transferor, and all other previous actions taken by the Postal Service under the contracts, shall be considered to have discharged those parts of the Postal Service's obligations under the contracts.

(7) The Transferor and the Transferee agree that the Postal Service is not obligated to pay or reimburse either of them for, or otherwise give effect to, any costs, taxes, or other expenses, or any related increases, directly or indirectly arising out of or resulting from the transfer of this agreement, other than those that the Postal Service in the absence of this transfer agreement would have been obligated to pay or reimburse under the terms of the contracts.

(8) The Transferor guarantees payments of all liabilities and the performance of obligations that the Transferee (i) assumes under this agreement or (ii) may undertake in the future, should these contracts be modified under their terms and conditions. The Transferor waives notice of, and consents to, any future modifications.

(9) The contracts shall remain in full force and effect, except as modified by this agreement.

"Transferor"

Midwest Transit, Inc.

by: ______________________

Don Hoagland
Court Appointed Receiver

"Transferee"

Midwest Transport, Inc.
d/b/a Midwest Transport of Illinois

by: ______________________

Ken Hohlbaugh
President

Approved and Accepted: United States Postal Service

by: ______________________

(Name) Russell A. Sykes
(Title) Manager, Surface Transportation CMC
Supply Management Transportation
Portfolio

CERTIFICATE

I, Don Hoagland, certify that I am the duly appointed and authorized Court Appointed Receiver of Midwest Transit, Inc., an Illinois corporation in receivership, who signed this agreement for the Transferor and that this agreement was duly signed and executed on behalf of this corporation by authority of the Circuit Court of the Second Judicial Circuit of Lawrence County, Illinois.

Witness my hand and seal this 7th day of September, 2003.

Don Hoagland

CERTIFICATE

I, John S. Elmore, certify that I am the Secretary of Midwest Transport, Inc., a Delaware corporation doing business as Midwest Transport of Illinois and that Kenneth Hohlbaugh who signed this agreement for this corporation was then of this corporation, and that this agreement was duly signed for and on behalf of this corporation by authority of its governing body and within the scope of its corporate powers.

Witness my hand and seal this 7th day of September, 2003.

John S. Elmore, Secretary

Contents

UNITED STATES
POSTAL SERVICE®

# Purchasing Manual

Issue 3

December 25, 2003

1. **Explanation.** This *Purchasing Manual* (PM) is published and maintained by Supply Management Infrastructure, Supply Management and contains the Postal Service's purchasing policy.

2. **Material Transmitted.** Issue 3 contains numerous new and significant changes in Postal Service purchasing policy and users are encouraged to consult the Summary of Changes which identifies general and specific policy changes. Issue 3 also contains all changes made to Issue 2 between January 31, 2002, and December 25, 2003.

3. **Other Directives.** Topics addressed in the PM may also be addressed in other purchasing-related directives such as Handbooks P-1, *General Purchasing Concepts and Practices*, P-2, *Design and Construction Purchasing Practices*, and PO-503, *Mail Transportation Procurement Handbook*. Should material in these handbooks or any other purchasing-related directive (pending their revision or replacement) conflict with material contained in the PM, the PM prevails.

4. **Availability.** The PM is published and available to all users on the World Wide Web at http://www.usps.com/business.

5. **Issuance Date/Effective Date/Transition Period.** Issue 3 is being issued on December 25, 2003. Pending the updating of purchasing support systems for consistency with the new policies contained in Issue 3, purchasing organizations may adopt the policies and procedures contained herein immediately, or may follow the policies and procedures contained in Issue 2. The end of this transition period will be announced in the *Postal Bulletin*. If a purchasing organization adopts Issue 3 policies and procedures for any category or categories of purchases, it must use those policies and procedures consistently for that category or categories, and not revert to previous policies and procedures. Contracting officers must ensure that solicitations and other purchasing documents make prospective offerors fully aware of the authority (Issue 3 or Issue 2, as revised through April 18, 2002) pursuant to which an individual purchase is made. Particular care must be taken that previous versions of provisions and clauses are not used in purchases made under the policies and procedures of Issue 3, and vice versa.

Keith Strange

*Keith Strange*
*Vice President*
*Supply Management*

effects of delays it causes, delays that are under its control, or delays for which it has agreed to compensate the supplier. Clause B-15, *Notice of Delay*, requires the supplier to notify the contracting officer of problems that might delay performance. Paragraph s of Clause 4-1 incorporates by reference each of these clauses.

6.5.3.b *Excusable Delays*

1. A supplier may be granted an extension of the delivery or performance schedule for an excusable delay.
2. A supplier's failure to perform may be considered an excusable delay when it arises out of either:
   (a) Causes beyond the control and without the negligence of the supplier — including acts of God or the public enemy; acts of the government in its sovereign capacity or the Postal Service in its contractual capacity; and fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather; or
   (b) A subcontractor default due to causes beyond the control and without the fault or negligence of both the supplier and the subcontractor, unless the supplies or services were obtainable from another source in time to permit the supplier to meet the delivery schedule.

6.5.3.c *Compensable Delays*

1. A supplier may be granted an extension of the contract delivery or performance schedule, a price adjustment, or both, as the purchase team, represented by the contracting officer, deems appropriate, when an unreasonable delay in performance is caused by the Postal Service or is under its control, or when it has agreed to pay the supplier for the delay. Situations that may entitle the supplier to an equitable adjustment (schedule, cost, or both) include:
   (a) Delay in issuing the notice to proceed;
   (b) Delay in availability of the site;
   (c) Differing site conditions;
   (d) Actual or constructive changes or delays;
   (e) Delay in providing funding;
   (f) Delay in inspections;
   (g) Delay in issuing changes;
   (h) Delay in providing Postal Service-furnished equipment; and
   (i) Failure to perform by other Postal Service suppliers.
2. The supplier has the burden of proof in establishing the basis for the equitable adjustment required to overcome the delay.

6.5.3.d *Concurrent Causes*. When a delay is attributable to both the Postal Service and the supplier, a contract delivery or performance schedule adjustment should not normally be granted for a period of delay caused at least in part by



App. 0132

actions or failures on the part of the supplier. (But damages may not be assessed against the supplier in these situations.)

6.5.3.e *Acceleration*

1. The Postal Service has the right to require accelerated performance under paragraph c of Clause 4-1. This right should be exercised only when required to maintain the operational capability of the Postal Service.
2. Contracting officers must document the specific facts that require acceleration of performance and the estimated impact on contract price. Whenever possible, the contracting officer must negotiate acceleration actions in advance.
3. Contracting officers should be alert to constructive acceleration situations. Constructive acceleration occurs when the Postal Service does not agree to a delivery or performance schedule extension to which the supplier is entitled (or is later determined to be entitled), causing the supplier to accelerate performance. Constructive acceleration may result in a claim for a price increase.

## 6.5.4 Novation and Change-of-Name Agreements

6.5.4.a *Definitions*

1. *Change-of-name agreements.* Agreements signed by the supplier and the Postal Service that recognize a legal change of the supplier's name without otherwise altering the original contract.
2. *Novation agreements.* Agreements signed by the supplier (the transferor), the successor in interest (transferee), and the Postal Service, by which, among other things, the transferor guarantees performance of the contract, the transferee assumes all obligations under the contract, and the Postal Service recognizes the transfer of the contract and related assets.

6.5.4.b *Responsibility*

1. The contracting officer is responsible for:
   - (a) Determining, in consultation with counsel, whether to permit contract novation; and
   - (b) Processing and signing novation and change-of-name agreements.
2. When multiple contracts of one supplier or transfers from several transferors to one transferee are involved, the contracting officer responsible for the largest unsettled (unbilled plus billed-but-unpaid) contract dollar balance is responsible for executing the novation or change-of-name agreement.

6.5.4.c *Novation Policy*

1. The Postal Service generally prohibits contract novation (see paragraph b of Clause 4-1, and Clause B-8, *Assignment of Claims*). However, the

Postal Service may recognize a third party as the successor in interest when that party's interest arises out of the transfer of:

(a) All the supplier's assets; or

(b) The entire portion of the assets involved in performing the contract.

2. Situations in which novation may be permitted include but are not limited to:

(a) Sale of the supplier's assets with a provision for assuming liabilities;

(b) Transfer of assets as part of a merger or corporate consolidation; and

(c) Incorporation of a proprietorship or partnership, or formation of a partnership.

3. Before concurring in a contract novation, the contracting officer must determine the capability (see 2.1.9.c) of the successor in interest.

4. When it is not in the Postal Service's interest to concur in a contract novation, the original supplier remains responsible for performance, and the contract may be terminated for default for failure to perform.

6.5.4.d *Change of Name.* A change-of-name agreement is appropriate when only a change of the supplier's name is involved, and the rights and obligations of the parties remain unaffected. The agreement must be signed by the contracting officer and the supplier modifying all existing contracts between the parties to reflect the name change.

# 6.6 Postal Service Property

## 6.6.1 Supplier's Property Control Systems

6.6.1.a *Review.* The contracting officer or the representative assigned to act as property administrator should review the supplier's property control systems to ensure compliance with the contract's property clauses.

6.6.1.b *Noncompliance.* The property administrator should notify the supplier in writing when its property control system does not comply with the contract requirements, requesting prompt correction of deficiencies. If the supplier does not correct the deficiencies within a reasonable period, the property administrator should request action by the contracting officer. The contracting officer may:

1. Notify the supplier in writing of any required corrections and establish a schedule for completion;

2. Caution the supplier that failure to take the required corrective action within the time specified will result in withholding or withdrawing system approval; and

3. Advise the supplier that its liability for loss of or damage to Postal Service property may increase if approval is withheld or withdrawn.

### 6.6.2 Records

6.6.2.a *Record Keeping.* Supplier records of Postal Service property, established and maintained under the terms of the contract, are the Postal Service's official records. Duplicate official records should be furnished to or maintained by Postal Service personnel, except as provided in 6.6.2.b.2.

6.6.2.b *Maintenance by the Postal Service.* Contracts may provide for the official records to be maintained by the Postal Service when Postal Service property is furnished:

1. For repair or servicing and return to the shipping organization;
2. For use at a Postal Service installation;
3. Under a local support service contract;
4. Under a contract with a short performance period or involving Postal Service property with an acquisition cost of $50,000 or less; or
5. When otherwise determined by the contracting officer to be in the Postal Service's interest.

## 6.7 Subcontracting Policies and Procedures

### 6.7.1 General

6.7.1.a *Requirements*

1. When a contract contains Clause B-18, *Subcontracts*, the supplier must notify the contracting officer in advance of its intent to subcontract. The supplier may enter into a subcontract unless notice of disapproval is received from the contracting officer within 15 days from the date the contracting officer was notified.
2. The purchase team, represented by the contracting officer, must:
   (a) Promptly evaluate supplier notices of intent to subcontract;
   (b) Obtain assistance in this evaluation, as necessary, from subcontracting, audit, pricing, technical, or other specialists; and
   (c) Have the contracting officer notify the supplier in writing if the subcontract is disapproved.

6.7.1.b *Considerations*

1. The purchase team must review the notice of intent to subcontract and any supporting data and should consider the following:
   (a) Is the subcontractor to acquire special test equipment or facilities that are available from Postal Service sources?
   (b) Is the selection of the particular supplies, equipment, or services technically justified?
   (c) Was adequate price competition obtained or its absence justified?
   (d) Did the supplier adequately assess its subcontractor's alternate proposals?

Contract Route Service Order

HQ:LMS:ms

3. Payment Method: PER Annum

OLD $Various

NEW $No Change

| 4. Contract No. | 5. Begin Contract Term | 6. End Contract Term | 7. Latest Change Date |
|---|---|---|---|
| See Below | Various | Various | Various |

| 8. For Mail Service in or Between | City & State | City & State |
|---|---|---|
| | Various | Various |

2004

9. Name

Midwest Transit, Inc.

10. Address (Street, City, State, Zip+4)

PO Box 151
Mt. Carmel, IL 62863-0151

11. This Space for Postal Data Use Only

| Contractor | | | | | | State | | Adjusted Pay This AP | | | | | | | | X7 | 80 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 71 | 72 | 73 | 74 | 75 | 76 | 77 | 78 | x78 | 80 |

COL 80 (8) Change

| 55 | 56 | 57 | 58 | 59 | 60 | 61 | 62 | 71 | 72 | 73 | 74 | 75 | 76 | 77 | 78 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

12. The following Order Is Hereby Issued

The Postal Service has approved a novation agreement, effective December 4, 2003, ~~for the below listed contracts from~~ Midwest Transit Inc. to Midwest Transport, Inc., dba Midwest Transport of Illinois, the address is will remain: PO Box 151, Mt. Carmel IL 62863-0151, the new EIN is: 71-0930845.

| Northeast | New York | Eastern | Eastern | Grt Lakes | Grt Lakes | Southwest | Western |
|---|---|---|---|---|---|---|---|
| 015SE | 08529 | 08013 | 440MR | 465L2 | 62834 | 730CE | 500LO |
| 030LJ | 10112 | 15021 | 440NS | 478AR | 62835 | 740AR | 50318 |
| 030PJ | 10216 | 15030 | 448A8 | 478UO | 628AO | 7401R | 50323 |
| 030VJ | | 15037 | 47611 | 47890 | 62935 | 740JR | 50324 |
| 137CE | Cap Metro | 15116 | 47630 | 48010 | 62936 | 740LR | 663YO |
| 14021 | 207AE | 15117 | 47631 | 530MO | 63290 | 740MS | 680NO |
| 140L5 | 207BE | 151YO | 47634 | 54112 | | 740PR | |
| 14024 | 207CK | 17039 | | 602L9 | | 740RR | Seattle |
| 14041 | 207FE | 171LO | | 60213 | | 740SR | 98011 |
| 14070 | 207HE | 189MR | | 60518 | Southeast | 740TR | 980L3 |
| 14075 | 207JE | 189MS | | 60537 | 32213 | 740WR | 980Y2 |
| 140CE | 207KE | 24011 | | 607L3 | 323DE | | 990L3 |
| 140LO | 207L1 | 270M4 | | 607L6 | 328CE | | |
| 144CJ | 207ME | 28014 | | 607MO | 350DE | | |
| 144EJ | 207QE | 42334 | | | 378CE | | |
| 14737 | 233L4 | 42335 | | | 38125 | | |
| 14813 | | 424AU | | | | | |
| | | 439MR | | | | | |

"THIS IS A TRUE COPY OF THE ORDER BEARING THIS CERTIFICATION."

SIGNED: [signature]

DATE: 1/14/03

[signature]

15. Title of Contracting Officer
Manager, Surface Transportation CMC

14. Address of Contracting Officer
USPS National Mail Transportation Purchasing
475 L'Enfant Plaza SW
Washington, DC 20260-6210

| 16a. Date Ordered | b. Order No. | c. Route Order No. | d. Budget Account No. | e. Finance No. |
|---|---|---|---|---|
| January 14, 2004 | 200-008-04 | 0 | No Change | No Change |

Form 7440, November 1990

# Contract Route Service Order

HQ:TMS:tms

3. Payment Method: PER Annum

OLD: $1,797,072.13

NEW: $No Change

| 4. Contract No. | 5. Begin Contract Term | 6. End Contract Term | 7. Latest Change Date |
|---|---|---|---|
| 14024 | 7/1/2003 | 6/30/2007 | 12/04/2003 |

| 8. For Mail Service in or Between | City & State | City & State |
|---|---|---|
| | Various | Various |

9. Name: Hal D. Hicks Mail Transportation

10. Address (Street, City, State, Zip+4): PO Box 98, Sumner IL 62466-0098

11. This Space for Postal Data Use Only

| Contractor | | | | | | State | | Adjusted Pay This AP | | | | | | | X7 8 | 80 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 71 | 72 | 73 | 74 | 75 | 76 | 77 | 78 | X78 | 80 |

COL 80 (X) Change

| 55 | 56 | 57 | 58 | 59 | 60 | 61 | 62 | 71 | 72 | 73 | 74 | 75 | 76 | 77 | 78 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

12. The following Order Is Hereby Issued

The Postal Service has approved a novation agreement, effective December 4, 2003, for this contract from Hal D Hicks Mail Transportation to Midwest Transport, Inc., dba Midwest Transport of Illinois, the new address is: PO Box 151, Mt. Carmel IL 62863-0151, the new EIN is: 71-0930845.

"THIS IS A TRUE COPY OF THE ORDER BEARING THIS CERTIFICATION."

SIGNED: [signature]

DATE: 2/24/04

[signature]

13. Title of Contracting Officer: Russell A. Sykes, Manager, Surface Transportation CMC

14. Address of Contracting Officer: USPS National Mail Transportation Purchasing, 475 L'Enfant Plaza SW, Washington, DC 20260-5210

| 16a. Date Ordered | b. Order No. | c. Route Order No. | d. Budget Account No. | e. Finance No. |
|---|---|---|---|---|
| February 24, 2004 | 200-009-04 | 0 | No Change | No Change |

PS Form 7440, November 1990

IN THE CIRCUIT COURT OF THE SECOND JUDICIAL CIRCUIT
LAWRENCE COUNTY OF ILLINOIS

EXHIBIT 2

MIDWEST TRANSPORT, INC.,
Plaintiff,

v.

HAL D. HICKS; HAL D. HICKS d/b/a
HAL D. HICKS MAIL TRANSPORTATION;
HHMT, INC.; and PAM MASON
Defendants.

Case No.

At Law

## AFFIDAVIT

I, Kenneth Hohlbaugh, being sworn upon oath, state that:

1. I am the President of Midwest Transport, Inc., ("Midwest Transport") located at 205 South Cross Street, Robinson, Illinois. From August 1, 2001 to December 4, 2003, I was the General Manager of Midwest Transit, Inc. ("Midwest Transit") located first in Sumner, Illinois and then Robinson, Illinois. All of the following statements are based on my own personal knowledge and if called and sworn as a witness in any trial or proceeding, I could and would testify with respect thereto.

2. Midwest Transport has a just claim for conversion against defendant Hal D. Hicks ("Hicks"), who claims that his primary residence is in Daytona Beach Shores, Florida. Upon information and belief, Hal D. Hicks also owns property and a residence in Mount Carmel, Illinois and multiple parcels of real estate in Sumner, Illinois.

3. I believe that Midwest Transport is entitled to recover from Hicks the amount of $170,237.34, after allowing all just credits and set-offs, which is now due. Midwest Transport's claim is based on the following facts.

## Background

4. Hal D. Hicks was one of two 50% stockholders of Midwest Transit, Inc. The other stockholder in Midwest Transit was C. Michael and Diane Witters (hereinafter collectively referred to as "Witters").

5. In January 2000, Witters, on behalf of themselves and derivatively on behalf of Midwest Transit, filed suit against Hicks in the Circuit Court of the Second Judicial Circuit in Lawrence County, Illinois, Cause No. Law No. 2000-L-2 (hereinafter referred to as the "Action"). The Action is currently pending before the Honorable James V. Hill.

6. In the Action, the Court found that Hicks committed fraud, misapplied corporate assets, engaged in self-dealing and conflicts of interest (A copy of the Court's Order dated July 25, 2001 is attached hereto as Exhibit A, p. 2-3, ¶ 5 A-C; aff'd in part by, Witters v. Hicks, 335 Ill. App.3d. 435 (5th Dist. 2002) attached hereto as Exhibit B). The Court also found that "Hicks treats the Buffalo Route as his own business and does not deposit the revenues received from said route into Midwest's accounts" (Exh. A, p. 3, ¶ 5 C). The Court appointed a Receiver to operate Midwest Transit and enjoined the parties from interfering with the Receiver's activities in any manner or diverting any funds away from the corporation and its accounts, including "all income generated by the Buffalo Route" (Exh. A, p. 4, ¶¶ A, C).

7. The Highway Contract No. 14024 with the United States Postal Service is for mail service between Buffalo, NY and Pittsburgh, PA (hereinafter referred to as the "Buffalo Route"). The Buffalo Route contract had been previously held in the name of "Hal D. Hicks Mail Transportation" but the Court found on July 25, 2001 that, due to Hicks' violation of his corporate fiduciary duty, the route was the property of Midwest Transit (Exh. A, aff'd, Witters v. Hicks, 335 Ill. App.3d. 435 at 444).

8. On March 25, 2002, the Court ordered the dissolution of Midwest Transit and further ordered the Receiver to sell the assets of the company (A copy of that Order is attached hereto as Exhibit C). The Court ordered the Receiver to continue to operate the mail contracts until they could be sold or conveyed (Exh. C, p. 2, ¶ 5). Once again, the Court enjoined the parties from interfering with the Receiver's activities or diverting any funds away from the corporation and its accounts, including "all income by the Buffalo Route" (Exh. C, p. 3, ¶ 8).

9. In response to the Court's direction to the Receiver to sell the assets of Midwest Transit, the undersigned affiant, together with others, formed a new corporation named "Midwest Transport, Inc." and made an offer to purchase the trucking assets and the mail contracts from the Receiver. The United States Postal contracts specifically bargained for included the Buffalo Route, Contract No. 14024.

10. On January 14, 2003, the Court approved the proposed purchase by Midwest Transport and entered an Order directing the Receiver to enter into a definitive agreement to that effect (A copy of the January 14, 2003 Order is attached hereto as Exhibit D).

11. The sale was concluded and on December 4, 2003, the United States Postal Service ordered the various postal contracts novated from Midwest Transit to Midwest Transport (A copy of the Asset Purchase Agreement and First Amendment thereto is attached hereto as Exhibit E). The United States Postal Service also issued a Contract Route Service Order, dated January 14, 2004, which lists all of the contracts, including the Buffalo Route, which are subject to the Novation Agreement (Contract Route Service Order is attached hereto as Exhibit F).

12. All of the contracts listed on Exhibit F had been in the name of Midwest Transit except the Buffalo Route (#14024) which had been in the name of Hal D. Hicks Mail Transportation. Therefore, in order to clarify the transfer of the Buffalo Route to Midwest

Transport, the United States Postal Service issued another Contract Route Service Order dated February 24, 2004, (effective December 4, 2003), which specifically ordered the contract novated from Hal D. Hicks Mail Transportation to Midwest Transport (A copy of that Order is attached hereto as Exhibit G).

**Recent Events Giving Rise to Plaintiff's Claims**

13. Midwest Transit regularly received the money from the United States Postal Service for the service on the Buffalo Route from July 2001 until November 2003. From December 2003 until February, 2004, Midwest Transport received the payments for service on the Buffalo Route. When the February payment did not arrive, I commenced an investigation. The investigation was performed by Midwest Transport's employees under my direction and supervision.

14. Midwest Transport's USPS Contract Administrator, N. Janie Ensminger, contacted the Postal Service Accounting Service Center in St. Louis, Missouri and spoke with the specialist handling the payment of the Buffalo Route, Kay Zakszewski. Zakszewski informed Ensminger of the following:

a. The check issued on January 30, 2004, in the amount of $17,284.22, was cashed on February 24, 2004.

b. The check issued on February 19, 2004, in the amount of $137,480.92, was cashed on February 24, 2004.

c. The check issued on March 4, 2004, in the amount of $15,472.20, was cashed on March 9, 2004.

15. All of the above-referenced checks were payments for service performed by Midwest Transport on the Buffalo Route (hereinafter collectively referred to as the "Checks"). None of Midwest Transport's employees cashed the Checks, totaling $170,237.34.

16. Upon further investigation, all of the Checks were mailed to P.O. Box 98, Sumner, Illinois, which had been the old mailing address of Midwest Transit. Further, I was informed on March 18, 2004, by the Post Office at Sumner, Illinois, that Hicks has access to that P.O. Box.

17. The Checks appear to have been deposited into a Suntrust bank account in Florida and Ensminger knows that Hal D. Hicks has had an account with Suntrust in Florida. Two of the Checks were endorsed "For Deposit Only Hal D. Hicks" and one Check was simply endorsed "For Deposit Only" but deposited at the same bank as the other two checks (Copies of the front and back of the Checks are attached hereto as Exhibit H).

18. Hal D. Hicks has not had any right to the Buffalo money for over 2 ½ years nor has he performed any service on the Buffalo Route since July, 2001.

19. Midwest Transport believes and alleges that Hal D. Hicks has exerted unauthorized control over funds rightfully belonging to Midwest Transport in the amount of $170,237.34. Therefore, Midwest Transport has filed a Complaint for conversion against Hicks and other defendants in the Circuit Court of the Second Judicial Circuit in Lawrence County, Illinois.

**Causes for Attachment**

20. I have good reason to believe and do believe that one or more of the following causes for attachment exist.

21. In past litigation, Hicks has claimed that his primary residence is in Daytona Beach Shores, Florida. Upon information and belief, Hal D. Hicks also owns property and a residence in Mount Carmel, Illinois and multiple parcels of real estate in Sumner, Illinois.

22. Upon information and belief, Hicks has in the past concealed or stood in defiance of a process server so that process could not be served upon him. Specifically, Hicks concealed himself from a process server by hiding for several hours in the men's restroom in the federal court for the Southern District of Illinois to avoid service of process. Further, Hicks has also tried to avoid service of process in another suit when the process server attempted to serve him in the Lawrence County, Illinois courthouse.

23. Furthermore, Hicks exercised dominion over the Checks as though they were his own and improperly removed them from the state of Illinois.

OFFICIAL SEAL
DEONA D DUGGER
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES:03/08/08

Further, Affiant saith not.

Kenneth Hohlbaugh

STATE OF ILLINOIS, COUNTY OF CRAWFORD:

Sworn to and subscribed before me this 2nd day of April, 2004, by Kenneth Hohlbaugh, who is personally known to me.

Notary Public

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **HAL D. HICKS, f/d/b/a HAL D. HICKS MAIL TRANSPORTATION,** | **Fed. Cl. No. 05-1058C** |
| **Plaintiff** | **(Judge Allegra)** |
| **v.** | |
| **UNITED STATES,** | |
| **Defendant** | |
| **v.** | |
| **MIDWEST TRANSPORT, INC.** | |
| **Defendant-Intervenor.** | |

**DECLARATION OF J. MICHAEL LITTLEJOHN**

Pursuant to 28 U.S.C. § 1746, I declare as follows:

1. My name is J. Michael Littlejohn. I am a shareholder in the law firm of Akerman Senterfitt Wickwire Gavin. Our firm is counsel for Midwest Transport, Inc. in the above-caption matter.

2. In the course of preparing the motion for summary judgment filed with the court in this case, I searched the Excluded Parties List System (EPLS) at http://www.epls.gov/ for Plaintiff Hal D. Hicks. The Excluded Parties List provides a list of those individuals and firms that have been debarred or suspended from government contracting pursuant to FAR Subpart 9.4. It is my understanding that the United States Postal Service also uses this listing for debarred and suspended parties.

3. At the www.epls.gov website, I conducted a search under the "Advanced Search" feature for "Partial name" equaling "Hicks" and "Agency" equaling "PS." The search returned one hit for Hal D. Hicks, the results of which are attached to this declaration.

4. According to the "CT Codes" listed on the search results, Mr. Hicks was suspended by the Postal Service on January 25, 2006 and then debarred on September 29, 2006. That debarment is schedule to end on September 30, 2009.

5. Using a hyperlink on the results for Mr. Hicks relating to the CT Code "A" refers the user to another section of the http://www.epls.gov/epls/jsp/CTCodes.jsp?type=recip#code_A which describes that code in the following manner.

**A**

**Cause**
Debarment by an agency pursuant to FAR 9.406-2, GPO Instructions 110.11A or 39 CFR 601.113, for one or more of the following causes: (a) conviction of or civil judgment for fraud violation of antitrust laws, embezzlement, theft, forgery, bribery, false statements, or other offenses indicating a lack of business integrity; (b) violation of the terms of a Government contract, such as a willful failure to perform in accordance with its terms or a history of failure to perform; or (c) any other cause of a serious and compelling nature affecting responsibility. (See Code N- Debarment pursuant to FAR 9.406 2(b)(2) Drug Free Workplace Act of 1988.)
**Treatment**
Contractors are excluded from receiving contracts and from directly or indirectly receiving benefits under Federal nonprocurement programs, and agencies shall not solicit offers from, award contract to renew or otherwise extend the duration of current contracts, or consent to subcontracts with these contractors, unless the acquiring agency's head or a designee determines that there is a compelling reason for such action. Government prime contractors, when required by the terms of their contract, shall not enter into any subcontract equal to or in excess of $25,000 with a contractor that is debarred, suspended, or proposed for debarment, unless there is a compelling reason to do so. Debarments are for a specified term as determined by the debarring agency and as indicated in the listing.

I declare under penalty of perjury that the foregoing is true and correct.

J. Michael Littlejohn

October 26, 2007



{TY023249;1}

# EPLS

Excluded Parties List System



**Search - Current Exclusions**

- > Advanced Search
- > Multiple Names
- > Exact Name and SSN/TIN
- > MyEPLS

**View Cause and Treatment Code Descriptions**

- > Reciprocal Codes
- > Procurement Codes
- > Nonprocurement Codes

**Agency & Acronym Information**

- > Agency Contacts
- > Agency Descriptions
- > State/Country Code Descriptions

**OFFICIAL GOVERNMENT USE ONLY**

- > Debar Maintenance
- > Administration
- > Upload Login

**EPLS Search Results** Results **1 - 1** of **1**

## Search Results for Parties Excluded by

**Partial Name : hicks**
**Agency : PS**

**Save to MyEPLS**

Page: **1**

| | |
|---|---|
| **Name** | Hicks, Hal D |
| **Classification** | Individual |
| **Exclusion Type** | Reciprocal |
| **Description** | none |

**Address(es) --**

| | |
|---|---|
| **Verify Street 1** | |
| **Verify Street 2** | |
| **Address** | Daytona Beach, FL, 32119-5432 |
| **DUNS** | none |

**CT Action(s) --**

| | |
|---|---|
| **Action Date** | 25-Jan-2006 |
| **Termination Date** | Indef. |
| **CT Code** | B |
| **Agency** | PS |
| **Agency POC** | PS Contacts |
| **Action Status** | Created (25-Jan-2006) |

| | |
|---|---|
| **Action Date** | 25-Jan-2006 |
| **Termination Date** | Indef. |
| **CT Code** | A1 |
| **Agency** | PS |
| **Agency POC** | PS Contacts |
| **Action Status** | Created (25-Jan-2006) |

| | |
|---|---|
| **Action Date** | 29-Sep-2006 |
| **Termination Date** | 30-Sep-2009 |
| **CT Code** | A |
| **Agency** | PS |
| **Agency POC** | PS Contacts |
| **Action Status** | Created (25-Jan-2006) |

**Cross Reference(s) --**

| | Name | Action Date | Term Date | CT Code |
|---|---|---|---|---|
| 1. | Mason, Pam | 25-Jan-2006 | 28-Mar-2009 | A |

Page: **1**

**Back New Search Report Excel XML ASCII Printer-Friendly**

**Resources**

- > Search Help
- > Public User's Manual
- > FAQ
- > Acronyms
- > Privacy Act Provisions
- > News

**Reports**

- > Advanced Reports

**Archive Search - Past Exclusions**

- > Advanced Archive Search
- > Multiple Names

**Contact Information**

- > Email: support@epls.gov
  eplscomments@epls.gov
- > Phone: 1-866-GSA-EPLS
  1-866-472-3757