# PLAINTIFF'S APPENDIX

Contract Route Service Order, dated February 24, 2004 .......... App. 001

Hicks Affidavit .......... App. 002

Order, dated May 16, 2005 .......... App. 005

Excerpt of Transcript, dated June 26, 2001 .......... App. 009

First Amendment to Definitive Assets Purchase Agreement .......... App. 019

Novation Agreement .......... App. 031

USPS Checks Issued to Hal D. Hicks Main Transportation .......... App. 035

# Contract Route Service Order

3. Payment Method: PER Annum

NEW: $No Change

| 4. Contract No. | 5. Begin Contract Term | 6. End Contract Term | 7. Latest Change Date |
|---|---|---|---|
| 14024 | 7/1/2003 | 6/30/2007 | 12/04/2003 |

8. For Mail Service in or Between — City & State: Various — City & State: Various

9. Name: Hal D. Hicks Mail Transportation

10. Address (Street, City, State, Zip+4): PO Box 98, Sumner IL 62466-0098

11. This Space for Postal Data Use Only

12. The following Order Is Hereby Issued

The Postal Service has approved a novation agreement, effective December 4, 2003, for this contract from Hal D Hicks Mail Transportation to Midwest Transport, Inc., dba Midwest Transport of Illinois, the new address is: PO Box 151, Mt. Carmel IL 62863-0151, the new EIN is: 71-0030845.

"THIS IS A TRUE COPY OF THE ORDER BEARING THIS CERTIFICATION."

SIGNED: [signature]

DATE: 2/24/04

13. Signature of Contracting Officer: [signature]
Russell A. Sykes
Manager, Surface Transportation CMC

14. Address of Contracting Officer:
USPS National Mail Transportation Purchasing
475 L'Enfant Plaza SW
Washington, DC 20260-1210

| 15a. Date Ordered | b. Order No. | c. Route Order No. | d. Budget Account No. | e. Finance No. |
|---|---|---|---|---|
| February 24, 2004 | 200-009-04 | 0 | No Change | No Change |

PS Form 7440, November 1990

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| HAL D. HICKS, f/d/b/a HAL D. HICKS MAIL TRANSPORTATION, | ) |
| PLAINTIFF, | ) |
| v. | ) No. 05-1058C |
| THE UNITED STATES POSTAL SERVICE, | ) |
| DEFENDANT, and | ) |
| MIDWEST TRANSPORT, | ) |
| INTERVENOR. | ) |

**AFFIDAVIT OF HAL D. HICKS**

I, Hal D. Hicks, upon my oath, states:

1. I am over 18 years of age. I have personal knowledge to the facts stated herein.

2. Midwest Transit's trucking assets were improperly sold to Midwest Transport in late December 2003. Midwest Transit's revenues were well in excess of $60,000,000.00 per year.

3. The sale of Midwest Transit's trucking assets was consummated through an amended asset purchase agreement that was not approved by the trial court supervising the Receivership. The amendment resulted in a fraudulent 9-month backdated sale, which then caused Midwest Transit to lose large revenues, net income and tax benefits.

4. I was the contractor on U. S. Highway Mail Contract 14024, from its inception until it was improperly novated into Midwest Transport name in early 2004.

5. Contract 14024 was at all times a permanent mail contract, renewed every 4 years in my d/b/a's name, including the 2003 renewal.

6. The annual revenues received on Contract 14024 was well in excess of $2,000,000.00 annually.

7. Prior to the February 2004, all revenue checks from the United States Postal Service for Contract 14024 came in the name of Hal D. Hicks Mail Transportation.

8. Hal D. Hicks Mail Transportation was a d/b/a for me personally.

9. Apparently, someone at Midwest Transport had been forging my name to these checks for many months. To my knowledge some 80-plus checks, which were issued in my name, were forged and improperly/illegally negotiated.

10. I was not a party to, nor did I consent to or approve of a novation of Contract 14024 from my name to Midwest Transport, Inc.

11. I filed a timely certified claim to the contracting officer regarding the improper novation of Contract 14024. This claim was subsequently denied by the contracting officer.

12. The Illinois State Court (cause No. 00-L-2) never found that the Buffalo Route was Midwest Transit's.

13. The S.D. of Illinois found in my favor when it ruled the state trial and appellate court did not make a determination that the Buffalo route was Midwest Transit's. They instead found the contract was mine.

Hal D. Hicks

State of Florida
Co. of Volusia
Subscribed and sworn to before me this 5th day of December 2007
Personally known

Notary Public
BARBARA K CHEH

My Commission Expires:

BARBARA K. CHEH
MY COMMISSION # DD 634945
EXPIRES: April 8, 2011
Bonded Thru Budget Notary Services

Westlaw



Hicks v. Midwest Transport, Inc.
S.D.Ill.,2005.
Only the Westlaw citation is currently available.
United States District Court,S.D. Illinois.
Hal HICKS, Plaintiff,
v.
MIDWEST TRANSPORT, INC. d/b/a, Midwest Transport of Illinois, Defendant.
No. 2004-CV-4263-JPG.

May 16, 2005.

John F. Theil, Theil Law Firm, St. Louis, MO, for Plaintiff.
Kelley F. Farrell, Carmody, MacDonald et al., St. Louis, MO, for Defendant.

*MEMORANDUM AND ORDER*

GILBERT, J.

***1** This matter comes before the Court on Defendant Midwest Transport's motion to dismiss this case for lack of subject matter jurisdiction, see FED. R. CIV. P. 12(b)(1), or, in the alternative, stay these proceedings (Doc. 5), to which Plaintiff Hal Hicks responded (Doc. 11) and Midwest Transport replied. (Doc. 12). For the reasons discussed below Midwest Transport's motion will be DENIED.

This Court is well acquainted with the parties to this case so only the relevant facts will be recounted here. Plaintiff, Hal Hicks, is in the transportation business. In the 1990s, he teamed up with C. Michael Witters and Diane Witters, who are married to each other, and started Midwest Transit, Inc., an Illinois corporation formed to fill the United States Postal Service's need for over-the-road contract mail delivery services. Hicks owned fifty percent of Midwest Transit's stock; the Witters together owned the other fifty. Significantly, Hicks was placed in charge of day-to-day company operations. But that turned out to be a decision which, as Judge Evans has written in another context, "[i]n retrospect ... looks a lot like Mister Burns' determination that Homer Simpson would make a fine nuclear safety inspector."*Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co.,* 200 F.3d 1102, 1105 (7th Cir.2000). That's because, in short order, the Witters suspected Hicks of mismanaging corporate assets. Their main concern was Hicks's apparent practice of converting assets from company use to his own personal use. Suspicions in hand, and with the help of a lawyer, the Witters petitioned the Circuit Court of Lawrence County, Illinois for an order removing Hicks as manager of Midwest Transit and appointing a custodian in his place-a move which Illinois law gave them every right to do in their capacity as shareholders. 805 ILCS 5/12.56(a). Following careful consideration of the petition, Illinois Circuit Judge James Hill granted the Witters' wish and appointed Donald Hoagland as custodian. These and other details are cogently explained in the Illinois appellate court's published opinion in *Witters v. Hicks,* 335 Ill.App.3d 435, 269 Ill.Dec. 241, 780 N.E.2d 713 (Ill.App.Ct.2002)(*Hicks I* ). Subsequent legal proceedings led the circuit court to conclude that Midwest Transit was beyond repair and should be liquidated forthwith. That ruling was the subject of another Hicks appeal and another published state-court opinion. See *Witters v. Hicks,* 338 Ill.App.3d 751, 273 Ill.Dec. 863, 790 N.E.2d 5 (Ill.App.Ct.2003)(*Hicks II* ). For what it's worth, the Court notes that the parties haven't told us what the status of the state-court litigation is-and that's a fact which weighs heavily in the Court's disposition of the motion to stay, as we'll see when we get to the end of this Order.

That said, now comes the really important part. In carrying out his duties as liquidating receiver, Hoagland sold most if not all of Midwest Transit's assets to the defendant in this case: a concern named Midwest Trans*port,* not to be confused with Midwest Trans*it.*One such asset (or perhaps it was "Hicks's asset"-that's the issue Hicks raises in this case) was a Postal Service contract the parties refer to as the Buffalo route-or H.C.R. No. 14024, in postal parlance-which Midwest Transport continues to service to this day without Hicks's assistance. It's been undisputed all along that the documents memorializing the Buffalo route deal were executed between the Postal Service and Hicks alone; Midwest Transit's name just isn't there. So under normal circumstances at least, probably most jurists would be tempted to presume that Hicks-and Hicks alone-owned the Buffalo route outright. After all, the written contract itself, supposedly the best evidence of the deal, was indisputably executed by Hicks alone, right? And so Hicks argues, though Midwest Transport points out that there's more to the story

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

than what we've said thus far. For one thing, there is the Illinois appellate court's first published opinion in this case. There the court observed, "Hicks acknowledges that several [Midwest Transit] trucks are used to operate the Buffalo route."*Hicks I*, 269 Ill.Dec. 241, 780 N.E.2d at 720. Moreover, the appellate court added, "[Midwest Transit] pays for all fuel and other operating costs."269 Ill.Dec. 241, 780 N.E.2d at 720. So given that the Buffalo route was maintained all along in Hicks's name and that "[s]ince the beginning of the present suit, Hicks retained the revenue from the route, although it continues to be operated by [Midwest Transit] and at [Midwest Transit's] expense." Hicks's conduct evidenced to that tribunal "exactly the type of commingling of personal and corporate assets that justifies the appointment of a receiver."269 Ill.Dec. 241, 780 N.E.2d at 720. Thus, Midwest Transport draws two conclusions from *Hicks I* on which it bases this motion to dismiss. First, it sees *Hicks I* as a conclusive adverse decision against Hicks on the claim he's asserted in this case. As such, Midwest Transport reasons, this Court-a court of federal *original* jurisdiction, not *appellate* jurisdiction-must dismiss Hicks's claim under the doctrine set forth in *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983). And if that doesn't fly, Midwest Transport continues, then Hicks's claim in this case is barred by the affirmative defense of res judicata. On this note Midwest Transport refers us to language in *Hicks I* where the court, after enjoining the parties in that case from interfering with Hoagland's (who again was Midwest Transit's receiver) control of Midwest Transit, including "all income generated by the Buffalo route," wrote that "[w]ith respect to the ... income generated from the Buffalo route, the evidence demonstrates that such *revenue* properly belongs to [Midwest Transit]." 269 Ill.Dec. 241, 780 N.E.2d at 721 (emphasis added).

*2 Let's tackle the *Rooker-Feldman* argument first. Before getting too far afield the Court notes in fairness to Midwest Transport that the United States Supreme Court decided *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, --- U.S. ----, 125 S.Ct. 1517, --- L.Ed.2d ---- (2005), after briefing was completed in this case. *Exxon* clarified the contours of *Rooker-Feldman* to the extent that it's debatable whether Midwest Transport would have made this argument at all were it with the benefit of that decision prior to making the motion. Be that as it may, let's begin our analysis with the applicable legal principle, stated by *Exxon* as follows:

The *Rooker-Feldman* doctrine, we hold today, is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments. *Rooker-Feldman* does not otherwise override or supplant preclusion doctrine or augment the circumscribed doctrines that allow federal courts to stay or dismiss proceedings in deference to state-court actions.

*Exxon*, 125 S.Ct. at 1521-1522. As applied to this case, *Exxon* suggests that a threshold problem with Midwest Transport's current position is that the state-court decisions Midwest Transport cites in support of its motion fail to reveal any state-court judgment "rendered [on this claim] before the district court proceedings commenced."As discussed in further detail below, *Hicks I* explored whether the appointment of a receiver was appropriate in the first instance, and *Hicks II* was even further afield. Indeed, here's how *Hicks I* described the issues involved in that appeal: "Hicks appealed the trial court's order appointing Hoagland as receiver. He also filed an interlocutory appeal of the trial court's order denying his motion to vacate the orders of attachment. This court ordered the appeals to be consolidated for purposes of the record, arguments, and disposition."*Hicks I*, 269 Ill.Dec. 241, 780 N.E.2d at 716. Even more fundamentally, Midwest Transport fails to explain how Hicks's current lawsuit could be characterized as "inviting district court review and rejection" of any state court judgment. Note that in order for this case to fit within *Rooker-Feldman*, one would have to be capable of characterizing Hicks's claim in this case as an appeal of a state-court judgment. In other words, the relief Hicks would necessarily seek from this Court would be vacatur of a state-court judgment, in some form or another, e.g., perhaps because the statute applied against him in those proceedings was unconstitutional. Such a claim would only be fair game for an appeal, but it's a far cry from the claim Hicks makes in this case. *Rooker*'s description of the district court "claim" at issue there underscores this view.A reading of the entire bill shows indisputably that there was full jurisdiction in the state court and that the bill at best is merely an attempt to get rid of the judgment *for alleged errors of law* committed in the exercise of that jurisdiction.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*3263 U.S. at 416 (emphasis added). Similarly, *Feldman* described its claim as follows:It is clear that [the plaintiffs'] allegations that the District of Columbia Court of Appeals acted arbitrarily and capriciously in denying their petitions for waiver and that the court acted unreasonably and discriminatorily in denying their petitions in view of its former policy of granting waivers to graduates of unaccredited law schools ... required the District Court *to review* a final judicial decision of the highest court of a jurisdiction in a particular case.

460 U.S. at 487 (emphasis added). In this case, by contrast, note that Hicks stated his prayer for relief as follows-and it's a characterization this Court has been given to reason to question:WHEREFORE, Hal D. Hicks, respectfully prays that this court enter judgment in his favor for conversion [and] that Mr. Hicks be awarded all damages incurred to date, that a constructive trust be award[ed] Mr. Hicks for the reasonable profits made on Highway Mail Contract 14024, and that this court return Highway Mail Contract 14024 to Mr. Hicks' possession and control, and for any other relief this court deems just and proper.

**(Doc. 1 at 5). Whatever the merits of Hicks's claim, it clearly cannot be fairly characterized as an attack on any state-court judgment *qua* judgment based on the materials presented to this point.**

On to res judiciata. The parties both agree on the governing legal principle, including the requirement that the former adjudication have reached a final judgment on the merits of the claim at issue in the second case. *Garcia v. Village of Mount Prospect,* 360 F.3d 630, 635 (7th Cir.2004). Indeed, this is exactly where Midwest Transport's argument fails: for as Hicks suggests, that no state court explicitly declared Midwest Transit the owner of the Buffalo route is difficult to get around. As the Court hinted above, *Hicks I* merely addressed the propriety of appointing a receiver to relieve Hicks of his duties as Midwest Transit's managing shareholder. Thus, the state court's discussion of Hicks's conduct relative to the Buffalo route was only relevant to the extent it suggested Hicks was "act[ing] in a manner that is illegal, oppressive, or fraudulent with respect to the petitioning shareholder whether in his or her capacity as a shareholder, director or officer:"805 ILCS 5/12.56(a)(3), or perhaps whether Midwest Transit's assets were "being misapplied or wasted." § 5 12.56(a)(4). Note that a principal concern in *Hicks I* was the "commingling" of assets. BLACK'S LAW DICTIONARY 264 (7th ed.1999), defines commingling as "[a] mixing together: esp., a fiduciary's mixing of personal funds with those of a beneficiary or client."So on some level at least, *Hicks I* believed that personal (i.e., separate) property was involved in the commingled Buffalo route account. It's therefore safe for us to infer that the state appellate court thought Hicks retained some ownership interest therein. If not, why would the appellate court describe the problem before it as a "commingling" of assets? Moreover, one mustn't ignore the context of *Hicks I.* It's axiomatic that the decision whether to order a corporation into receivership is an equitable judgment, 16 FLETCHER'S CYCLOPEDIA OF PRIVATE CORPORATIONS § 7671 (1999 & supp.2005), and considerations of equity include fairness and preservation of the status quo-the latter a concept particularly relevant in *Hicks I* since the appellate court was also presented with a preliminary injunction entered by the state circuit court. This context is important because it explains the circuit court's judgment (affirmed by the appellate court) "enjoining" the parties from "diverting any funds away from the corporation and its accounts," including "all income generated by the Buffalo route," and also the appellate court's statement-again, written in the context we've just described-that all "income generated from the Buffalo route ... properly belongs to [Midwest Transit.]"*Hicks I,* 269 Ill.Dec 241, 780 N.E.2d at 721. In the final analysis, this language simply reflects the state courts' preliminary judgments to maintain the status quo pending the final resolution of that case.

*4 All this is not to say, of course, that Midwest Tranport's instincts might not be correct. That's why the Court hinted that Midwest Transport's motion is denied based on the information presented up to this point. Indeed, it's hard to believe that the Illinois circuit court-and the Postal Service, for that matter-would've stood by or actively participated in a novation which allegedly erroneously assumed Midwest Transit owned the Buffalo route when that route was in fact owned by Hicks. If the Buffalo route was Hicks's personal property, perhaps Illinois law required him to make a claim with the circuit court on pain of losing the claim forever. See, e.g., 805 ILCS 5 12.75. Alternatively, maybe some other state-court decision exists which squarely resolves Hicks's rights to the Buffalo route vis-a-vis Midwest

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Transit. So to the extent these considerations apply, Midwest Transport is invited to move for summary judgment later.

In closing, the Court will address Midwest Transport's request for a stay of these proceedings pending a ruling on a motion for summary judgment Midwest Transport filed in a parallel (we'll assume it's parallel for the sake of argument) state court case. In a nutshell, the Court finds that a stay here would be inappropriate. At this point (again, without knowing the status of the state-court litigation relating to the liquidation proceedings) the only conceivable basis for granting a stay in this case is the abstention doctrine set forth in *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). But that doctrine is principally based on the notion that it's a waste of judicial resources to litigate a parallel case when another case is on the cusp of a final judgment and much time and effort has been expended in getting to that point. Simply put, the filing of one motion for summary judgment just doesn't fit the bill.

*CONCLUSION*

Midwest Transport's motion to dismiss Plaintiff's complaint, or in the alternative, motion to stay proceedings (Doc. 5) is DENIED. Per FED. R. CIV. P. 12(a)(4)(A), Midwest Transport's answer to Plaintiff's complaint is due within 10 days of service of this Order.

IT IS SO ORDERED.

S.D.Ill.,2005.
Hicks v. Midwest Transport, Inc.
Not Reported in F.Supp.2d, 2005 WL 1267463 (S.D.Ill.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

COPY

*IN THE MATTER OF:*

***C. Michael Wilson***

***vs.***

***[illegible]***

***Transcript of Proceedings, Volume 2***

***6/26/01***

***Gore Perry Gateway & Lipa Reporting***
***515 Olive Street***
***Suite 1007***
***St. Louis, MO 63101***

and that has to do with what's called the Buffalo route.

A: Yes.

Q: Would you explain to the Court, first of all, just what the Buffalo route is?

A: The Buffalo route is a highway contract, highway transportation contract, with Buffalo, New York as a termini. I'll stop there.

Q: Well, for those of us who don't do mail contracting, does that mean trucks start there and stop there; what does it mean?

A: Trucks start there, stop there and come back to there transporting mail on a regular basis between points.

Q: Does Midwest Transit have a connection to the Buffalo route?

A: Yes, it does.

Q: Could you explain to the Court how the Buffalo route came about and what it did?

A: Some years ago the postal service was changing its rules and trying to decide what to do about safety ratings for companies that hauled mail for it. It made a very temporary decision which precluded Midwest Transit from bidding on the Buffalo route which came up for bid at that

Sommer?

MR. SOMMER: No, I have not. Can we take one second? Your Honor, may we take a five-minute break to confer about the exhibits? And for the record, we received that this morning, so we are trying to ascertain if we have an objection to that.

THE COURT: Let's take five minutes then.

(Recess)

THE COURT: I guess we wish Mr. Witters to return to the stand?

MR. BERTSCHY: I would like him to do so.

THE COURT: Please do.

MR. BERTSCHY: Judge, while we were off the record, opposing counsel was looking at the records that Mr. Witters had gone through and the -- I think we have a stipulation. I am going to state what I think it is, and we can see if this is what's agreed to, that as Mr. Witters has testified, the official name of the contract is in Mr. Hicks' name. However, since the very first date of that contract, Buffalo contract, the monies have been paid into -- have been paid into Midwest Transit and appear on a particular line on the balance sheet or the financial statement as Mr. Witters has testified

testified that the contract was officially and technically in Mr. Hicks' name. However, since the first day of the contract, sometime before 1994, this money was put into the, by whomever, the money was put into the treasury of Midwest Transit, was transferred into the account, and that the financial statement in fact has a line that refers to that as Mr. Witters testified to. And that continued without fail up until the year 2000. And we pick up the testimony from there to talk about what happened after the year 2000.

MR. SOMMER: That's fine.

THE COURT: All right.

Q: (by Mr. Bertschy) All right. Mike, if we could continue then.

A: All right.

Q: I think when we broke, we were talking about those documents, but let's move on with that. You have heard the stipulation we just gave; is that accurate?

A: I have trouble with the characterization of Mr. Hicks putting the money into the company, Mr. Hicks paid over to the company. It's money.

Q: That's what I wanted to get to.

A: Yes.

THE COURT: Okay. If you would, please.

CROSS-EXAMINATION

QUESTIONS BY MR. SOMMER:

Q: Mr. Witters, Mr. Hicks is the party who has the contract with the United States Postal Service for the Buffalo route; isn't that correct?

A: I don't believe it's his contract, but it stands in his name.

Q: So the contract is in his name, correct?

A: Stands in his name.

Q: Is that correct, sir? I am trying to ask yes or no questions.

A: I've given you my answer.

MR. SOMMER: Your Honor, I believe I asked the question which is to be answered yes or no. He's doing phraseology.

THE COURT: I am going to overrule your objections because he answered. I don't think it's capable of being asked and answered in such a succinct manner without creating inherent misunderstanding.

Q: (by Mr. Sommer) Okay. Is the contract with the United States Postal Service for the Buffalo route in the name of Hal D. Hicks?

MR. BERTSCHY: Object. Asked and answered.

MR. SOMMER: I don't think I got an answer.
THE COURT: He answered in his own way.
A: The contract on the piece of paper has Hal D. Hicks' name on it.
Q: (by Mr. Sommer) And Midwest Transit is not a party to the contract between United States Postal Service for the Buffalo route, correct?
A: It did not sign the contract.
Q: Okay. Was it listed anywhere in the contract as being a party?
A: No. I believe it to be a party by virtue of the relationship that the contract has had with the company throughout the years. The company has always provided the service.
Q: That's not my question. I am only asking about the relationship between Midwest Transit and United States Postal Service with respect to the Buffalo route.
A: Midwest Transit's name does not appear on the contract in writing.
Q: And Mr. Hicks has held the contract for the Buffalo route for about ten years or more; is that correct?
A: The contract has had Mr. Hicks' name written on it since the beginning.

A: Yes.
Q: And what is that entity?
A: Hal D. Hicks Mail Transportation.
Q: Are the employees for that entity on a separate payroll from Midwest Transit?
A: Yes.
Q: Janie, are you familiar with a mail route that operates with a terminus at Buffalo, New York?
A: Yes.
Q: How are you familiar with that route?
A: It's in Mr. Hicks' name.
Q: I'm sorry?
A: It's in Hal D. Hicks' name.
Q: Did you participate in the negotiation of that route?
A: Yes, I have. I've renewed it several times.
MR. MAKEPEACE: May I approach, Your Honor?
THE COURT: Certainly.
Q: (by Mr. Makepeace) Let me hand you this.
MR. BERTSCHY: Do you have a copy?
MR. MAKEPEACE: Yes.
Q: (by Mr. Makepeace) Now, I've handed you a document that's not been identified yet. Do you

recognize that?

A: Yes, I do.

Q: Can you identify it for me?

A: It's the renewal contract for the Buffalo, Route 1424.

Q: Did you aid in the preparation of that document?

A: The postal service sends a document. I did the renewal on the contract in July of '99.

Q: Okay. Aside from the postal service, who was the other party listed on that contract?

A: Hal D. Hicks Mail Transportation.

Q: How did Mr. Hicks come to possess that mail route?

A: In 1990, Midwest Transit had an unsatisfactory DOT rating and could not be awarded a contract with an unsatisfactory DOT rating. So Mr. Hicks bid on this route personally because he had a satisfactory DOT rating.

Q: And he has operated that route --

A: Yes.

Q: -- since that time?

A: Yes, he has.

Q: Has Midwest Transit ever operated that route?

MR. BERTSCHY: Well, I object to the question on the same basis it was discussed this morning, the use of the term "operate."

MR. MAKEPEACE: I withdraw the question.

THE COURT: All right.

MR. MAKEPEACE: I understand your objection.

Q: (by Mr. Makepeace) Has Midwest Transit ever contracted with the postal service in regards to that mail route?

A: No.

Q: Does Hal Hicks or HDH Transportation, either one, currently operate any routes that were ever possessed by Midwest Transit?

A: No.

Q: And I believe you testified that at the time Mr. Hicks obtained this route, Midwest Transit was incapable of contracting for it because of an unsatisfactory DOT rating?

MR. BERTSCHY: Objection. Asked and answered. It's a leading question.

THE COURT: Okay. I'll sustain that.

Q: At the time that Mr. Hicks obtained that mail route, was Midwest Transit capable of doing so?

A: No.

witness, together with the questions propounded by counsel and remarks and objections of counsel thereto, and is in all respects a full, true, correct and complete transcript of the questions propounded to and the answers given by said witness.

I further certify that I am not of counsel or attorney for either of the parties to said suit, not related to nor interested in any of the parties or their attorneys.

Witness my hand and notarial seal at St. Louis, Missouri, this 9th day of June, 2001.

My Commission expires August 22, 2004.

____________________________

Notary Public in and for the State of Illinois

CSR No. 084-003727.

CATHERINE L. TURNER
Notary Public – Notary Seal
STATE OF MISSOURI
City of St. Louis
My Commission Expires: July 9, 2004

# FIRST AMENDMENT TO DEFINITIVE ASSET PURCHASE AGREEMENT

This First Amendment to Definitive Asset Purchase Agreement (the "First Amendment") is made and entered into September 7, 2003, by and among Midwest Transport, Inc., a Delaware corporation ("Buyer"), and Midwest Transit, Inc., an Illinois corporation in receivership ("Seller").

## RECITALS

WHEREAS, on March 25, 2002, the Court approved a Liquidating Receiver, pursuant to 805 ILCS 5/12.56(b) [part of the Illinois Corporations Act of 1983 (the "Act")] and 5/12.56(b)(12) of the Act, because the Court found under the circumstances, that the "dissolution" of the corporation was the only alternative. This was also upheld on appeal at Witter v. Hicks II, 2003 WL 1878210; and

WHEREAS, under the March 25, 2002 Order, the Court granted the Liquidating Receiver the authority to dissolve the corporation, as well as the power to, pursuant to terms outlined in the Act: " Sell, convey and dispose of all or any part of the assets of Midwest Transit, Inc...and to take any action as may be necessary to wind up and liquidate the corporation' s business and affairs."; and

WHEREAS, on January 14, 2003, the Court granted an Order approving a Letter of Intent which was executed by Buyer, Midwest Transportation Services, Inc., and Seller on that same date and which further authorized Seller to enter into a Definitive Asset Purchase Agreement as contemplated in the Letter of Intent; and

WHEREAS, on February 7, 2003, Buyer and Seller entered into a certain Definitive Asset Purchase Agreement which was contemplated in the Letter of Intent wherein Buyer agreed to purchase from Seller the Assets and Seller agreed to sell to Buyer the Assets all upon the terms and conditions contained in the Definitive Asset Purchase Agreement; and

WHEREAS, pursuant to a certain Definitive Asset Purchase Agreement Closing Date Extension dated March 21, 2003, Buyer and Seller agreed to extend the Closing Date with respect to the transaction contemplated in the Definitive Asset Purchase Agreement to April 18, 2003; and

WHEREAS, Seller was not able, on or before April 18, 2003, to comply with the condition contained in Section 3.1(a) of the Definitive Asset Purchase Agreement which requires Seller to cause the USPS Contracts to be transferred to Buyer through valid and binding novations with the United States Postal Service; and

WHEREAS, on April 16, 2003, legal counsel to SLM Trans, Inc., a Maryland corporation ("SLM"), issued a letter to the United States Postal Service ("USPS") which

sought to dissuade the USPS from novating the USPS Contracts into Buyer's name as contemplated in the Definitive Asset Purchase Agreement; and

WHEREAS, SLM is owned by Shelly Lynn Myles, the daughter of Hal D. Hicks, and it is believed that such letter caused Hal D. Hicks to indirectly violate the terms of the March 25, 2003 Order described above and further caused the USPS to fail to approve the sale transaction contemplated in the Definitive Asset Purchase Agreement which certain personnel of the USPS had previously verbally indicated would be approved prior to or concurrently with the April 18, 2003 Closing Date; and

WHEREAS, by letter dated May 15, 2003 (the "First United States Postal Service Letter"), the United States Postal Service advised Buyer that the primary reason for the denial of the request to consent to a novation of the USPS Contracts was that the transfer of assets needs to have already taken place when a novation request is made; and

WHEREAS, in order to comply with the First United States Postal Service Letter, Midwest Transportation Services, Inc. hereby agrees to be removed as a party to the Definitive Asset Purchase Agreement; and

WHEREAS, on August 19, 2003, Buyer obtained a conditional approval letter of the United States Postal Service (the "Second United States Postal Service Letter") with respect to the novation into Buyer's name of the USPS Contracts; and

WHEREAS, in order to comply with the First United States Postal Service Letter and the Second United States Postal Service Letter, Buyer and Seller are desirous of consummating the transaction contemplated in the Letter of Intent and embodied in the Definitive Asset Purchase Agreement in accordance with the terms and conditions of this First Amendment.

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants, representations, warranties, conditions and agreements hereinafter expressed, the Parties agree as follows:

1. Definitions. Any initially capitalized term or phrase which is not defined herein shall the meaning(s) ascribed to that term or phrase in the Definitive Asset Purchase Agreement. In addition, the following initially capitalized terms and phrases shall have the following meanings:

   "*Buyer*" shall mean Midwest Transport, Inc., a Delaware corporation (and not Midwest Transportation Services, Inc., a Delaware corporation, as defined in the Definitive Asset Purchase Agreement and as referred to in the First Amendment).

(4644\0001\158460.DOC;4)

"*Definitive Asset Purchase Agreement*" shall mean that certain Definitive Asset Purchase Agreement executed by Buyer and Seller on February 7, 2003, as amended by this First Amendment and as further amended and/or restated.

"*Lawsuit*" shall mean Hal D. Hicks v. Midwest Transportation Services, Inc., Midwest Transport, Inc., Kenneth Hohlbaugh and Charles E. Smith filed in the United States District Court for the Southern District of Illinois.

"*Operational Liabilities*" shall mean any remaining liability, after all insurance recovery and payments to Seller with respect thereto, of Seller arising under a claim which arises in tort, contract or otherwise, the underlying basis for which occurred on or after April 19, 2003. The definition of "Operational Liabilities" shall only include liabilities related to the operation of trucking business of Seller and with respect to the performance of the USPS Contracts and shall not include any claim, liability or other matter relating to the receivership of Seller or any lawsuit or claim of Seller brought directly or indirectly by Hal D. Hicks or C. Michael Witters or Diane Witters. The phrase "the underlying basis for which occurred on or after April 19, 2003" means that the act or omission which gave rise to or created the liability occurred on or after April 19, 2003. (As an example only, if a tax lien arises on or after April 19, 2003, but the unpaid taxes which gave rise to the lien were first due and payable prior to April 19, 2003, such tax lien shall not be considered part of the "Operational Liabilities".)

"*Nonrecourse Loan Participation Agreement*" shall mean that certain Nonrecourse Loan Participation Agreement dated May 23, 2003 by and between Buyer and Fifth Third Bank, Indiana.

"*Note*" shall mean that certain Promissory Note of even date herewith made by Buyer for the benefit of Seller in the original principal amount described in this First Amendment.

"*United States Postal Service Letter*" shall mean a certain letter dated May 15, 2003, from the United States Postal Service to Buyer.

2. Closing Date. The Closing Date shall be the date of this First Amendment, but it shall be effective as of April 18, 2003. Subject to the provisions of a certain Security Agreement executed by Buyer and Seller of even date herewith, Buyer and Seller shall each make all deliveries required at Closing which are described in the Definitive Asset Purchase Agreement. Buyer does hereby waive all contingencies and conditions precedent to the Closing which are contained in the Definitive Asset Purchase Agreement, provided that Seller does hereby represent to Buyer that upon any novation of the USPS contracts into the name of Buyer, all USPS Contracts shall be novated into the name of Buyer.

{4644\000\158460.DOC.4}

3. Determination of cash payment under the Definitive Asset Purchase Agreement. The Parties agree that the sale contemplated under the Definitive Asset Purchase Agreement shall, for all purposes, be considered to have occurred on April 18, 2003, and that the following sums of cash are due to Seller from Buyer:

| [redacted] | [redacted] |
|---|---|
| $1,011,825 | Cash Purchase Price as described in the Definitive Asset Purchase Agreement, subject to adjustments due to computations described on Exhibit A. |

The total amount of cash due to Seller from Buyer described in this Section 3 of One Million Eleven Thousand Eight Hundred Twenty Five Dollars ($1,011,825) shall, instead of being paid to Seller at Closing as provided under the Definitive Asset Purchase Agreement, be paid to Seller in accordance with the terms and conditions of the Note. The Seller shall also receive a payment of Two Hundred Six Thousand Seven Hundred Seventy Dollars ($206,770) which represents Seller's net working capital position as of April 18, 2003. If any of the amounts described on Exhibit A or in this paragraph are determined to be in error by Harding Shymanski & Co., on or before October 7, 2003, then the computations described on Exhibit A shall be appropriately adjusted and the amount of the Note as described above shall be appropriately adjusted.

4. Assumption of Fifth Third Note. The Parties agree that the assumption of the Fifth Third Note described in Section 2.3(a) of the Definitive Asset Purchase Agreement has occurred pursuant to the terms and conditions of the Nonrecourse Loan Participation Agreement.

5. Closing of Effingham Property. The closing of the Effingham Property, as described in paragraph number 2 of the definition of "Assets" contained in the Definitive Asset Purchase Agreement, shall be upon the terms and conditions contained in the Definitive Asset Purchase Agreement, and Buyer shall receive title to the Effingham Property, free and clear of all liens and encumbrances, except that the closing date shall be fifteen (15) days after the novation of USPS Contracts in the name of Buyer on or before December 20, 2003.

6. Amendment of Section 3.2 of the Definitive Asset Purchase Agreement. Section 3.2 of the Definitive Asset Purchase Agreement is hereby removed and replaced with the following:

3.2 **Payments Under Noncompete Agreements.** If Michael and Diane Witters, on the one hand, or Hal D. Hicks, on the other hand, do not execute their respective Noncompete Agreements on or before fifteen (15) days after the novation of the USPS Contracts, then the amount which would be paid to them under Section 1(b) of their respective Noncompete Agreements (which equals $1,075,000.00 plus interest) will be paid to the Company pursuant to the Escrow Agreement. The Noncompete Agreements will be conditioned upon the novation of the USPS Contracts in the name of Buyer on or before December 20, 2003, and all payments under this section relating to the Escrow Agreement or the Noncompete Agreements will not commence to be due until such novations occur.

7. Revision of Section 8.1. Section 8.1 of the Definitive Asset Purchase Agreement is hereby deleted and the following is substituted therefor:

**Indemnification of Buyer by Seller.** Seller shall indemnify and hold harmless the Indemnified Parties, jointly and severally, and Seller hereby waives any claim for contribution or indemnity against the Indemnified Parties, or any of them, from any and all lawsuits, claims, losses, or damages arising out of or in connection with: (i) their employment by Seller; and (ii) Seller's receivership; and (iii) the operation and management of Seller; and (iv) the Lawsuit. The indemnification in the preceding sentence, however, shall not include any matter, the basis for which occurs after April 18, 2003.

8. Removal of Midwest Transportation Services, Inc. The Parties do hereby agree that Midwest Transportation Services, Inc. is removed as a party to the Definitive Asset Purchase Agreement and that all references in the Definitive Asset Purchase Agreement to Midwest Transportation Services, Inc. shall be to Buyer. Notwithstanding the foregoing sentence, however, Midwest Transportation Services, Inc. shall still be considered to be one of the "Indemnified Parties" under the Definitive Asset Purchase Agreement.

9. Assumption of Operational Liabilities. Buyer does hereby assume all Operational Liabilities of Seller the basis for which occurs on or after April 19, 2003.

10. Return of Trailers Owned by Hal Hicks. Buyer agrees to return all trailers owned by Hal Hicks at the Seller's prior Sumner facility on or before October 26, 2003.

11. Further Assurances. Buyer and Seller shall do such acts and execute such documents and instruments as may be reasonably required to make effective the transactions contemplated hereby. In addition, in the event the United States Postal Service shall fail to novate into Buyer's name all of the USPS contracts,

or condition such novation in a manner which materially negatively affects or impacts Buyer, then Buyer by giving written notice to Seller, may elect to adjust the amount of the Note, and Buyer and Seller shall equitably adjust the amount of the Note.

12. Republication of the Definitive Asset Purchase Agreement. Except as explicitly amended herein, the Parties to this First Amendment do hereby republish and reaffirm the Definitive Asset Purchase Agreement.

**IN WITNESS WHEREOF**, the Parties hereto have executed this First Amendment on the date and year first above written.

**[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]**

**COUNTERPART SIGNATURE PAGE TO**
**FIRST AMENDMENT TO DEFINITIVE ASSET PURCHASE AGREEMENT**
**DATED AS OF THE 7TH DAY OF SEPTEMBER, 2003**

"Seller"

Midwest Transit, Inc., an Illinois corporation in receivership

By: [signature], Receiver

**COUNTERPART SIGNATURE PAGE TO**
**FIRST AMENDMENT TO DEFINITIVE ASSET PURCHASE AGREEMENT**
**DATED AS OF THE 7TH DAY OF SEPTEMBER, 2003**

"Buyer"

Midwest Transport, Inc., a Delaware corporation

By: [signature]

**COUNTERPART SIGNATURE PAGE TO**
**FIRST AMENDMENT TO DEFINITIVE ASSET PURCHASE AGREEMENT**
**DATED AS OF THE 7TH DAY OF SEPTEMBER, 2003**

The undersigned does hereby consent to the provisions of Section 8 of this First Amendment.

Midwest Transportation Services, Inc., a Delaware corporation

By: [signature]

Printed Name: Kenneth Hillbaird

Its: President

Date: 9/07/03

# EXHIBIT A
# MIDWEST TRANSIT, INC.
# NET WORKING CAPITAL POSITION
# AS OF APRIL 18, 2003

CASH

| | | |
|---|---|---|
| USPS REC'D ON 4/18/2003 | $ | 3,408,473 |
| USPS RECEIVABLE | $ | 500,422 |
| CASH IN BANK | $ | - |
| FREIGHT RECEIVABLE | $ | 368,263 |
| PILOT REBATE ($19,419.81) PRO-RATED 18 DAYS | $ | 11,646 |
| TOTAL CASH | $ | 4,288,804 |

CASH TO BE PAID OUT

| | | |
|---|---|---|
| PAYROLL 4/18/2003 INCL TAXES | $ | 941,365 |
| UNION PLANTERS BANK - LINE OF CREDIT | $ | 717,000 |
| CHECK RUN ON 04/18/2003 | $ | 923,020 |
| ACCOUNTS PAYABLE AFTER CHECK RUN | $ | 582,909 |
| UNION PLANTERS BANK - NOTE | $ | 150,000 |
| TOTAL PAID OUTS | $ | 3,314,284 |
| SURPLUS SURPLUS | $ | 974,520 |
| RECEIVERSHIP EXPENSES PAID AFTER 04/18/2003 | $ | 767,750 |
| CASH OWED TO MIDWEST TRANSIT, INC. | $ | 206,770 |

# MIDWEST TRANSIT, INC.
# RECEIVERSHIP EXPENSES
# PAID AFTER APRIL 18, 2003

| | | | |
|---|---|---|---|
| | DON HOAGLAND'S SALARY FROM 04/18/2003 TO 08/22/2003 | $ | 108,000 |
| | TERRY SHARP PAID AFTER 04/18/2003 | $ | 139,613 |
| | BOGGS, BOGGS, & BATES, LLC (legal-court ordered) | $ | 22,881 |
| | REBNAN, LINHARES & BEACHEM (legal-court ordered) | $ | 21,750 |
| | THIEL LAW FIRM / HAL HICKS (legal-court ordered) | $ | 21,216 |
| | ROOT REAL ESTATE ( 4 MONTHS P&I) | $ | 60,419 |
| | INTEREST ON UPB $150,000 NOTE | $ | 2,352 |
| | ALLEN BRYSON (NASCAR EQUIPMENT RECOVERED) | $ | 6,962 |
| | JAY PRINDABLE - STORAGE RECORDS | $ | 8,400 |
| 2 | WICKWIRE GAVIN LEGAL | $ | 13,228 |
| | REAL ESTATE TAXES ON FLORIDA | $ | 83,213 |
| | NORMA PRICE (rent on new office) | $ | (7,500) |
| | COST OF GETTING HAL HICKS EQUIPMENT OUT OF SERVICE (238 trailers at 750 miles at .65 per mile) | $ | 116,025 |
| | USPS OVERPAYMENTS DEDUCTED OUT AFTER 04/18/2003 | $ | 178,600 |
| | 1995 FREIGHTLINER THAT HAL HICKS KEPT | $ | 11,000 |
| | STORAGE AND CLEANING RACING TRAILER | $ | 2,494 |
| | LOADING RACING TRAILER | $ | 500 |
| | RELOCATING RACING TRAILER | $ | 4,982 |
| 3 | CARMODY MACDONALD | $ | 27,615 |
| | TOTALS | $ | 767,750 |

1 ALL NUMBERS ARE NOT FINAL UNTIL REVIEWED BY INDEPENDENT AUDITORS, INCLUDING ANY FUTURE FINDINGS.

2 IT IS THE DUTY OF SELLER TO GET CONTRACTS NOVATED IN ACCORDANCE THE DEFINITIVE ASSET PURCHASE AGREEMENT. ALL FUTURE BILLS REGARDING NOVATION, WILL BE PAID BY SELLER.

3 IT IS THE RESPONSIBILITY OF SELLER TO DEFEND BUYER AGAINST ALL EXISTING AND FUTURE LAWSUITS REGARDING THE SALE, PURSUANT TO SELLER'S INDEMNIFICATION OBLIGATIONS.

# MIDWEST TRANSPORT, INC.
## REVISED PROPOSED PURCHASE
## 18-Apr-03

| | | | |
|---|---|---|---|
| PURCHASE PRICE | | $ | 8,798,950 |
| | TOTAL OWED | $ | 8,798,950 |
| SOURCE OF FUNDING | | | |
| DOL | | $ | 2,000,000 |
| FIFTH THIRD NOTE | | $ | 2,400,000 |
| CASH FROM SHAREHOLDERS | | $ | 1,011,825 |
| ASSUME ACCRUED PAYROLL AND ACCR VAC | | $ | 1,376,874 |
| ASSUME RIGHTWAY LEASE | | $ | 687,229 |
| ASSUME MWT TRAILER LEASE | | $ | 775,000 |
| ASSUME KBK LEASE | | $ | 548,022 |
| | TOTAL | $ | 8,798,950 |
| MONEY TO MIDWEST TRANSIT, INC. | | $ | 1,011,825 |
| INCOME TAX LIABILITY | | $ | (612,605) |
| | NET PROCEEDS AFTER TAX | $ | 399,220 |

# NOVATION AGREEMENT

(a) THE PARTIES TO THIS AGREEMENT:

Midwest Transit, Inc. (Transferor), an Illinois corporation with its principal office in Mt. Carmel, Illinois; Midwest Transport, Inc. (Transferee) a Delaware corporation doing business as Midwest Transport of Illinois, with its principal office in Robinson, Illinois; and the United States Postal Service enter into this agreement as of the 4th day of December 2003.

(b) THE FACTS OF WHICH THE PARTIES AGREE AND WHICH FORM A BASIS FOR THIS AGREEMENT:

(1) The United States Postal Service has entered into contractual agreements with the Transferor which contracts are accurately identified on Exhibit "A", attached hereto and incorporated herein, including modifications to these contractual documents made between the parties before the effective date of this agreement. Included in the term "contractual agreements" are those contractual agreements under which performance has been accepted and payments have been made if the United States Postal Service or the Transferor have any remaining rights, duties, or obligations under those contractual agreements. Hereafter, the term "contract" shall include all the contractual agreements as referenced in this paragraph.

(2) As of February 7, 2003, the Transferor, an Illinois corporation in receivership, has agreed to transfer its Postal Service contracts, together with all necessary equipment to perform such contracts, to the Transferee. A copy of the Definitive Asset Purchase Agreement is attached hereto as Exhibit "B". This was done pursuant to a Court Order dated January 14, 2003 granting the authority to enter into such a contract. A copy of said Court Order is attached as Exhibit "C".

(3) The Transferee has acquired the entire portion of the Transferor's assets necessary to perform the contracts. A copy of the Bill of Sale is attached as Exhibit "D".

(4) The Transferee agrees to assume all obligations and liabilities of the Transferor under the said contracts, including all liabilities arising out of the performance of said contracts.

(5) The Transferee is in a position to fully perform all obligations that may exist under the contracts.

(6) It is consistent with the United States Postal Service's interest to recognize the Transferee as the successor party to the contracts.

(7) All the necessary documentation and evidence have been filed with the United States Postal Service.

(8) A certificate issued by the Secretary of the State of Illinois, to the effect that the Transferee is authorized to do business as Midwest Transport of Illinois is attached hereto as Exhibit "E".

(c) IN CONSIDERATION OF THESE FACTS, THE PARTIES HEREBY AGREE THAT:

(1) The Transferor confirms the transfer to the Transferee, and waives any claims and rights it now has or may have in the future against the Postal Service in connection with the contracts.

(2) The Transferee agrees to be bound by and perform each contract in accordance with conditions contained in the contracts. The Transferee also assumes all obligations and liabilities of and all claims against the Transferor under the contracts as if the Transferee were the original party to the contracts.

(3) The Transferee ratifies all previous actions taken by the Transferor with respect to the contracts, with the same force and effect as if the action had been taken by the Transferee.

(4) The Postal Service recognizes the Transferee as the Transferor's successor in interest in and to the contracts. The Transferee by this agreement becomes entitled to all rights, titles, and interests of the Transferor in and to the contracts as if the Transferee were the original party to the contracts. Following the effective date of this agreement, the term "contractor" as used in the contract shall refer to the Transferee.

(5) Except as expressly provided in this agreement, nothing in it shall be construed as a waiver of any rights of the Postal Service against the Transferor.

(6) All payments and reimbursements previously made by the Postal Service to the Transferor, and all other previous actions taken by the Postal Service under the contracts, shall be considered to have discharged those parts of the Postal Service's obligations under the contracts.

(7) The Transferor and the Transferee agree that the Postal Service is not obligated to pay or reimburse either of them for, or otherwise give effect to, any costs, taxes, or other expenses, or any related increases, directly or indirectly arising out of or resulting from the transfer of this agreement, other than those that the Postal Service in the absence of this transfer agreement would have been obligated to pay or reimburse under the terms of the contracts.

(8) The Transferor guarantees payments of all liabilities and the performance of obligations that the Transferee (i) assumes under this agreement or (ii) may undertake in the future, should these contracts be modified under their terms and conditions. The Transferor waives notice of, and consents to, any future modifications.

(9) The contracts shall remain in full force and effect, except as modified by this agreement.

"Transferor"

Midwest Transit, Inc.

by: ______________________

Don Hoagland
Court Appointed Receiver

"Transferee"

Midwest Transport, Inc.
d/b/a Midwest Transport of Illinois

by: ______________________

Ken Hohlbaugh
President

Approved and Accepted: United States Postal Service

by: ______________________

(Name) Russell A. Sykes
(Title) Manager, Surface Transportation CMC
Supply Management Transportation
Portfolio

CERTIFICATE

I, Don Hoagland, certify that I am the duly appointed and authorized Court Appointed Receiver of Midwest Transit, Inc., an Illinois corporation in receivership, who signed this agreement for the Transferor and that this agreement was duly signed and executed on behalf of this corporation by authority of the Circuit Court of the Second Judicial Circuit of Lawrence County, Illinois.

Witness my hand and seal this 7th day of September, 2003.

Don Hoagland

CERTIFICATE

I, John S. Elmore, certify that I am the Secretary of Midwest Transport, Inc., a Delaware corporation doing business as Midwest Transport of Illinois and that Kenneth Hohlbaugh who signed this agreement for this corporation was then of this corporation, and that this agreement was duly signed for and on behalf of this corporation by authority of its governing body and within the scope of its corporate powers.

Witness my hand and seal this 7th day of September, 2003.

John S. Elmore, Secretary

[illegible]

Date 01-30-2004 L 04184051 Check No. 0302863930

Seventeen Thousand Two Hundred Eighty-Four and 22/100 Dollars

$***17284.22

Pay To The Order Of

[illegible]

HAL D HICKS MAIL TRANSP
PO BOX [illegible]
SUMNER IL [illegible]

[illegible]

Void After One Year

Vice President, Treasurer

⑈0302863930⑈ ⑆031100267⑆ 4101500835 509⑈ ⑈0001728422⑈

Date 02-18-2004 L 84293056 Check No 0302893903

One Hundred Thirty-Seven Thousand Four Hundred Eighty and 92/100 Dollars

$**137480.92

Pay To The Order Of

HAL D HICKS MAIL TRANSP
PO BOX [illegible]
SUMNER IL [illegible]

Void After One Year

Vice President, Treasurer

⑈0302893903⑈ ⑆031100267⑆ 630150083 5 509⑈ ⑈0013748092⑈

Date 09-09-2004 L 04419341 Check No. 0302937503

Fifteen Thousand Four Hundred Seventy-Two and 20/100 Dollars

$***15472.20

Pay To The Order Of

HAL H HICKS MAIL TRANSP
PO BOX
SUMNER IL 62466-0

Vice President, Treasurer

⑈0302937503⑈ ⑆031100267⑆ 5301500835 509⑈ ⑈0001547220⑈