# In the United States Court of Federal Claims

No. 05-1058C

(Filed:  September 18, 2009)
_____

| | |
|---|---|
| HAL D. HICKS,  f/d/b/a  HAL D. HICKS MAIL TRANSPORTATION,<br><br>                              Plaintiff,<br><br>      v.<br><br>THE UNITED STATES,<br><br>                              Defendant,<br><br>      and<br><br>MIDWEST TRANSPORT, INC.,<br><br>                    Defendant-Intervenor. | *<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>* | Trial; Postal Service mail delivery contract; Breach of contract; Transfer of contract; State court receivership proceedings; *Rooker-Feldman* doctrine; Collateral estoppel; State court ruling authorizing transfer of contract given preclusive effect; Novation – requirements; Novation did not cause anticipatory breach; Novation did not cause immediate breach – impracticability/impossibility doctrine; Lack of proof regarding damages; Credibility; Insufficient evidence to prove lost profits; Claim rejected. |

_____

## OPINION
_____

*John Freeman Theil,* Theil Law Firm, LLC, Saint Louis, MO, for plaintiff.

*Michael Duane Austin*, Civil Division, United States Department of Justice, Washington, D.C., with whom was Assistant Attorney General *Tony West*, for defendant.

*Jerry Michael Littlejohn*, Akerman Senterfitt Wickwire Gavin, *et al.*,Vienna, VA, for defendant-intervenor.

**ALLEGRA Judge:**

This case is before the court following trial in St. Louis, Missouri, and Washington, D.C. Plaintiff, Hal D. Hicks, formerly d/b/a Hal D. Hicks Mail Transportation, claims that the United States Postal Service (the Postal Service) breached his mail delivery contract when it novated that contract to a third party.  Defendant asserts that the latter action was validated by state court orders as part of the sale of a company in receivership – one partly owned by Mr. Hicks – and thus gave rise to no breach.  Not so, plaintiff remonstrates, contending that the state court orders

neither validated the novation nor correspondingly insulate defendant from liability.  As will be seen, though, plaintiff is wrong, both under the facts and the law.

## I.     FINDINGS OF FACT

Based upon the record, including the parties' stipulation of facts, the court finds as follows:

The Postal Service is charged with transporting mail domestically and throughout the world.  In aid of this mission, it sometimes contracts with private concerns to operate its mail routes.  At times, a single contractor might operate several or more routes around the country.  The Postal Service employs a hierarchal system to manage such contracts, in which regional distribution network offices (DNOs), responsible for all routes within a given region, report to a national purchasing office (NPO) located in Washington, D.C.

In 1980, Hal D. Hicks and C. Michael Witters formed Midwest Transit (MWT) to operate routes for the Postal Service.  Mr. Hicks owned one half of the company, while Mr. Witters (and his wife) owned the remainder.  During 1992, MWT had an "unsatisfactory" safety rating from the U.S. Department of Transportation, making it ineligible to bid on Postal Service contracts.  During this year, the Postal Service sought bids on a contract to deliver mail between Buffalo, New York, and Pittsburgh, Pennsylvania – the resulting contract to be known as contract 14024 or the "Buffalo route."  On June 30, 1992, Mr. Hicks bid on the Buffalo route in his personal capacity, as "Hal D. Hicks Mail Transportation."  He was awarded the contract in October 1992.  The Buffalo route contract was renewed on June 29, 1995, and again on June 25, 1999 – both times in the name of Hal D. Hicks Mail Transportation and both for four-year terms.[1]

In 2000, Mr. Witters filed suit on his own behalf, and derivatively on behalf of MWT, against Mr. Hicks and MWT in the Circuit Court for the Second Judicial Circuit of Illinois,[2] claiming that Mr. Hicks had acted fraudulently and misused MWT's assets.  On July 25, 2001, the Circuit Court found largely uncontradicted evidence of fraud and other wrongful activity on the part of Mr. Hicks and placed MWT in receivership, appointing Donald Hoagland as receiver.  In that order, the court found that:

Hal D. Hicks has caused oppressive activity to occur by the payment to him individually, and not the corporation, of rebate checks and Colorado Auto Auction rents.  Further, Hicks, while a corporate officer and director of Midwest Transit,

---

[1]  While Mr. Hicks' name appears on the 1995 renewal, a different name – Janie Ensminger – appears on the 1999 renewal documents.  Ms. Ensminger was not employed by Mr. Hicks, but rather by MWT.

[2]  Under the Illinois court system, Circuit Courts are the principal trial courts, each representing one of twenty-three circuits.

inc, has submitted bids for mail routes for his own competing company
(Mail-A-Way) while ceasing submission of such bids for Midwest Transit and
while using a Midwest employee to prepare and submit bids.  Other use has been
made by Hicks of Midwest's corporate employees for Hicks' private use while on
the corporate payroll.  Additionally, Hicks treats the Buffalo Route as his own
business and does not deposit the revenues from said route into Midwest's
accounts . . . The above-mentioned checks retained by Hicks and not deposited
into Midwest's corporate accounts . . . constitute[s] misapplication of corporate
assets.

It additionally ordered that:

All parties to this action shall be enjoined from interfering with the interim
receiver's activities in any manner and shall be mandatorily enjoined to grant him
and his agents and others under his command unfettered access to the corporate
premises, to all corporate property, and to all books, records, and accounts of the
corporation.  The parties are further enjoined from interfering in any way with the
interim receiver's sole control of the finances of the corporation and are enjoined
from diverting any funds away from the corporation and its accounts, including all
fuel supplier rebate checks, all rent checks from the Colorado Auto Auction, and
all income generated by the Buffalo Route.

On July 31, 2001, an attorney appointed by the receiver, Terry Sharp, sent a letter to Al
Machia, the Postal Service employee responsible for managing the Buffalo route, in which he
represented that "[t]he Court in Lawrence County has specifically found [the Buffalo route] to be
property of Midwest Transit, Inc."  Attached to the letter was a copy of an April 20, 2000,
temporary restraining order, restricting Mr. Hicks from taking various actions involving MWT's
resources and finances.  After reviewing this letter, Joseph Arsenault, the Postal Service
contracting officer for the region involved, wrote an internal note directing that a contract file be
opened in the name of "Midwest Transit."  On August 24, 2001, the Circuit Court issued an order
granting Mr. Hoagland authority to negotiate the sale of MWT, subject to the final approval of
the  court.

On October 26, 2001, Mr. Witters filed a motion to dissolve MWT and appoint a
liquidating receiver.  On March 25, 2002, the court granted this motion, dissolving MWT,
appointing Mr. Hoagland as the company's liquidating receiver, and granting him the power to
"sell, convey and dispose of all or any part of the assets of Midwest Transit, Inc., either at public
or private sale, and to take any other action as may be necessary to wind up and liquidate the
corporation's business and affairs."  This order admonished:

The parties are further enjoined from interfering in any way with the liquidating
receiver's sole control of the finances of the corporation and are enjoined from
diverting any funds away from the corporation and its accounts, including all fuel

supplier rebate checks, all rent checks from the Colorado Auto Auction, and all income generated by the Buffalo Route.

Mr. Hicks appealed this ruling to the Appellate Court of Illinois, Fifth District.  In an opinion dated November 21, 2002, the court affirmed the lower court's ruling, finding –

> The Buffalo route was a mail route operated by MWT.  MWT pays for all fuel and other operating costs.  MWT employees operate the route and handle all the paperwork for the route.  MWT financial statements show a line item for revenue from the Buffalo route.  Although maintained in Hicks name, since its inception, revenue for the Buffalo route had been transferred to MWT.  Since the beginning of the present suit, Hicks retained the revenue from the route, although it continues to be operated by MWT and at MWT's expense.  Hicks acknowledges that several MWT trucks are used to operate the Buffalo route, but he argues that MWT uses 68 of his trucks but pays him nothing.  Not only does this not justify Hicks' use of MWT assets and personnel to operate a route which is in his name and from which he keeps all revenue, but it also is exactly the type of commingling of personal and corporate assets that justifies the appointment of a receiver.

*Witters v. Hicks*, 780 N.E.2d 713, 720 (Ill. App. Ct. 2002).  Ultimately, the court concluded that "[w]ith respect to . . . income generated from the Buffalo route, the evidence demonstrates that such revenue properly belongs to MWT."  *Id.* at 721.

On December 27, 2002, Kenneth Hohlbaugh, who had been appointed by Mr. Hoagland as MWT's general manager during the receivership, sent a letter to Mr. Hoagland, outlining a plan whereby Midwest Transport, Inc. (Midwest Transport), a company owned by former MWT employees, would purchase the assets of MWT.  This so-called "letter of intent" indicated that MWT would sell "all of its assets which are useful or necessary to operate a trucking company," and proceeded to catalog "Included Assets" and "Excluded Assets" that would or would not be subject to the sale, respectively.  The list of "Included Assets" referenced "all postal routes," and an attachment thereto specifically listed contract 14024, the Buffalo route, as among those routes to be sold.[3]  The letter anticipated a total purchase price of $10,800,000.  It further envisioned that a "Definitive Asset Purchase Agreement" (DAPA) would be entered into once the court approved the acquisition by Midwest Transport.  Toward the latter end, on December 30, 2002,

---

[3]  At trial, plaintiff seized on the fact that contract 14024 was not included on several internal MWT listings of postal route contracts that apparently were generated in 2002 and 2003.  However, other internal MWT documents from this same period – including statements of revenue and expenses for periods ending August 31, 2002, and December 30, 2002 – included a line item for revenue from the Buffalo route.  And the wide majority of the documents in the record  – internal listings, materials assembled in anticipation of the MWT sale, correspondence and court orders – all refer to contract 14024 as being among MWT's routes.

Mr. Hoagland filed a motion seeking the authority to enter into a contract for sale, based upon the terms in the letter of intent.  On January 14, 2003, the court granted Mr. Hoagland the authority "to sign the Letter of Intent and to enter a definitive agreement as contemplated in the Letter of Intent."  Mr. Hicks filed a motion to reconsider this order, which was denied on February 18, 2003.  On March 5, 2003, Mr. Hicks appealed the order and the denial of the motion to reconsider.  On March 17, 2003, the Appellate Court of Illinois, Fifth District, held that the Circuit Court had the authority to appoint Mr. Hoagland as the liquidating receiver, and on March 18, 2003, the same court formally denied Mr. Hicks' appeal.

While this was happening, the parties to the purchase pressed forward with drafting the DAPA.  On February 7, 2003, Messrs. Hoagland and Hohlbaugh signed the DAPA on behalf of MWT and Midwest Transport, respectively.  Under this agreement, the closing of the sale was "subject to and conditioned upon" MWT arranging for the transfer to Midwest Transport of all the postal contracts it currently owned and operated through "valid and binding novations with the U.S. Postal Service."[4]  An exhibit to the DAPA again listed contract 14024 as among those contracts to be transferred.[5]  From February 7, 2003, through October 2003, representatives of

---

[4]  Specifically, the DAPA contained a section, entitled Conditions Precedent to Buyer's Obligations, which read:

> Seller, at its sole cost and expense, will cause all and not less than all of the USPS contracts currently owned and operated by Seller (95 contracts) to be transferred to Buyer through valid and binding novations with the U.S. Postal Service.

Another subsection in the same section stated:

> Buyer understands that Mr. Hal D. Hicks has appealed to . . . Illinois appellate courts certain rulings of the Court with respect to, inter alia, your receivership, and has instituted legal action outside of Illinois relating to certain of Seller's assets.  Buyer further understands Seller's position that these appeals and any such suits are without merit.

[5]  At trial, plaintiff suggested that the Buffalo route had been mistakenly included in the list of routes to be transferred.  In making this claim, plaintiff noted that the number of contracts to be transferred rose over the course of the negotiations – from an original count of eighty-seven to an eventual high of 106 or 107 – but without any increase in the purchase price.  In his testimony, however, Mr. Hohlbaugh fully explained why the sales price did not increase as the number of contracts increased, stating:

> What didn't change was the revenue and expenses of the company.  Whether it was one contract, or 140, you look at expenses, equipment, et cetera, and that's how you determine whether a company makes money or not, not whether or not it has 80, 89, 91, 95 or 150 routes . . . .  [W]hether we call it 80 or 105 it all

MWT and Midwest Transport sought to have the Postal Service agree to novate all of MWT's routes, including the Buffalo route.  On March 12, 2003, Mr. Hohlbaugh sent a letter to Dwight Young, the manager of the NPO, requesting that the Postal Service novate all the contracts listed in the DAPA.  The following day, March 13, 2003, attorneys for Midwest Transport sent a letter to Mr. Young reiterating that the "court-approved sale of Midwest Transit's postal assets to Midwest Transport" was contingent upon the Postal Service agreeing to novate the contracts.  Enclosed with this letter was a novation agreement, already signed by Messrs. Hohlbaugh and Hoagland, on behalf of Midwest Transport and MWT, respectively.  On March 18, 2003, the receiver's attorney sent a letter to Mr. Young, attached to which was a copy of the order by the appellate court of Illinois, affirming the decision to appoint a liquidating receiver.  On March 19, 2003, the same attorney sent a letter informing Mr. Young of the March 18, 2003, order of the appellate court of Illinois denying Hicks' motion to stay the sale of MWT.[6]

On May 15, 2003, Russell Sykes, the Postal Service's Manager of Surface Transportation, sent a letter to Mr. Hohlbaugh formally denying Midwest Transport's novation request, citing as the primary reason that "the [Postal Service] Purchasing Manual [] require[s] the transfer of assets to have taken place already when a novation request is made."  This letter went on to note that the Postal Service had examined the paperwork forwarded with the novation request to ascertain whether it could agree, "in principal, with the proposed sale and novation."  The Postal Service concluded that it could not do so, Mr. Sykes reported, owing to concerns about the proposed subdivision of MWT into two companies, Midwest Transport, which would hold the contracts, and Midwest Transportation Services, which would own the trucks.  The Postal Service felt that this arrangement would "directly contradict" a requirement in the Purchasing Manual mandating "that the successor in interest be transferred all of the current postal suppliers' assets or at least the entire portion involved in performing the contract."  In this same letter, Mr. Sykes identified several other minor deficiencies that precluded the Postal Service from

accumulated to that number that was in the original booklet that we gave out in September on the gross dollar volume of the company unless they were added after that.

[6]  In her testimony, Ms. Teri San Luis recalled first learning about the novation and the Buffalo route in a meeting between her and Messrs. Young, Hoagland and Hohlbaugh, as well as the parties' respective attorneys.  In this regard, she testified that "[w]hat we were told was that [the Buffalo route] was listed in the list of routes that were given to the receivership by the court and that the money to operate that had come from Midwest Transit and that's why it was in the list of contracts."  In addition, the parties to this case stipulated that Messrs. Hohlbaugh and Sharp, as well as representatives of both MWT and Midwest Transport, sent letters to Ms. San Luis, in which they represented that the Buffalo route was specifically included within the assets to be sold to Midwest Transport and that the inclusion thereof was proper.  Ms. San Luis also received several letters from Mr. Hohlbaugh providing her updates on the sale of MWT and advising her about the Illinois state court decisions he believed impacted Midwest Transport's novation request.

conditionally approving the novations at that time.  He left open the possibility that, once the sale of MWT's assets was finalized, the novation request could be renewed and reconsidered.

On June 19, 2003, the Postal Service renewed the Buffalo route with Hal D. Hicks Mail Transportation again listed as the contractor on the renewal form.  However, MWT employee Janie Ensminger signed the renewal on the orders of Mr. Hoagland, as communicated to her by Mr. Hohlbaugh.

On July 14, 2003, Messrs. Hohlbaugh and Hoagland sent Mr. Sykes and Ms. San Luis a written response to the May 15, 2003, letter.  They addressed the concerns identified by the Postal Service in its May letter, indicating, *inter alia*, that Midwest Transport would now use only a single company to operate the routes and own the equipment and that virtually all of the employees of MWT would be employees of the new company.  Recognizing that the Postal Service would sign the novation agreement only after the sale of assets had occurred, this letter inquired whether the Postal Service could provide written assurance that it would novate if Midwest Transport met the conditions outlined in the Service's regulation for a novation.  On July 16, 2003, an attorney representing Midwest Transport wrote the Postal Service to confirm the information Mr. Hohlbaugh had supplied in the earlier letter.  Attached to this letter was another novation agreement, a list of all the contracts to be novated, and individual documents for each contract entitled, "Modification Recognizing a Contract Novation."  Contract 14024, the Buffalo route, was included in that list and had its own modification document.

On August 19, 2003, the Postal Service formally responded to Mr. Hohlbaugh's July 14, 2003, letter.  It explained that it would approve a novation if the parties to the DPA submitted the following "supporting paperwork:"

1.  An authenticated copy of the instrument affecting the transfer of assets: a bill of sale, contract, deed, agreement or court decree. That document must show that either all the assets were transferred OR that all the assets necessary to perform the Postal Service contracts were transferred.  PM 6.5.4.c.[7]

2.  A certified copy of each resolution of the corporate parties' boards of directors authorizing the transfer of assets.

3.  A certified copy of the minutes of each corporate parties' boards of directors authorizing the transfer of assets.

---

[7]  Section 6.5.4.c. of the Postal Service's Purchasing Manual stated that "[t]he Postal Service generally prohibits contract novation."  This paragraph, however, indicated that the Postal Service "may recognize a third party as the successor in interest when the party's interest arises out of the transfer of (a)  All the supplier's assets; or (b)  The entire portion of the assets involved in performing the contract."

4.      An authenticated copy of the transferee's certificate and articles of incorporation if a corporation was formed for the purpose of receiving the assets involved in performing the Postal Service contract(s).

5.      The opinion of legal counsel for the transferor and transferee, stating the transfer was properly affected under applicable law and giving the effective date of transfer.

6       Evidence of the transferee's capability of performing the contracts.

7.      Balance sheets of the transferor and transferee as of the dates immediately before and after the transfer of assets, certified for accuracy by independent accountants.

This letter indicated that "[a]fter the completed sale, should all of the paperwork be received and in order and should the transferee's capability to perform be verifiable, novation would be granted."

        On September 7, 2003, the parties to the sale of MWT's assets agreed to an amendment of the DAPA, striking Midwest Transportation Services, Inc. from the deal and leaving Midwest Transport as the only buyer.  In addition, the number of routes subject to the agreement increased from ninety-five to 103 (with contract 14024 still listed among the routes to be novated).  That same day, the sale of the assets closed, as evidenced by a bill of sale, attached to which was a schedule again reflecting that the Buffalo route was among the assets sold.  In a letter to Mr. Sykes, dated October 2, 2003, an attorney for Midwest Transport recounted the events leading up to the sale and stated that – "[i]t is my opinion as an Illinois lawyer that the sale is final and that it properly closed under Illinois law."  In another letter, dated October 3, 2003, John Elmore, then Midwest Transport's general counsel again requested that the Postal Service novate MWT's contracts to Midwest Transport.  He sent a binder of supporting documentation with this letter, including the novation agreement, a list of the contracts to be novated (again including the Buffalo route), as well as the various documents of sale and court orders approving the sale. Although he was aware that the novation was proceeding, Mr. Hicks made no attempt to object to the novation with the Postal Service.

        On December 4, 2003, Mr. Sykes signed the novation agreement on behalf of the Postal Service; the agreement noted, *inter alia*, the Circuit Court's approval of the DAPA.  On January 14, 2004, the Postal Service issued a route service order which stated that "[t]he Postal Service has approved a novation agreement, effective December 4, 2003, for the below listed contracts from Midwest Transit Inc. to Midwest Transport, Inc."  The referenced list included contract 14024.  At some later date, data specialists employed by the Postal Service discovered that contract 14024 was in the name of Hal D. Hicks, not Midwest Transit and informed Ms. San Luis that she would have to prepare a separate contract route service order approving the novation of that contract.  On February 24, 2004, Ms. San Luis signed such an order, which stated that "[t]he

Postal Service has approved a novation agreement, effective December 4, 2003, for [contract 14024] from Hal D. Hicks Mail Transportation to Midwest Transport, Inc."

At least from the outset of the receivership in 2001, when Mr. Hicks received checks from the Postal Service for the Buffalo route, he either endorsed them over to MWT or deposited the checks in his account and immediately wrote MWT a check for the same amount.  The last of these endorsed checks is dated January 22, 2004.  On or about March 17, 2004, the Postal Service discovered that, prior to the contract service order novating contract 14024 to Midwest Transport, several checks, totaling $170,237.34 had been paid to Hal D. Hicks for service on the Buffalo route, and that Mr. Hicks had cashed these checks in lieu of endorsing them over to MWT.  On April 13, 2004, the Postal Service made a lump sum payment to Midwest Transport in the amount of $170,237.34 and, on April 19, 2004, recovered the same amount by withholding payments owed on several other of Mr. Hicks' Postal Service contracts.

On July 15, 2005, Mr. Hicks filed a claim under the Contract Disputes Act of 1978 with the Postal Service, in which he asserted that, "he ha[d] a contract dispute and/or claim against the United States Postal Service and its employees and/or agents for the willful and malicious transfer/novation of Highway Mail Contract 14024 to Midwest Transport, Inc., which in turn resulted in the wrongful termination of Mr. Hicks' contract."  He certified that he was owed $10 million in damages.  On September 8, 2005, this claim was denied by the Postal Service contracting officer.

On October 3, 2005, plaintiff filed a complaint in this court alleging that "the USPS breached Contract 14024 . . . when it unilaterally transferred and/or novated the contract out of Hicks' name and into Midwest Transport, Inc.'s name."  On September 29, 2006, Mr. Hicks was debarred from Postal Service work and is currently listed on the excluded parties list system.[8]  On

_____

[8]  In the letter from the Postal Service announcing the debarment, Susan Brownell, Vice President, Supply Management, stated –

As previously noted, on January 12, 2006, Mr. Hicks entered a guilty plea in open court before the United States District Court for the Southern District of Illinois. Mr. Hicks admitted that he willfully and knowingly made a false, fictitious, and fraudulent statement, in that he falsified a "Fuel Use Certification" submitted to the United States Postal Service in connection with the performance of a mail transportation contract, in violation of Title 18, United States Code, Sections 1001 and 1002, and that he willfully and knowingly filed an IRS form 1040 with the IRS which was false as to a material matter in violation of Title 26, United Sates Code, Section 7206(1).  Postal regulations set forth at 39 CFR 601[.]113(e) provides that I, with the concurrence of the General Counsel, may debar a supplier for the following causes: "1. Conviction of a criminal offense . . . in the performance of a contract or subcontract . . . 3. Commission of making false statements [or] tax evasion."

January 25, 2007, the court permitted Midwest Transport to intervene in the case.[9]  On October 26, 2007, Midwest Transport filed a motion for summary judgment, which the court denied on May 28, 2008, finding that the existence of genuine issues of material fact precluded summary relief.  Trial in this case was subsequently held in St. Louis, Missouri, on December 15-17, 2008, and continued in Washington, D.C. on January 23, 2009.  Post-trial briefing has now been completed.[10]  The court has deemed closing argument unnecessary.[11]

## II.   DISCUSSION

Plaintiff asserts that the Postal Service effectuated "an anticipatory and actual breach" of his mail delivery contract when it wrongfully agreed to novate that contract.  He contends that the novation was unauthorized and invalid, absent his personal authorization.  As in any claim for breach of contract, in order to recover here, plaintiff must establish that: (i) a valid contract existed between him and the government; (ii) the contract gave rise to duties or obligations; (iii) the government breached those duties or obligations; and (iv) the breaches resulted in damages.  *See San Carlos Irr. and Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989); *Health Ins. Plan of Greater New York v. United States*, 62 Fed. Cl. 33, 43 (2004); *Cornejo-Ortega v. United States*, 61 Fed. Cl. 371, 373 (2004).  Plaintiff bears the burden of establishing these elements by a preponderance of the evidence.  *See Gibson v. Dept. of Veterans Affairs*, 160 F.3d 722, 728 (Fed. Cir. 1998); *Tech. Assistance Int'l, Inc. v. United States*, 150 F.3d 1369, 1373 (Fed. Cir. 1998); *Spectrum Sciences v. United States*, 84 Fed. Cl. 716, 735 (2008).

Viewed through the prism of these proof requirements, there are several major issues here.  To begin with, there are serious questions as to whether, at the time of the alleged breach (or breaches), Mr. Hicks still had a valid contract with the Postal Service to operate the Buffalo route.  Second, assuming *arguendo* he did have such a contract, it is far from clear that defendant breached the duties owed plaintiff thereunder either in agreeing to the novation or, subsequent thereto, in failing to perform on the original contract.  Finally, assuming *arguendo* there was a breach here, there are, as will be seen, potentially serious deficiencies in plaintiff's proof of damages.  The court will discuss these issues *seriatim*.

---

[9]  In December of 2007, Mr. Hicks filed suit in the United States District Court for the Southern District of Illinois against Midwest Transport alleging that it had converted the Buffalo route contract via the wrongful novation.  On April 14, 2008, the district court stayed that action pending the entry of final judgment in this case.  *See Hicks v. Midwest Transport, Inc.*, 2008 WL 1766523, at *2 (S.D. Ill. Apr. 14, 2008).

[10]  On August 19, 2009, the court ordered the parties to file supplemental memoranda on several issues, including whether the state court orders were entitled to preclusive effect in this case.

[11]  At present, MWT is still in receivership, with a final accounting still pending.

**A.**

Plaintiff asserts that MWT had no rights to the contract in question, which was entered into by Mr. Hicks in his personal capacity. It contends that the state courts did not – indeed, could not – order this asset to be included within the receivership, but merely temporarily diverted the revenue from the route to the receiver, to maintain the *status quo*. Plaintiff further asserts that those same state courts neither concluded that the Buffalo route was held by MWT, nor, correspondingly, authorized the sale of that asset in authorizing the receiver to liquidate MWT's assets. The result, plaintiff contends, is that the novation of the subject contract, which followed on the heels of the contract's purported transfer, was ineffective – the receiver lacked the authority to enter into the novation absent the consent of Mr. Hicks, the true owner of the contract in question, which consent was never given. These assertions, and the conclusions that spring therefrom, might be more persuasive were they not so estranged from the facts – were they not, in particular, based upon an inaccurate description of the state court rulings.

Contrary to plaintiff's claims, the state courts not only focused on the dispute over the Buffalo route, but disagreed with plaintiff as to who was the true owner of that route not once, but *twice* – in deciding whether to establish a receivership and in authorizing the liquidation of MWT. On both occasions it treated the Buffalo route as a corporate asset, finding, for example, in the receivership order that Mr. Hicks had erroneously "treat[ed] the Buffalo route as his own business and did not deposit the revenues from said route into [MWT's] accounts." While plaintiff asserts that the court did not intend permanently to treat the contract as belonging to the corporation, there can be little doubt that was precisely the case, given the specific inclusion of this asset among those to be liquidated. Moreover, while the expressed rationale of the trial court was compressed, such was not the case when the Illinois appellate court rejected plaintiff's appeal of the liquidation order. The latter court, in its opinion, found that the Buffalo route was operated by MWT – that the corporation hired and paid the employees who operated the route, used its trucks to deliver the mail, paid for all fuel and operating costs, and maintained a line item in its books and records for the revenue from the route. And, it was on this basis – and not some temporary notion of protecting the *status quo*, as plaintiff claims – that the Illinois courts concluded that the income from the route belonged to MWT and authorized MWT to sell off the route, albeit with the Postal Service's cooperation.

In arguing to the contrary, plaintiff proceeds as if this court were empowered to set aside these orders of the Illinois courts. But, it is not. *See MGA, Inc. v. General Motors Corp.*, 827 F.2d 729, 732 (Fed. Cir. 1987), *cert. denied*, 484 U.S. 1009 (1989); *Burlison v. United States*, 75 Fed. Cl. 736, 741 (2007) ("'lower federal courts **lack jurisdiction** to review state court judgments'" (quoting *Fielder v. Credit Acceptance Corp.*, 188 F.3d 1031, 1034 (8th Cir. 1999) (emphasis in original)); *Vanderbeek v. United States*, 41 Fed. Cl. 545, 546 (1998). By statute, rather, a federal court must give the same preclusive effect to a state court judgment that the

judgment would be accorded in the courts of the rendering state.  28 U.S.C. § 1738.[12]  Only the Supreme Court may review such judgments – and, indeed, plaintiff did not pursue these matters in the Illinois Supreme Court, so as to lay the predicate for such review.  *See* 28 U.S.C. § 1257.  Applying principles akin to these, the Supreme Court in *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923) and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983), held that a lower federal court may not entertain an action that directly or in effect seeks to overturn a state court judgment.  The so-called *Rooker-Feldman* doctrine precludes "state-court losers" from challenging "state-court judgments rendered before the [Federal] proceedings commenced." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005); *see also Lance v. Dennis*, 546 U.S. 459, 460 (2006) (per curiam).  The doctrine deprives lower federal courts of jurisdiction not only over claims that are identical to those adjudicated in the state court, but also over claims that are "inextricably intertwined" with those that were subject of a state court judgment.  *See Feldman*, 460 U.S. at 482 n.16; *Lemonds v. St. Louis Cty.*, 222 F.3d 488, 493 (8th Cir. 2000), *cert. denied sub nom.*, *Halbman v. St. Louis Cty.*, 531 U.S. 1183 (2001).  A claim is "inextricably intertwined" if the federal claim succeeds only to the extent that the federal court must conclude that the state court erred or otherwise takes action that would render the state court judgment moribund.  *See Bianci v. Rylaarsdam*, 334 F.3d 895, 898 (9th Cir. 2003), *cert. denied*, 540 U.S. 1213 (2004); *Desi's Pizza v. Wilkes-Barre*, 321 F.3d 411, 419 (3d Cir. 2003).

        To be sure, the *Rooker-Feldman* doctrine applies only in "limited circumstances," *Exxon Mobile*, 544 U.S. at 291, where a party in the preceding state action effectively "seeks to take an appeal of an unfavorable state-court decision to a lower federal court," *Lance*, 546 U.S. at 466.  But, if there ever were a case in which this doctrine ought to apply, it is this case.  Mr. Hicks' state court case is over and the rulings rendered therein are long final.  Plaintiff's claim here is "inextricably intertwined" with those that were the subject of the state court rulings – it can succeed only to the extent this court either ignores the state rulings or concludes that the state courts wrongly decided that the Buffalo route should be included in the receivership and liquidated.  While plaintiff disagrees with these rulings, it seems plain that a collateral attack thereupon would not have been countenanced under state law, particularly given plaintiff's

---

[12]  In this regard, 28 U.S.C. § 1738 provides that –

        [J]udicial proceedings [of any court of any State] shall have the same full faith
        and credit in every court within the United States and its Territories and
        Possessions as they have by law or usage in the courts of such State . . .

*See also MGA*, 827 F.2d at 732 (describing this statute).  Notably, the Illinois courts apply essentially the same requirements for collateral estoppel as are applied in this circuit.  *See, e.g.*, *Gumma v. White*, 833 N.E. 2d 834, 843 (Ill. 2005); *Talirico v. Dunlap*, 685 N.E. 2d 325, 328 (Ill. 1997).

apparent failure to perfect a claim against the now dissolved MWT.[13]  Absent some special grant of ancillary jurisdiction (of which none is apparent), it is not for this court to suffer a collateral challenge that would be rejected out of hand by the courts of plaintiff's home state.  This is no court of cassation.

Even if the *Rooker-Feldman* doctrine is inapplicable, plaintiff's case still falters on more traditional collateral estoppel grounds.  *Rooker-Feldman* "does not otherwise override or supplant preclusion doctrine."  *Exxon*, 544 U.S. at 284.  "Under collateral estoppel," the Supreme Court has instructed, "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case."  *Allen v. McCurry*, 449 U.S. 90, 94 (1980).  The Federal Circuit has distilled this definition into a four-part test, under which the party invoking collateral estoppel (in this case, defendant) must show that:

> (1) the issue is identical to one decided in the first action; (2) the issue was
> actually litigated in the first action; (3) resolution of the issue was essential to a
> final judgment in the first action; and (4) the party against whom estoppel is
> invoked had a full and fair opportunity to litigate the issue in the first action.

*Innovad Inc. v. Microsoft Corp.*, 260 F.3d 1326, 1334 (Fed. Cir. 2001); *see Ammex, Inc. v. United States*, 384 F.3d 1368, 1371 (Fed. Cir. 2004) (same); *Jet, Inc. v. Sewage Aeration Sys.*, 223 F.3d 1360, 1365-66 (Fed. Cir. 2000), *cert. denied*, 544 U.S. 948 (2005) (same).  As the Supreme Court and other courts have often recognized, collateral estoppel "relieve[s] parties of the cost and vexation of multiple lawsuits, conserve[s] judicial resources, and, by preventing

---

[13]  As the Seventh Circuit made clear in another case involving Mr. Hicks –

> Under Illinois law, "a final judgment on the merits rendered by a court of
> competent jurisdiction acts as a bar to a subsequent suit between the parties
> involving the same cause of action."  *River Park, Inc. v. City of Highland Park*,
> 184 Ill. 2d 290, 234 Ill. Dec. 783, 703 N.E.2d 883, 889 (Ill. 1998) (citing *Rein v.
> David A. Noyes & Co.*, 172 Ill. 2d 325, 216 Ill. Dec. 642, 665 N.E.2d 1199, 1204
> (Ill.1996); *Rodgers v. St. Mary's Hosp.*, 149 Ill. 2d 302, 173 Ill. Dec. 642, 597
> N.E.2d 616, 620-21 (1992)).

*Hicks v. Midwest Transit, Inc.*, 479 F.3d 468, 471 (7th Cir. 2007).  In this case, the Seventh Circuit applied the doctrine of *res judicata* to preclude Mr. Hicks from relitigating claims involving the purported loan of money from Mr. Hicks to MWT.  *Id.* at 471-72.  Noteworthy, in terms of plaintiff's failure to perfect a claim, is 805 ILCS 5/12.75, which indicates that where a dissolving corporation notifies a known claimant of its dissolution and follows certain other procedural steps, a claimant who does not file a claim against a dissolving corporation "shall have no further rights against the dissolved corporation, its directors, officers, employees or agents, or its shareholders or their transferees."

inconsistent decisions, encourage[s] reliance on adjudication." *Allen*, 449 U.S. at 94.[14]  And, again under 28 U.S.C. § 1738, federal courts are required to give preclusive effect to state court judgments whenever the courts of the relevant State would do so, thereby "promot[ing] the comity between state and federal courts that has been recognized as a bulwark of the federal system." *Allen*, 449 U.S. at 96.

Here, all the prerequisites for applying collateral estoppel are met:  whether the Buffalo route was properly included in the receivership, subject to liquidation and should be transferred to Midwest Transport were all issues litigated in the state court action and essential to the judgments rendered therein.  *See Banner v. United States*, 238 F.3d 1348, 1354 (Fed. Cir. 2001); *Mother's Restaurant, Inc. v. Mama's Pizza, Inc.*, 723 F.2d 1566, 1571 (Fed. Cir. 1983) (holding that the requirement that prior determination was necessary excludes "the incidental or collateral determination of [] nonessential issue[s]").[15]  Plaintiff had a full and fair opportunity to litigate these issues in state court, *inter alia*, repeatedly contesting the rulings before the trial court and pursuing multiple appeals.  *See Shell Petroleum, Inc. v. United States*, 319 F.3d 1334, 1340 (Fed. Cir. 2003).  But, he was unsuccessful.  And, under the collateral estoppel doctrine, plaintiff is precluded from relitigating the same issues anew before this court.[16]

---

[14]  *See also Montana v. United States*, 440 U.S. 147, 153-54 (1979) (doctrine "preclud[ing] parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation of attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions"); *Warthen v. United States*, 157 Ct. Cl. 798, 798 (1962) (collateral estoppel is "grounded on the theory that one litigant cannot unduly consume the time of the court at the expense of other litigants, and that, once the court has finally decided an issue, a litigant cannot demand that it be decided again").

[15]  Lest the attentive reader think otherwise, both under Federal precedent, as well as Illinois law, a final appealable court order that resolves the merits of an issue is treated as the equivalent of a judgment for purposes of applying collateral estoppel.  *See Martin v. Dep't of Justice*, 488 F.3d 446, 455 (D.C. Cir. 2007); *EDP Medical Computer Sys., Inc. v. United States*, 480 F.3d 621, 625-26 (2d Cir. 2007); *Allianz Ins. Co. v. Guidant Corp.*, 900 N.E. 2d 1218, 1231-32 (Ill. App. Ct. 2008); *see also* Restatement (Second) Judgments § 13.

[16]  Even if the relief in the second suit is different than in the first, collateral estoppel can still apply where "'the question upon which the recovery of the second demand depends has, under identical circumstances and conditions, been previously concluded by a judgment between the parties or their privies.'"  *Corrigan v. United States*, 82 Fed. Cl. 301, 307 (2008) (quoting *New Orleans v. Citizens' Bank*, 167 U.S. 371, 396 (1897)).  Accordingly, it is of no moment that plaintiff, in the state court actions, directly challenged the receivership, liquidation and novation, and here predicates a breach of contract claim on the notion that the same actions were inappropriate.

In sum, before the state courts, plaintiff contested whether the Buffalo route should be subject to the MWT receivership – and he lost.  He then argued that the route should not be subject to the liquidation – and lost again.  And, finally, he objected when the court authorized the transfer of that route – and, once more, was worsted.  This case provides no opportunity for plaintiff to snatch victory from the jaws of defeat.[17]  Rather, once and for all, plaintiff must come to grips with what the state courts essentially held –  that, despite his firm's name being on the contractual documents, plaintiff was not the true owner of the Buffalo route, having long ago

---

[17]  In a proceeding before the United States District Court for the Southern District of Illinois, Mr. Hicks sought, *inter alia*, an order requiring the "return [of] Mail Contract 14024 to [his] possession and control."  *Hicks v. Midwest Transport, Inc.*, 2005 WL 1267463, at *3 (S. D. Ill. May 16, 2005).  Plaintiff notes that in that case, the district court preliminarily rejected application of the *Rooker-Feldman doctrine*, finding that the lawsuit before it did not invite district court review and rejection of any state court judgment.  *Id.* at *2.  Yet, the district court seemed to proceed from the false impression that *Rooker-Feldman* only precluded it from directly overturning the state court judgments, but did not prevent if from reviewing a "judgment *for alleged errors of law* committed in the exercise of that jurisdiction."  *Id.* (emphasis in original).  With all due respect, this formulation of the *Rooker-Feldman* doctrine appears to be unduly cramped.  The district court went on to consider whether the doctrine of *res judicata* applied to the state court rulings.  It declined to apply the doctrine, holding that the state court rulings did not determine who owned the Buffalo route, but merely "reflect[ed] the state court's preliminary judgment to maintain the status quo pending the final resolution of that case."  *Id.* at *3.  While plaintiff emphasizes the quoted passage, it ignores the following paragraph in which the district court caveated:

> All this is not to say, of course, that Midwest Transport's instincts might not be correct.  That's why the court hinted that Midwest Transport's motion is denied based on the information presented up to this point.   Indeed, it's hard to believe that the Illinois circuit court – and the Postal Service, for that matter – would've stood by or actively participated in a novation which allegedly erroneously assumed Midwest Transit owned the Buffalo route when that route was in fact owned by Hicks.  If the Buffalo route was Hicks' personal property, perhaps Illinois law required him to make a claim with the circuit court on pain of losing the claim forever.  See, e.g., 805 ILCS 5/12.75.  Alternatively, maybe some other state-court decision exists which squarely resolves Hicks' rights to the Buffalo route vis-a-vis Midwest Transit.  So to the extent these considerations apply, Midwest Transport is invited to move for summary judgment later.

*Id*. at *4.  A review of the opinion, in fact, suggests that the district court had before it only a small portion of the evidence in the record here, persuading this court that the district court, faced with a fuller record, would have ruled otherwise.

effectively ceded his rights and obligations under the contract to MWT.[18]  Mr. Hicks, therefore, was not entitled to any performance under that contract at the time he claims it was breached.  In other words, the foundational predicate for demonstrating a breach of contract – that plaintiff had a valid contract with the government at the time of the alleged breach – is absent here.

**B.**

Even if plaintiff could overcome this first hurdle, it is difficult to see how the novation resulted in a breach.

The Restatement (Second) of Contracts defines a "novation" as a "substituted contract that includes as a party one who was neither the obligor nor the obligee of the original duty." Restatement (Second) of Contracts § 280.  A novation is a new contractual relation that has four requisites:  (i) a previous valid obligation; (ii) the agreement of all the parties to the new contract; (iii) the extinguishment of the old contract; and (iv) the validity of the new one.  *Cincinnati Ins. Co. v. Leighton*, 403 F.3d 879, 887 (7th Cir. 2005) (applying Illinois law); *see also* Richard A. Lord, Williston on Contracts §76:11 (9th ed. 2004).  While the second of these requirements has

_____

[18]  Plaintiff repeatedly emphasizes that a Federal statute (and Postal Service policy) prohibited the assignment of the contract.  To be sure, the Anti-Assignment Act, 41 U.S.C. § 15(a), provides that "[n]o contract, or order, or any interest therein, shall be transferred by the party to whom such contract or order is given to any other party, and any such transfer shall cause the annulment of the contract or order transferred, so far as the United States is concerned."  *See also* 31 U.S.C. § 3727 (prohibiting the assignment of claims).  Yet, in invoking this statute, plaintiff, like old Dobbins, seemingly dons blinders to what he actually did here:  at a time when MWT was ineligible to bid on the contract because it lacked the appropriate safety rating, Mr. Hicks bid instead on the contract and then promptly shifted virtually every aspect of the performance of the route to MWT.  And he did this even though the proposal, which he signed, stated, in no uncertain terms, that "the bidder/offeror certifies that this proposal is made in his own interest and not by him as the representative of another person or company."  As such, it was plaintiff, and not the Illinois courts, who first assigned the Buffalo route to a third party – seemingly in violation of the very statute that plaintiff now invokes.  That said, it is important to note that the bar of the Anti-Assignment Act is not as absolute as one might think.  In fact, under the decisional law, defendant here was empowered to recognize an assignment if it wished – either plaintiff's assignment to MWT or MWT's assignment to Midwest Transport.  *See Delmarva Power & Light Co. v. United States*, 542 F.3d 889, 894 (Fed. Cir. 2008), *cert. denied*, 129 S.Ct. 2050 (2009); *Tufco Corp. v. United States*, 614 F.2d 740, 745-46 (Ct. Cl. 1980); *L-3 Communications Integrated Sys., L.P. v. United States*, 84 Fed. Cl. 768, 776 n.13 (2008).  And that recognition could – and, in fact, did – take the form of a novation.  *See L-3 Communications*, 84 Fed. Cl. at 776 n.13; *Westinghouse Elec Co. v. United States*, 56 Fed. Cl. 564, 569 (2003).  Accordingly, far from assisting plaintiff, the Anti-Assignment Act adds further weight to the conclusion that plaintiff did not possess rights against the United States at the time of the claimed breaches.

been construed as requiring the assent of the original contracting parties, that is but to emphasize that a novation cannot be achieved unilaterally. Various cases, indeed, hold, that the putative holder of a contract may be supplanted by operation of state law. And if so supplanted, it is the successor in interest, and not the original contract signatory, who must assent to the novation. *See In re Transit Cas. Co.*, 900 S.W.2d 671, 675 (Mo. App. 1995) (receiver could enter into novation with court approval); *see also L-3 Communications Integrated Sys.*, 84 Fed. Cl. at 777-78. Logic suggests that these rules apply to receivers, who as an arm of the court, stand in the shoes of the received entity. *See Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 626 (6th Cir. 2003); *Shanahan v. Hattam*, 77 N.E. 567, 568 (Ill. App. Ct. 1948).

Based on these cases, the court has little difficulty concluding that the novation entered into by the receiver, Midwest Transport and the Postal Service was effective. Again, the state court rulings preclude a contrary finding, as they essentially laid the predicates for the novation. As the novation was valid, defendant cannot be liable for any alleged breach of the original contract that occurred subsequent thereto. It is hornbook law, after all, that a "novation operates to discharge the prior agreement." Williston, *supra* at §76:40; *see also* Restatement (Second) of Contracts § 280 cmt. b. ("novation discharges the original duty"). As such, any duties previously owed by the Postal Service to Mr. Hicks were extinguished by the novation, such that any subsequent nonperformance of the contract did not give rise to a breach. *See Newkirk v. Village of Steger*, 536 F.3d 771, 775 (7th Cir. 2008) (citing *Phillips & Arnold, Inc. v. Federick J. Borgsmiller, Inc.*, 123 Ill. App. 3d 95 (1984)); *Cincinnati Ins. Co. v. Leighton*, 403 F.3d 879, 887 (7th Cir. 2005) (citing *Faith v. Martoccio*, 316 N.E. 2d 164, 167 (Ill. App. Ct. 1974)). This effectively spells the end to plaintiff's claim that the novation represented an anticipatory breach.

But, what of his claim that defendant's consent to the novation itself effectuated a breach of the original contract? Thus, plaintiff asserts that "[h]aving no power or authority to enter into a novation absent consent and authorization from Hicks, the Postal Service disregarded its own rules and was complicit in the scheme organized by [Midwest Transport] to improperly acquire Mr. Hicks' personal asset – the Buffalo Contract." Plaintiff neither expounds on this point nor, for that matter, provides the slightest evidentiary support for his claim that the Postal Service was engaged in some "scheme." And for good reason – as there is no such credible evidence in the record. Nevertheless, assuming *arguendo* plaintiff was the owner of a contract that could be breached, the court does not believe that the Postal Service's agreement to novate itself gave rise to a breach.

This is not because, as defendant claims (sans citation), its actions were "reasonable" under the circumstances. In the words of a famous commentator – "[l]iability for breach of contract is, *prima facie*, strict liability; the promisor promises in effect either to perform or to compensate the promisee for the cost of nonperformance." Williston, *supra* at §63:8 (emphasis added); *see also Patton v. Mid-Continent Sys., Inc.*, 841 F.2d 742, 750 (7th Cir. 1988); Restatement (Second) Contracts § 235 cmt. b. Nor is this finding predicated upon the fact that, contrary to plaintiff's claims, the Postal Service appears to have had the authority, both via the state court orders and under its own regulations, to enter into the novation. Rather, the  novation

did not effectuate a breach of the earlier contract because the government's obligations thereunder were discharged under an impossibility or impracticability defense.

A party has no duty to perform a contractual obligation if "performance is rendered impossible or impracticable, through no fault of the party, because of a fact, existing at the time the contract was made, of which the party neither knew nor had reason to know and the non-existence of which was a basic assumption of the party's agreement." *Mass. Bay Transp. Auth. v. United States*, 254 F.3d 1367, 1372 (Fed. Cir. 2001) (citing *United States v. Winstar Corp.*, 518 U.S. 839, 904 (1996)); *see also Hercules, Inc. v. United States*, 24 F.3d 188, 204 (Fed. Cir. 1994), *aff'd*, 516 U.S. 417 (1996); Restatement (Second) of Contracts § 261. A contract is commercially impracticable when performance would cause "extreme and unreasonable difficulty, expense, injury, or loss to one of the parties," or when "all means of performance are commercially senseless." *Raytheon Co. v. White*, 305 F.3d 1354, 1367 (Fed. Cir. 2002) (citing, *inter alia*, Restatement (Second) of Contracts § 261 cmt. d). It is well-recognized that this defense lies where "performance of a duty is made impracticable by having to comply with a domestic . . . governmental . . . order." *Id.* at § 264; § 264 cmt. a ("if a supervening governmental action prohibits a performance or imposes requirements that make it impracticable, the duty to render that performance is discharged"). "Under this doctrine, the entry of a judicial order that renders performance legally impossible excuses the party who must perform as long as [it] did not cause or fail to prevent the entry of the judicial order." *In re Martin Paint Stores*, 199 B.R. 258, 266 (Bankr. S.D.N.Y. 1996).[19]

At the point where the novation was executed and plaintiff claims a breach occurred, the Postal Service no longer had a practicable option to perform under the original contract. By that time, the mail delivery contract had become part of the liquidating receivership and had been transferred under the purchase agreement, as authorized by specific state court order, to Midwest Transport. The state court orders which rendered impractical the performance of the original contract, were in no way procured by defendant. Nor is there the slightest indication that at the time of the formation of the contract, the Postal Service was aware of the potential for such a dispute and assumed that risk. In these circumstances, at least by the time of the novation, defendant's performance of any duties still owed Mr. Hicks was rendered impracticable, discharging those duties and precluding plaintiff from demonstrating that a breach occurred when the Postal Service agreed to the novation. *See id.* at 266 (holding that impossibility defense relieved party of liability for breach of lease where a court had approved the assumption of the lease and its assignment to a third party). To rule otherwise would be to suggest not only that the Postal Service should have discounted a half dozen or more state court orders, but that it was

---

[19]   *See also Organizacion JD Ltda. v. U.S. Dep't of Justice*, 18 F.3d 91, 95 (2d Cir.), *cert. denied*, 512 U.S. 1207 (1994); *Leon County v. Gluesenkamp*, 873 So. 2d 460, 464 (Fla. Dist. Ct. App. 2004) (applying this rule where a court order made performance impracticable); *Wien Air Alaska v. Bubbel*, 723 P.2d 627, 630 (Alaska 1986); Restatement (Second) Contracts § 264 illustr. 4; *and see* Restatement (First) of Contracts § 458 (1932) (contractual duty is discharged where performance is subsequently prevented or prohibited by "judicial decision").

obliged to do so in the face of considerable evidence that plaintiff had acted fraudulently in the past and had never used his own staff or equipment to perform the contract in question. Plaintiff neither had the right to impose unilaterally these changed circumstances on the Postal Service, nor to require the agency to rebuff the novation and instead take the contractual equivalent of a Kierkegaardian leap of faith in allowing plaintiff to perform a contract that he had never performed before. And the Postal Service had every right to expect that it would not be held liable for complying with valid state court orders.[20]

For the reasons stated, plaintiff thus also has failed to demonstrate that the Postal Service breached any duties or obligations owed him.

## C.

Finally, there is the matter of damages – or, to be more specific, whether plaintiff adequately proved that he was damaged by an alleged breach. Plaintiff, of course, has the burden of proof on this count, as well. *See Fifth Third Bank v. United States*, 518 F.3d 1368, 1374-75 (Fed. Cir. 2008); *San Carlos Irr. and Drainage Dist.*, 111 F.3d at 1563. His proof consisted almost entirely of his own testimony, unsupported by any receipts or other documentary evidence, expert testimony or even corroborating factual witnesses. Given the analysis above, pointing out the inadequacies in this proof is perhaps asking to be flagged for "piling on." Yet, those deficiencies are many and the court feels compelled to explain why, even had plaintiff established liability here, he would not have recovered any damages.

We begin with common ground. "The general rule in common law breach of contract cases," the Federal Circuit has oft-stated, "is to award damages sufficient to place the injured party in as good a position as he or she would have been had the breaching party fully performed," *San Carlos Irr.*, 111 F.3d at 1562-63, in short, to give the injured party "the benefits [it] expected to receive had the breach not occurred." *Glendale Federal Bank, FSB v. United States*, 239 F.3d 1374, 1380 (Fed. Cir. 2001), *cert. denied*, 544 U.S. 904 (2005) (citing Restatement (Second) of Contracts, at § 344(a)); *see also Franconia Assocs. v. United States*, 61 Fed. Cl. 718, 746 (2004). Conversely, it is also axiomatic that "the non-breaching party should not be placed in a better position through the award of [expectancy] damages than if there had

---

[20] In his supplemental brief, plaintiff asserts that defendant waived any arguments regarding impracticability or impossibility of performance because they were not affirmatively pled in defendant's answer. To be sure, such defenses appear to constitute "avoidance or affirmative defense[s]" within the meaning of RCFC 8(c) (although they are not listed among the litany of examples of such defenses contained in RCFC 8(c)(1)). *See* Williston, *supra*, at § 77:6. But, even if this is true, the facts that are relevant to these defenses and, with them, the implications of the state court orders, were heavily litigated throughout this case and were thoroughly explored by the parties during the trial. In the court's view, then, the issues regarding the impracticability or impossibility of performance here were tried by consent. *See* RCFC 15(b)(2); *see also Nanavati v. Brudette Tomlin Mem. Hosp.*, 857 F.2d 96, 104 (3d Cir. 1988).

been no breach." *Bluebonnet Sav. Bank, FSB v. United States*, 339 F.3d 1341, 1345 (Fed. Cir. 2003). The Federal Circuit has further elucidated – "[t]he benefits that were expected from the contract, 'expectancy damages,' are often equated with lost profits, although they can include other damage elements as well." *Glendale Fed. Bank*, 239 F.3d at 1380 (citing Restatement (Second) of Contracts, § 347); *see also Energy Capital Corp. v. United States*, 302 F.3d 1314, 1324 (Fed. Cir. 2002). To recover lost profits for breach of contract, the plaintiff must establish by a preponderance of the evidence that: "(1) the loss was the proximate result of the breach; (2) the loss of profits caused by the breach was within the contemplation of the parties because the loss was foreseeable or because the defaulting party had knowledge of special circumstances at the time of contracting; and (3) a sufficient basis exists for estimating the amount of lost profits with reasonable certainty." *Id.* at 1325; *see also Cal. Fed. Bank, FSB v. United States*, 245 F.3d 1342, 1349 (Fed. Cir. 2001), *cert. denied*, 534 U.S. 1113 (2002); *Chain Belt Co. v. United States*, 115 F. Supp. 701, 714 (Ct. Cl. 1953).

Undoubtedly sensing the weaknesses in his proof, plaintiff is quick to point out that the Federal Circuit has oft-observed that "[t]he ascertainment of damages is not an exact science, and where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision." *Bluebonnet Sav. Bank, FSB v. United States*, 266 F.3d 1348, 1355 (Fed. Cir. 2001); *see also Franconia Assocs.*, 61 Fed. Cl. at 746. "'It is enough,'" that court has also instructed, "'if the evidence adduced is sufficient to enable a court . . . to make a fair and reasonable approximation.'" *Elec. & Missile Facilities, Inc. v. United States*, 416 F.2d 1345, 1358 (Ct. Cl. 1969) (quoting *Specialty Assembling & Packing Co., Inc. v. United States*, 355 F.2d 554, 572 (Ct. Cl. 1966)); *see also Seaboard Lumber Co. v. United States* , 308 F.3d 1283, 1303 (Fed. Cir. 2002). Accordingly, "[i]f a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery . . . ." *Ace-Federal Reporters, Inc. v. Barram*, 226 F.3d 1329, 1333 (Fed. Cir. 2000) (quoting *Locke v. United States*, 283 F.2d 521, 524 (Ct. Cl. 1960)); *see also Glendale Federal Bank, FSB*, 378 F.3d at 1313. Yet, while these statements unquestionably confirm that Talismanic precision is not required in determining damages, that is a far cry from saying that a back-of-the-napkin calculation suffices for this purposes – particularly one unaccompanied by even a shred of corroborating evidence.

Conceivably, the oral testimony of a single credible witness might be sufficient to support a damages determination, even without further documentation. Several cases suggest as much. *See, e.g.*, *Hollywood Fantasy Corp. v. Gabor*, 151 F.3d 203, 215 (5th Cir. 1998) (noting that oral testimony could be competent evidence of damages for breach of contract without documentation); *Bonjorno v. Kaiser Aluminum & Chem. Corp.*, 518 F. Supp. 102, 114 (E.D. Pa. 1981) (finding testimony of owner of damaged business may be sufficient to support a verdict on damages where owner is qualified by experience and position to make damages estimates); *see also Elliott v. United States*, 184 Ct. Cl. 298, 304 (1968) (awarding $50 of breach damages based upon uncorroborated oral testimony). Other cases, however, exhibit a hesitancy to award lost profits, let alone other forms of damages, based upon such scant testimony. *See Racicky v. Farmland Indus., Inc.*, 328 F.3d 389, 398 (8th Cir. 2003); *In re Lightfoot*, 399 B.R. 141, 150 (Bankr. E.D. Pa. 2008). Fortunately, the court need not reconcile these various cases. That is

because, unlike in these cases, the single witness who testified for plaintiff on this count – Mr. Hicks himself – was **not** credible.  Indeed, he was utterly incredible for several reasons.

For one thing, his testimony at trial was contradicted by various documents in the record, as well as other reliable testimony.  For example, Mr. Hicks repeatedly assured the court that he, not MWT, operated the Buffalo route – that his "employees started the Buffalo route for sure, and they were paid by me" and that he personally owned "[a]ll the equipment – the tractors, the trailers, the tires, the wheels, everything that was operating the Buffalo route" "up and to and through 2003."  Yet, under cross-examination, Mr. Hicks contradicted himself, readily admitting for example, that by no later than 1998, the employees who ran the route were paid by MWT and that he was turning the money received from the Postal Service over to MWT.[21]  Janie Ensminger, a MWT employee whose name appears on the signature line of the renewals of the contract in question and who performed payroll and other administrative functions for MWT for the Buffalo route, convincingly testified that it was MWT all along which had operated the contract:

> Q:      [W]hat is your understanding of which entity actually performed
>          Contract 14024 after 1992 or so?
>
> A:      Midwest Transit hired the drivers.  They were hired.  Their driver
>          packets had Midwest Transit on them.  They were put on the
>          Midwest Transit payroll. Midwest Transit paid for the fuel and
>          furnished the equipment.  We operated the contract.

And, unlike Mr. Hicks, Ms. Ensminger's assertions were backed up by documents, including contemporaneous submissions to the Postal Service and pay stubs.  She also confirmed that when Mr. Hicks would receive checks for the Buffalo route from the Postal Service, "[h]e would deposit them in his personal account and then have his secretary write Midwest Transit a check

---

[21]  For example, Mr. Hicks testified –

> Q:      So in 1998, all of the employees who operated the Buffalo route were Midwest
>          Transit employees?
>
> A:      I'm thinking that's fairly close to a fair statement. They were Hal Hicks'
>          employees, but paid by Midwest Transit because all I was doing was reimbursing
>          them the money.
>
> Q:      Reimbursing them money.  So you would get a check from the Postal Service, and
>          you would give an equivalent amount to Midwest Transit?
>
> A:      That's right.  I would try to.  That's right.  Close enough.

for that same amount of the check that he got from the Postal Service."[22]  Of course, it is highly unlikely that plaintiff would have done this if, as he blithely claims, it was he and not MWT that was actually operating the Buffalo route.  A like use of blinders underlies Mr. Hicks' claims regarding other aspects of what occurred in the state court proceedings.  A prime example of this was Mr. Hicks' repeated claim that the state court had never authorized the sale of the Buffalo route – when, in fact, it plainly did.[23]

While none of this testimony directly involved damages, the extent to which Mr. Hicks was willing to engage in palter and cavil obviously impact his overall credibility, and thus his testimony on damages, as well.  Indeed, the latter testimony – again, the only evidence offered by plaintiff on this subject – was fraught with its own set of problems.  The first indication of this was the wild variation in the amount of damages Mr. Hicks claimed – from the $10 million he initially sought in his certified claim with the Postal Service, to the $3.84 million he derived with a hand calculator and a piece of paper during his direct testimony, back to the $10 million that he attempted to rationalize during his cross-examination, and, ultimately, to the $3.2 million he now seeks in his post-trial brief.

While Mr. Hicks periodically claimed that the lower numbers in this series were "conservative," it is readily apparent that the variations in his figures are more attributable to the speculative values he assigned to the components in his damage calculation.  For example –

---

[22]  When pressed about this response on cross-examination, Ms. Ensminger explained that Mr. Hicks' secretary "sent me a copy of the actual check he got from the Postal Service along with the check that he wrote out to Midwest Transit so I'd know for sure we were getting the proper amount of money from the Postal Service for our services."  And she confirmed that this practice began in 1992.

[23]  In this regard, at one point, Mr. Hicks testified as follows:

Q:     Mr. Theil asked you a question to the effect of was it your testimony that the Buffalo route was never included and judicially authorized for sale as an asset of Midwest Transit.  Do you recall that?

A:     Judicially authorized for sale.  I'll have to answer that first.  I am positive that the Judge never judicially authorized my mail route, which he knew was mine, for sale.  I'm positive of that.

When confronted with documents that contradicted his testimony, Mr. Hicks initially claimed that they were "forgeries" – an assertion that his counsel quickly retreated from when it was observed that some of the same documents had previously been offered by plaintiff in support of his earlier motion for summary judgment.

- Mr. Hicks testified that he was entitled to lost profits equal to twenty percent of the revenue to be generated from the contract per year.  His calculation of that figure, however, vacillated.  At one point, he used a revenue figure of $1.9 million per year, then, on cross-examination asserted that the gross revenue was $2.5 million per year.  At various points in his testimony, he also asserted he was entitled to such profits for 4 years, 5 years, 5.5 years and 8 years.  And, in his post-trial brief, Mr. Hicks seeks profits over a period of 3.81 years.  Evidence in the record, however, suggests that the actual gross revenue from the Buffalo route was much lower – between $1.5 and 1.75 million per year – and with absolutely no indication in the record that profits of twenty percent were ever actually earned on the contract or could reasonably be expected.

- In other damage calculations, Mr. Hicks sought to recover some quantity associated with the trucks and trailers he allegedly purchased to perform the Buffalo route.  At times, though, he testified that what he was seeking was the cost of acquiring that equipment, while at other points, he appeared to testify that what he was seeking was the lost income associated with those vehicles.  Particularly confusing was testimony in which he appeared to mix these concepts, that is, calculating the income lost from the trucks apparently standing idle by reference to the cost of acquiring them – a particularly odd calculation as there was no correlation between the term of the loans purportedly used to acquire the trucks and the period for which Mr. Hicks claimed lost income.[24]  Similar

---

[24]  On direct testimony, Mr. Hicks, responding to a question as to what he believed his damages were, testified that he bought trucks to start the Buffalo route and then proceeded to explain as follows:

When we buy trucks, they were approximately $100,000 a truck, tractor.  You would finance it for 84 months.  The rate of interest [was] 8 percent.  So add that to the amount, take that over 84 months, which is seven years, you're looking at payment of around $1,800 or so on a monthly basis, and so I always took into account with that being the case about $60 a day for a truck on a daily basis.

\*          \*          \*          \*          \*

Well, it takes a minimum of eight tractors, so without calculating it overboard, that's what the contract calls for . . . use that number to be fair and use the same payment at 1,800, which is about $60 a day a truck, and set aside then without the

confusion was engendered by his testimony regarding trailers.
And, of course, his testimony on this component of his damages
was contradicted by evidence that the trucks used to operate the
Buffalo route were not owned by him, but by MWT.

- In some of his damage calculations, Mr. Hicks also included
$75,000 for "start-up costs," a figure that apparently covered the
cost of making certain alterations to the trucks used on the Buffalo
route and moving equipment to Buffalo.  Yet, it is difficult to see
how Mr. Hicks could have incurred such start-up costs on a route
that the evidence indicates he did not operate.  Moreover, under
cross-examination, Mr. Hicks admitted that the costs he was
seeking to recover were incurred in 1992, when he first purportedly
received the Buffalo route and that he "hoped [he had] initially
recovered them."

These three points barely scratch the surface in illustrating the extent to which Mr. Hicks'
testimony varied inconsistently over the course of trial and ultimately was contradicted by other
probative evidence.  Accordingly, if the court were required to determine damages here – which
it is not – it would find it difficult to begin.

Finally, in terms of assessing credibility, the court simply cannot ignore Mr. Hicks' past
history of making false statements.  Under Federal Rule of Evidence 609(a)(2), evidence of a
prior conviction for a crime involving "dishonesty or false statement" may be admitted for the
purpose of attacking a witnesses' credibility.[25]  In the court's view, it is thus probative that, in
2006, Mr. Hicks pled guilty to: (i) making knowingly and willfully a false statement to the Postal
Service, in submitting a  fuel use certification for a route other than the Buffalo route, in which
Mr. Hicks overstated the price of fuel purchased, in violation of 18 U.S.C. § 1001; and

---

mail route, that's been 66 months as of this month right there, just the trucks alone
the income off the trucks would be $950,000.

On cross-examination, Mr. Hicks then testified that he knew "the trucks were about 1.9 million,"
adding that this number is "what those trucks . . . would have generated in revenues to me if I
were to have rented them to Midwest Transit to operate this mail route."

[25] According to the Advisory Committee Notes on the 1990 Amendment to Rule
609(a)(2), by "dishonesty and false statement," the Conference Committee meant "crimes such as
perjury, subornation or perjury, false statement, criminal fraud, embezzlement, or false pretense,
or any other offense in the nature of *crimen falsi*, commission of which involves some element of
deceit, untruthfulness, or falsification bearing on the accused's propensity to testify truthfully."
*See also Walker v. Horn*, 385 F.3d 321, 332 (3d Cir. 2004), *cert. denied*, 599 U.S. 1021 (2005).

(ii) signing and filing his tax return for 1998, knowing that the return was false in not reporting the income he had received through the false fuel certification, in violation of 26 U.S.C. § 7201(1).[26]  If this were not enough, a series of electronic messages in the record reveals that Mr. Hicks demanded payment of Buffalo route funds from the Postal Service in 2004, knowing full well that, under various court orders, he was not entitled to those funds.  Perhaps this past tendency to stretch facts explains Mr. Hicks' evasiveness and willingness to indulge in casuistry while testifying before this court.  Again, a prime example of this was his claim that the Buffalo route was operated by his employees, even though, on cross-examination, he admitted that those employees were paid for and accounted by MWT (which pay stubs and accounting records confirmed).

Given the telltales that permeate the record, the court thus totally discounts, as incredible, plaintiff's self-serving and entirely uncorroborated testimony regarding damages.  Even if the court were convinced to give this testimony some weight, the sketchy details presented by plaintiff fall far short of that required to demonstrate entitlement to lost profits.  In no way did plaintiff show, for example, that such profits "would have accrued and grown out of the contract itself, as the direct and immediate result of its fulfillment."  *Energy Capital*, 302 F.3d at 1328; *see also Wells Fargo v. United States*, 88 F.3d 1012, 1022-23 (Fed. Cir. 1996); *Franconia Assocs.*, 61 Fed. Cl. at 747.  Nor did he "definitely establish[] that he would have made the profits claimed, absent any alleged breach."  *California Fed. Bank, FSB v. United States*, 245 F.3d 1342, 1349 (Fed. Cir. 2001), *cert. denied*, 520 U.S. 1116 (1997) (quoting *Neely v. United States*, 285 F.2d 438, 443 (1961)).  Rather, he simply assumed that, no matter what he encountered in terms of business volume and costs, he would have derived twenty-percent profit – precisely the sort of assumption "fraught with speculation" that the case law has been unwilling to indulge.  *Oiness v. Walgreen* Co., 88 F.3d 1025, 1029-30 (Fed. Cir. 1996); *see also, e.g.*, *Shockley v. Arcan, Inc.*, 248 F.3d 1349, 1363 (Fed. Cir. 2001).  And this failure of proof supplies yet another reason why this court must reject plaintiff's breach of contract claim.

---

[26]  While defendant made glancing references to this conviction in its opening statement and a few questions, it never introduced several marked exhibits that related to this case.  Nonetheless, the court is able to take judicial notice of Mr. Hicks' plea based upon documents available through the docket of *United States of America v. Hal Dawson Hicks*, Criminal No. 05-40023-JPG, United States District Court for the Southern District of Illinois, *to wit*:  Indictment (filed Apr. 7, 2005); Plea Agreement (filed Jan. 12, 2006); Amended Stipulation of Facts (filed Feb. 3, 2006); and Judgment in a Criminal Case (filed Sep. 21, 2006).  The information in these documents constitute "adjudicative fact[s]" that are "capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned under Federal Rule of Evidence 201(b)(2)."  *See United States v. Booker*, 543 U.S. 220, 244 (2005); *United States v. Perkins*, 548 F.3d 510, 516 (7th Cir. 2008); *United States v. Black*, 482 F.3d 1035, 1041 (9th Cir. 2007).

**III.    CONCLUSION**

The court will not gild the lily, for this is not a close case.  The court finds that plaintiff has not met his burden of demonstrating that a breach of the Buffalo route service contract occurred here and that he was damaged thereby.  The Clerk is hereby ordered to dismiss the complaint.

**IT IS SO ORDERED**.

s/ Francis M. Allegra
Francis M. Allegra
Judge